**Oral Argument Not Yet Scheduled**
**No. 18-7154**

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

◆◆

PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED,

*Petitioner-Appellee,*

—v.—

FEDERAL REPUBLIC OF NIGERIA and MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA,

*Respondents-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 18-cv-0594 (HON. CHRISTOPHER R. COOPER)

## JOINT APPENDIX

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP

KEVIN A. MEEHAN                JOSEPH D. PIZZURRO
JUAN O. PERLA                 1717 Pennsylvania Avenue, NW
101 Park Avenue               Washington, DC 20006
New York, NY 10178            (202) 452-7373
(212) 696-6000                jpizzurro@curtis.com

*Attorneys for Respondents-Appellants Federal Republic of Nigeria and Ministry
of Petroleum Resources of the Federal Republic of Nigeria*

*(Counsel continued on inside cover)*

KOBRE & KIM LLP

MICHAEL S. KIM
JOSEF M. KLAZEN
1919 M Street NW
Washington, DC 20036
(202) 664-1900
michael.kim@kobrekim.com
josef.klazen@kobrekim.com

—and—

DARRYL GLEN STEIN
800 Third Avenue, 6th Floor
New York, NY 10022
(212) 488-1200
darryl.stein@kobrekim.com

*Attorneys for Petitioner-Appellee*
  *Process and Industrial*
  *Developments Limited*

# TABLE OF CONTENTS

PAGE

Civil Docket for Case No. 1:18-cv-00594-CRC ...................................................JA-1

P&ID's Petition to Confirm Arbitration Award (March 16, 2018) (DE 1) .........JA-7

Declaration of Seamus Ronald Andrew in Support of P&ID's Petition to
    Confirm Arbitration Award (March 16, 2018) (DE 3) ...........................JA-22

    Exhibit 1: Gas Supply and Processing Agreement
    (January 11, 2010) (DE 3-1) ....................................................................JA-29

    Excerpt from Exhibit 2: P&ID's Letter to Minister of Petroleum
    Resources Referring Matter to Arbitration
    (August 22, 2012) (DE 3-2, pp. 1-5) ......................................................JA-52

    Exhibit 7: Arbitral Tribunal's Part Final Award on Jurisdiction
    (June 2014) (DE 3-7) ...............................................................................JA-57

    Exhibit 8: Arbitral Tribunal's Part Final Award on Liability
    (July 17, 2015) (DE 3-8) ..........................................................................JA-74

    Exhibit 9: Nigeria's Application to Set Aside Liability Award
    in London Commercial Court (December 23, 2015) (DE 3-9) .............JA-101

    Exhibit 10: London Commercial Court's Order Dismissing
    Nigeria's Application to Set Aside Liability Award
    (February 10, 2016) (DE 3-10) ...............................................................JA-130

    Excerpt from Exhibit 11: Nigeria's Application to Set Aside
    Liability Award in Federal High Court of Nigeria
    (February 24, 2016), excluding exhibits (DE 3-11, pp. 1-10) ..............JA-133

    Exhibit 12: Arbitral Tribunal's Procedural Order No. 12 on Seat of
    Arbitration (April 26, 2016) (DE 3-12) .................................................JA-143

    Exhibit 13: Nigerian Court's Order Granting Nigeria's Application
    to Set Aside Liability Award (May 24, 2016) (DE 3-13) .....................JA-161

PAGE

Exhibit 14: Email from Arbitral Tribunal Requesting Nigeria's
Confirmation of Continued Participation in Arbitral Proceedings
(May 27, 2016) (DE 3-14) ...................................................................JA-165

Exhibit 15: Email from Nigeria to Arbitral Tribunal Confirming
Continued Participation in Arbitral Proceedings
(June 21, 2017) (DE 3-15) ...................................................................JA-167

Excerpt from Exhibit 16: Email from Arbitral Tribunal
Acknowledging Issue of Seat of Arbitration
(April 19, 2016) (DE 3-16, pp. 42-43) .................................................JA-169

Excerpt from Exhibit 16: Nigerian Court's Order Granting
Nigeria's Application to Enjoin the Arbitration Pending Resolution
of the Set-Aside Application (April 20, 2016) (DE 3-16, pp. 44-46) ...JA-172

Excerpt from Exhibit 16: Emails from Nigeria and P&ID Advising
the Tribunal of the Nigerian Court's Injunction
(April 21, 2016) (DE 3-16, pp. 47-48) .................................................JA-175

Exhibit 17: Arbitral Tribunal's Final Award on Damages
(January 31, 2017) (DE 3-17) ..............................................................JA-177

Exhibit 18: Dissenting Final Award of Bayo Ojo, SAN on Damages
(January 31, 2017) (DE 3-18) ..............................................................JA-214

Nigeria's Notice of Motion to Dismiss P&ID's Petition for Lack of
Jurisdiction under the Foreign Sovereign Immunities Act
(August 27, 2018) (DE 28) ..................................................................JA-224

District Court's Opinion and Order (October 1, 2018) (DE 34) ....................JA-226

Nigeria's Notice of Appeal (October 5, 2018) (DE 35) ..................................JA-231

District Court's Opinion and Order (November 1, 2018) (DE 40) .................JA-234

ii

APPEAL,STAYED,TYPE-E

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:18–cv–00594–CRC

PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED
v. FEDERAL REPUBLIC OF NIGERIA et al
Assigned to: Judge Christopher R. Cooper
Case in other court:  18–07154
Cause: 09:0202 Award under Convention on Foreign Arbitral
Awards

Date Filed: 03/16/2018
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Petitioner**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**                represented by        **Michael S. Kim**
KOBRE & KIM LLP
1919 M Street, NW
Suite 410
Washington, DC 20036
(202) 664–1900
Fax: (202) 664–1920
Email: michael.kim@kobrekim.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Josef Maxim Klazen**
KOBRE & KIM LLP
1919 M Street, NW
Suite 410
Washington, DC 20036
202–664–1900
Email: jef.klazen@kobrekim.com
*ATTORNEY TO BE NOTICED*

**Marcus Johnson Green**
KOBRE & KIM, LLP
800 Third Avenue
6th Floor
New York, NY 10022
(212) 488–1200
Email: marcus.green@kobrekim.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**FEDERAL REPUBLIC OF NIGERIA**                represented by        **Joseph Dominic Pizzurro**
CURTIS, MALLET–PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 452–7373
Fax: (202) 452–7333
Email: jpizzurro@curtis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Juan Otoniel Perla**
CURTIS, MALLET–PREVOST, COLT &
MOSLE, LLP
101 Park Avenue
New York, NY 10178–0002
(212)696–6170

**JA-1**

Fax: (212)697–1559
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Arthur Meehan**
CURTIS, MALLET–PREVOST, COLT
AND MOSLE, LLP
101 Park Avenue
New York, NY 10178
212–696–6000
Fax: 212–697–1559
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Respondent**

| | | |
|---|---|---|
| **MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA** | represented by | **Joseph Dominic Pizzurro** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Juan Otoniel Perla** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |
| | | **Kevin Arthur Meehan** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/16/2018 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA ( Filing fee $ 400 receipt number 0090–5378116) filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Summons, # 2 Summons, # 3 Civil Cover Sheet)(Green, Marcus) (Entered: 03/16/2018) |
| 03/16/2018 | 2 | MEMORANDUM re 1 Petition to Confirm Arbitration Award, filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Green, Marcus) (Entered: 03/16/2018) |
| 03/16/2018 | 3 | AFFIDAVIT re 1 Petition to Confirm Arbitration Award, *(Declaration of Seamus Ronald Andrew)* by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Green, Marcus) (Entered: 03/16/2018) |
| 03/16/2018 | 4 | AFFIDAVIT re 1 Petition to Confirm Arbitration Award, *(Declaration of Marcus J. Green)* by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Green, Marcus) (Entered: 03/16/2018) |
| 03/16/2018 | 5 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Green, Marcus) (Entered: 03/16/2018) |
| 03/16/2018 | | Case Assigned to Judge Christopher R. Cooper. (jd) (Entered: 03/20/2018) |

| | | |
|---|---|---|
| 03/19/2018 | 6 | ERRATA *(Corrected first page of Petition)* by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED 1 Petition to Confirm Arbitration Award, filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Errata)(Green, Marcus) (Entered: 03/19/2018) |
| 03/20/2018 | 7 | SUMMONS (2) Issued Electronically as to FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. (Additional attachment(s) added on 3/20/2018: # 1 Notice and Consent) (jd) (Entered: 03/20/2018) |
| 03/20/2018 | 8 | AFFIDAVIT REQUESTING FOREIGN MAILING re 1 Petition to Confirm Arbitration Award, 7 Summons Issued Electronically by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Green, Marcus) (Entered: 03/20/2018) |
| 03/22/2018 | 9 | REQUEST from Plaintiff's for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by FEDEX, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (See docket entry no. 8 to view.) (td) (Entered: 03/22/2018) |
| 03/22/2018 | 10 | CERTIFICATE OF CLERK of mailing one copy of the summons and complaint, together with a translation of each into the official language of the foreign state on 3/22/18, by FEDEX, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 FedEx Mailing Labels) (td) (Entered: 03/22/2018) |
| 04/16/2018 | 11 | NOTICE of Appearance by Michael S. Kim on behalf of PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Kim, Michael) (Entered: 04/16/2018) |
| 04/16/2018 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to FEDERAL REPUBLIC OF NIGERIA served on 3/27/2018, answer due 5/26/2018; MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA served on 3/27/2018, answer due 5/26/2018. (Kim, Michael) (Entered: 04/16/2018) |
| 05/29/2018 | 13 | NOTICE of Appearance by Josef Maxim Klazen on behalf of PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Klazen, Josef) (Entered: 05/29/2018) |
| 06/04/2018 | 14 | AFFIDAVIT FOR Default by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Klazen, Josef) Modified text on 6/8/2018 (ztd). (Entered: 06/04/2018) |
| 06/05/2018 | | NOTICE of ERROR re 14 Motion for Entry of Default; emailed to josef.klazen@kobrekim.com, cc'd 2 associated attorneys ––– The PDF file you docketed contained errors: 1. Do Not Refile. In the future, please use the default forms on the courts website. (ztd, ) (Entered: 06/05/2018) |
| 06/05/2018 | 15 | SET ASIDE PURSUANT TO MINUTE ORDER FILED 7/13/18. . . . . Clerk's ENTRY OF DEFAULT as to FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (ztd) Modified on 7/16/2018 (ztd). (Entered: 06/05/2018) |
| 06/12/2018 | 16 | NOTICE of Appearance by Joseph Dominic Pizzurro on behalf of FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (Pizzurro, Joseph) (Entered: 06/12/2018) |
| 06/12/2018 | 17 | MOTION to Set Aside Default , MOTION to Dismiss by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (Attachments: # 1 Memorandum in Support, # 2 Declaration –Joseph D. Pizzurro, # 3 Exhibit –1, # 4 Exhibit –2, # 5 Text of Proposed Order, # 6 Certificate of Service)(Pizzurro, Joseph) (Entered: 06/12/2018) |
| 06/14/2018 | 18 | NOTICE *Request to Issue Additional Summonses* by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Klazen, Josef) (Entered: 06/14/2018) |
| 06/14/2018 | 19 | REQUEST FOR SUMMONS TO ISSUE *Additional Summonses* re 18 Notice (Other) filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. Related document: 18 Notice (Other) filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED.(Klazen, Josef) (Entered: 06/14/2018) |

## JA-3

| | | |
|---|---|---|
| 06/18/2018 | 20 | Summons (2) Issued as to FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. (ztd) (Entered: 06/18/2018) |
| 06/18/2018 | 21 | AFFIDAVIT REQUESTING FOREIGN MAILING re 1 Petition to Confirm Arbitration Award, 20 Summons Issued by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Kim, Michael) (Entered: 06/18/2018) |
| 06/21/2018 | 22 | REQUEST from Plaintiff's for the Clerk to effect service upon defendants of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by FEDEX, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (SEE DOCKET ENTRY NO. 21 TO VIEW.) (ztd) (Entered: 06/21/2018) |
| 06/21/2018 | 23 | CERTIFICATE OF CLERK of mailing one copy of the summons and complaint, together with a translation of each into the official language of the foreign state, upon defendants, on 6/21/18, by FEDEX, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 FedEx Mailing Waybills) (ztd) (Entered: 06/21/2018) |
| 06/26/2018 | 24 | Memorandum in opposition to re 17 MOTION to Set Aside Default MOTION to Dismiss filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Declaration, # 2 Exhibit 1 to Declaration, # 3 Exhibit 2 to Declaration, # 4 Certificate of Service)(Klazen, Josef) (Entered: 06/26/2018) |
| 06/29/2018 | 25 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to FEDERAL REPUBLIC OF NIGERIA served on 6/27/2018, answer due 8/26/2018; MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA served on 6/27/2018, answer due 8/26/2018. (Klazen, Josef) (Entered: 06/29/2018) |
| 07/03/2018 | 26 | REPLY to opposition to motion re 17 MOTION to Set Aside Default MOTION to Dismiss filed by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. (Pizzurro, Joseph) (Entered: 07/03/2018) |
| 07/06/2018 | 27 | DECLARATION of Service by Josef M. Klazen of Summons and Complaint Executed as to (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Klazen, Josef) Modified text on 7/13/2018 (ztd). (Entered: 07/06/2018) |
| 07/13/2018 | | MINUTE ORDER granting in part and denying in part 17 Respondents' Motion to Set Aside the Clerk's Entry of Default and To Dismiss. The motion is GRANTED to the extent it seeks to set aside the Clerk's entry of default because Petitioner did not properly effectuate service of process under 28 U.S.C. section 1608(a)(3) by addressing the process documents to the "head of the ministry of foreign affairs." See Barot v. Embassy of Zambia, 785 F.3d 26, 27 (D.C. Cir. 2015) (finding that strict adherence to 1608(a) is required). (The Court would have set aside entry of default in any case in light of Nigeria's recent appearance in the case, belated as it may be.) The motion is DENIED to the extent it seeks dismissal of the petition. Signed by Judge Christopher R. Cooper on 7/13/2018. (lccrc3) (Entered: 07/13/2018) |
| 08/27/2018 | 28 | MOTION to Dismiss for Lack of Jurisdiction Under The FSIA by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (Attachments: # 1 Memorandum in Support, # 2 Declaration –Joseph D. Pizzurro, # 3 Exhibit –A, # 4 Exhibit –B, # 5 Text of Proposed Order, # 6 Certificate of Service)(Pizzurro, Joseph) (Entered: 08/27/2018) |
| 08/27/2018 | 29 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kevin Arthur Meehan, :Firm– Curtis, Mallet–Prevost, Colt & Mosle LLP, :Address– 101 Park Avenue, NY, NY 10178. Phone No. – 212–696–6197. Fax No. – 917–368–8835 Filing fee $ 100, receipt number 0090–5659476. Fee Status: Fee Paid. by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (Attachments: # 1 Declaration –Kevin Arthur Meehan, # 2 Text of Proposed Order, # 3 Certificate of Service)(Pizzurro, Joseph) (Entered: 08/27/2018) |
| 08/27/2018 | 30 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Juan Otoniel Perla, :Firm– Curtis, Mallet–Prevost, Colt & Mosle LLP, :Address– 101 Park Avenue, NY, |

**JA-4**

| | | |
|---|---|---|
| | | NY 10178. Phone No. – 212–696–6084. Fax No. – 212–697–1559 Filing fee $ 100, receipt number 0090–5659557. Fee Status: Fee Paid. by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA (Attachments: # 1 Declaration –Juan Otoniel Perla, # 2 Text of Proposed Order, # 3 Certificate of Service)(Pizzurro, Joseph) (Entered: 08/27/2018) |
| 08/28/2018 | | MINUTE ORDER: Upon consideration of the Respondents' Motion 30 for Admission of Attorney Juan Otoniel Perla *Pro Hac Vice*, it is hereby ORDERED that the Motion is GRANTED. Signed by Judge Christopher R. Cooper on 08/28/2018. (lccrc3) Modified on 8/29/2018 (zlsj). (Entered: 08/28/2018) |
| 08/28/2018 | | MINUTE ORDER: Upon consideration of the Respondents' Motion 29 for Admission of Attorney Kevin Arthur Meehan *Pro Hac Vice*, it is hereby ORDERED that the Motion is GRANTED. Signed by Judge Christopher R. Cooper on 08/28/2018. (lccrc3) Modified on 8/29/2018 (zlsj). (Entered: 08/28/2018) |
| 09/05/2018 | 31 | MOTION for Briefing Schedule by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Klazen, Josef) (Entered: 09/05/2018) |
| 09/06/2018 | | MINUTE ORDER: Defendants shall file any opposition to Plaintiff's 31 Motion for Setting a Briefing Schedule on or before September 11, 2018 and Plaintiff shall file any reply on or before September 14, 2018. Plaintiff's deadline for opposing Defendants' 28 Motion to Dismiss is hereby vacated until further order of the Court. So Ordered. Signed by Judge Christopher R. Cooper on 09/06/2018. (lccrc3) (Entered: 09/06/2018) |
| 09/11/2018 | 32 | Memorandum in opposition to re 31 MOTION for Briefing Schedule filed by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Pizzurro, Joseph) (Entered: 09/11/2018) |
| 09/14/2018 | 33 | REPLY to opposition to motion re 31 MOTION for Briefing Schedule *On the Petition to Confirm Arbitration Award* filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Certificate of Service)(Klazen, Josef) (Entered: 09/14/2018) |
| 10/01/2018 | 34 | ORDER granting 31 Motion for Briefing Schedule. It is hereby ORDERED that the parties shall adhere to a briefing schedule as follows: Respondents shall file their opposition to 1 Petition to Confirm Arbitration Award on or before October 31, 2018; Petitioner shall file its reply on or before November 21, 2018. See full Order for details. Signed by Judge Christopher R. Cooper on 10/1/2018. (lccrc3) (Entered: 10/01/2018) |
| 10/02/2018 | | Set/Reset Deadlines: Respondent's Opposition to Petition due by 10/31/2018. Petitioner's Reply due by 11/21/2018. (lsj) (Entered: 10/02/2018) |
| 10/04/2018 | | MINUTE ORDER: A hearing on the Petition to Confirm Arbitration Award is set for December 20, 2018 at 10 AM in Courtroom 27A. Signed by Judge Christopher R. Cooper on 10/04/2018. (lccrc3) (Entered: 10/04/2018) |
| 10/04/2018 | | Set/Reset Hearings: Petition Hearing set for 12/20/2018 at 10:00 AM in Courtroom 27A before Judge Christopher R. Cooper. (lsj) (Entered: 10/04/2018) |
| 10/05/2018 | 35 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 34 Order on Motion for Briefing Schedule, by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. Filing fee $ 505, receipt number 0090–5725071. Fee Status: Fee Paid. Parties have been notified. (Pizzurro, Joseph) (Entered: 10/05/2018) |
| 10/09/2018 | 36 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date 10/5/18 re 35 Notice of Appeal to DC Circuit Court,. (ztd) (Entered: 10/09/2018) |
| 10/09/2018 | | MINUTE ORDER: In light of Respondents' 35 Notice of Appeal, it is hereby ORDERED that the case is stayed until further notice and the hearing scheduled for December 20, 2018 is vacated. Signed by Judge Christopher R. Cooper on 10/09/2018. |

**JA-5**

| | | (lccrc3) Modified on 10/9/2018 (lsj). (Entered: 10/09/2018) |
|---|---|---|
| 10/15/2018 | 37 | MOTION to Certify Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay re 35 Notice of Appeal to DC Circuit Court, by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Klazen, Josef). Added MOTION to Lift Stay on 10/22/2018 (ztd). (Entered: 10/15/2018) |
| 10/16/2018 | | USCA Case Number 18–7154 for 35 Notice of Appeal to DC Circuit Court, filed by MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA, FEDERAL REPUBLIC OF NIGERIA. (jf) (Entered: 10/16/2018) |
| 10/17/2018 | | MINUTE ORDER: Respondents shall file any response to 37 Petitioner's Motion to Retain Jurisdiction and Lift Stay by 5 P.M. on October 19, 2018; Petitioner shall file any reply by 5 P.M. on October 23, 2018. Signed by Judge Christopher R. Cooper on 10/17/2018. (lccrc3) (Entered: 10/17/2018) |
| 10/17/2018 | | Set/Reset Deadlines: Respondents' Response due by 10/19/2018. Petitioner's Reply due by 10/23/2018. (lsj) (Entered: 10/17/2018) |
| 10/19/2018 | 38 | Memorandum in opposition to re 37 MOTION to Certify Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay re 35 Notice of Appeal to DC Circuit Court, filed by FEDERAL REPUBLIC OF NIGERIA, MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Pizzurro, Joseph) (Entered: 10/19/2018) |
| 10/23/2018 | 39 | REPLY to opposition to motion re 37 MOTION to Certify Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay re 35 Notice of Appeal to DC Circuit Court, MOTION to Lift Stay filed by PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED. (Attachments: # 1 Certificate of Service)(Klazen, Josef) (Entered: 10/23/2018) |
| 11/01/2018 | 40 | OPINION and ORDER denying 37 Motion to Certify Respondents' Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay. Signed by Judge Christopher R. Cooper on 11/01/2018. (lccrc3) (Entered: 11/01/2018) |

**JA-6**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,                                   :

                 Petitioner,                      :

v.                                                      :

                                               Civil Action No. 18-594

FEDERAL REPUBLIC OF NIGERIA and                         :
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,                        :

                 Respondents.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PETITION TO CONFIRM ARBITRATION AWARD

Petitioner Process and Industrial Developments Limited ("P&ID") hereby petitions this

Court for an order and judgment confirming a final, binding arbitration award (the "Final

Award") issued in London, England, on January 31, 2017, by a duly constituted arbitral tribunal

(the "Tribunal") in *In the Matter of the Arbitration Act 1996 (England & Wales) and In the*

*Matter of an Arbitration Under the Rules of the Nigerian Arbitration and Conciliation Act (Cap*

*A18 LFN 2004) Between Process and Industrial Developments Limited, Claimant, and the*

*Ministry of Petroleum Resources of the Federal Republic of Nigeria, Respondent* (the

"Arbitration").  A duly certified true and correct copy of the Final Award is attached as Exhibit

17 to the accompanying Declaration of Seamus Ronald Andrew, dated March 16, 2018 (the

"Andrew Declaration").  In support of this Petition, P&ID respectfully states as follows:

### THE PARTIES

1.      Petitioner P&ID is an engineering and project management company organized

and existing under the laws of the British Virgin Islands.  P&ID was created in 2006 as a vehicle

**JA-7**

for implementing a project devised by two Irish nationals who had been involved in major engineering and infrastructure projects in Nigeria for several decades.  In 2010, P&ID entered into a contract with Nigeria's Ministry of Petroleum Resources, acting for and on behalf of the Federal Government of Nigeria, whereby P&ID would help Nigeria harness abundant natural gas reserves to solve the growing electricity crisis in Nigeria.  When Nigeria failed to perform its contractual obligations, P&ID commenced an arbitration pursuant to the contract's arbitration clause, resulting in the Final Award that remains unpaid and that P&ID is now seeking to enforce in the United States.

2.      Respondent Federal Republic of Nigeria (the "Republic" or "FRN") is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act.  *See* 28 U.S.C. § 1603(a). Respondent Ministry of Petroleum Resources of the Federal Republic of Nigeria (the "Ministry") is a political organ of the Republic and does not have a separate legal personality.  As Nigeria explained in the arbitration: "The [Ministry] is a policy instrument of the government of the Federal Republic of Nigeria; it is not a juristic person."  (Andrew Decl. Ex. 4 at 4 (Notice of Preliminary Objection dated October 3, 2013).)

3.      In the Arbitration and in the Final Award, the Ministry was named as the respondent, as it had entered into the underlying contract in its name, for and on behalf of the Federal Government of Nigeria.  Because the Ministry is part of the Republic and does not have a separate legal personality, P&ID hereby seeks entry of judgment against the Republic as well as the Ministry.  This Petition will refer to the Ministry and the Republic collectively as "Nigeria."

**JURISDICTION AND VENUE**

4.      This proceeding arises under the 1958 Convention on the Recognition and

Enforcement of Foreign Arbitral Awards (the "New York Convention").  Chapter 2 of the

Federal Arbitration Act, codified at 9 U.S.C. § 201 *et seq.*, applies the New York Convention to

award-recognition actions brought in the courts of the United States.

5.      This Court has jurisdiction over the subject matter of this proceeding under 9

U.S.C. § 203, which provides that "[t]he district courts of the United States . . . have original

jurisdiction over" any "action or proceeding falling under the [New York] Convention."  This

proceeding "fall[s] under the Convention" because it arises out of a commercial contract between

P&ID and Nigeria, neither of which are citizens of the United States.  *See* 9 U.S.C. § 202.  In

addition, the Final Award was made in the territory of the United Kingdom, a nation that is a

contracting State to the New York Convention, and which is a State other than the State where

P&ID seeks recognition and enforcement.

6.      The Court also has jurisdiction over the subject matter of this proceeding under 28

U.S.C. § 1330(a), as Nigeria is not entitled to sovereign immunity in connection with the cause

of action set forth herein.  Specifically, Nigeria is not immune for two independent reasons.

First, Nigeria is subject to this Court's jurisdiction under 28 U.S.C. § 1605(a)(6), which creates

an exception to foreign states' sovereign immunity for cases brought to confirm arbitral awards

"governed by a treaty or other international agreement in force for the United States calling for

recognition and enforcement of arbitral awards."  As noted above, the Final Award in this case is

governed by the New York Convention, an international agreement of the type contemplated by

Section 1605(a)(6).  Second, Nigeria is subject to this Court's jurisdiction under 28 U.S.C.

**JA-9**                                    3

§ 1605(a)(1), because Nigeria's signing an agreement to arbitrate waived its sovereign immunity

as to any action to confirm an award issued pursuant to that agreement.

7.      This Court has personal jurisdiction over Nigeria under 28 U.S.C. § 1330(b),

which confers "[p]ersonal jurisdiction over a foreign state . . . as to every claim for relief" for

which the foreign state does not enjoy sovereign immunity under 28 U.S.C. §§ 1605–1607, and

over which the Court has subject matter jurisdiction.

8.      Venue is proper in this District under 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4).

Section 1391(f)(4) provides that venue lies in this District for any action "brought against a

foreign state or political subdivision thereof."

## FACTUAL BACKGROUND

9.      The Final Award results from a dispute between P&ID and Nigeria that arose

under a Gas Supply and Processing Agreement dated January 11, 2010 (the "Agreement").  The

descriptions of the respective parties in the Agreement were P&ID and "The Ministry of

Petroleum Resources for and on behalf of the Federal Government of Nigeria."  A duly certified

true and correct copy of the Agreement is attached to the Andrew Declaration as Exhibit 1.

10.      The Agreement set forth the terms of an arrangement under which P&ID would

build the necessary facilities and, over a period of 20 years, refine associated natural gas (also

known as "wet gas") into non-associated natural gas (or "lean gas") to be used by Nigeria in

powering its national electric grid.  Nigeria was to supply P&ID with agreed-upon quantities of

wet gas—at first, 150 million, and eventually, 400 million standard cubic feet per day—during

the 20-year period of supply.  P&ID, in turn, was to strip away the heavy hydrocarbons known as

Natural Gas Liquids ("NGLs") that make wet gas unsuitable for electricity generation, then

return to Nigeria the lean gas thus created.  This refining process was to take place at the gas processing facilities to be built by P&ID on a site in Calabar, Nigeria.

11.     As compensation under the Agreement, P&ID would be permitted to retain the NGLs separated during the refinement process and sell them for its own account.  Although they render wet gas unsuitable for electricity generation, NGLs—which include ethane, propane, and butane—are independently (and profitably) marketable.  P&ID therefore stood to make a substantial profit from its sale of millions of metric tons of NGLs over the 20-year term of the Agreement.

12.     Among other things, the Agreement required Nigeria to:

> ensure that all necessary pipelines and associated infrastructure are installed and all requisite arrangements with agencies and/or third part[ies] are in place to ensure the supply and delivery of Wet Gas in accordance with [the scope of work set forth in the Agreement] so as to facilitate the timely implementation of gas processing by the [Gas Processing Facilities] as provided for in this Agreement.

13.     Nigeria failed to satisfy these obligations in two key respects.  First, Nigeria failed to secure a supply of the agreed-upon quantities of wet gas.  Second, and relatedly, Nigeria failed to complete construction of infrastructure necessary to transport wet gas from a source chosen by Nigeria to the Calabar site.  In particular, Nigeria never completed the Adanga Pipeline, which was intended to carry wet gas to the Calabar site where P&ID was to build the gas processing facilities.

14.     Nigeria's failures to comply with these obligations caused the collapse of the project contemplated by the Agreement.  Nigeria abandoned the Adanga pipeline, ceased its efforts to secure a suitable source of wet gas, and eventually stopped responding to P&ID's correspondence.  Nigeria's breach ensured that no wet gas was ever delivered to the Calabar site.

**JA-11**

15.    As a result of Nigeria's failure to perform its obligations under the Agreement,

P&ID lost 20 years' worth of profits from the sale of NGLs.

## THE ARBITRATION AND THE FINAL AWARD

16.    Article 20 of the Agreement provided for arbitration in the event of a dispute

between the Parties:

> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement . . .
>
> The arbitration award shall be final and binding upon the Parties . . .
>
> The venue of the arbitration shall be London, England or otherwise as agreed by the Parties . . .

17.    Based on Nigeria's failure to perform under the Agreement, and consistent with

the terms of the arbitration clause, P&ID commenced the Arbitration by serving a Notice of

Arbitration on August 22, 2012.  By that time, P&ID had been a willing participant in

discussions with Nigeria and other stakeholders about an alternative solution for over a year,

with no sign of progress.  A true and correct copy of the Notice of Arbitration is attached to the

Andrew Declaration as Exhibit 2.

18.    The Tribunal was duly constituted according to a procedure set forth in the

Agreement and included, as presiding arbitrator, Leonard, Lord Hoffmann, former Lord of

Appeal in Ordinary (during Lord Hoffmann's tenure, the highest judicial position in the United

Kingdom, and the equivalent today of a U.K. Supreme Court Judge).  The other arbitrators were

Sir Anthony Evans, Q.C., former justice of the Court of Appeal of England and Wales and

former chief justice of the Dubai International Financial Centre Courts (appointed by P&ID), and

**JA-12**

Chief Bayo Ojo, S.A.N., former Attorney General of Nigeria (appointed by Nigeria).  As

stipulated in the Agreement, the venue of the arbitration was London, United Kingdom.

19.     The Tribunal considered several rounds of written submissions from both parties

(accompanied by exhibits, witness statements, and expert reports), held two rounds of hearings

(one day on issues relevant to Nigeria's liability, and two days on the calculation of P&ID's

damages), and issued three awards.

20.     In its first Part Final Award, issued on July 3, 2014, the Tribunal considered

certain preliminary issues, including (i) whether the Tribunal had jurisdiction to decide its own

jurisdiction, (ii) the capacity of the Ministry to enter into the Agreement on behalf of the

Nigerian government, and (iii) the validity of the Agreement in light of P&ID's incorporation in

the British Virgin Islands rather than in Nigeria.  The Tribunal ruled, among other things, that it

had jurisdiction to decide its own jurisdiction; it explained that this authority derived from the

United Kingdom's Arbitration Act 1996, which it identified as "the law of the seat of

arbitration."  (Andrew Decl. Ex. 7 ¶ 51.)  The tribunal also ruled that the Agreement was valid.

Notably, the Tribunal determined that the Ministry's execution of the Agreement raised no

capacity-to-contract issue, because there is no legal distinction between the Nigerian government

and its various Ministries.  As the Tribunal put it, "[t]he Ministries *are* the Government,

operating in different spheres."  (Andrew Decl. Ex. 7 ¶ 40 (emphasis in original).)

21.     In its second Part Final Award, issued on July 17, 2015 (the "Liability Award"),

the Tribunal addressed the issue of liability: it determined that Nigeria's failure to satisfy its

contractual obligations constituted a repudiation of the Agreement, and that P&ID was entitled to

accept the repudiation and recover its damages caused thereby.  A true and correct copy of the

Liability Award is attached to the Andrew Declaration as Exhibit 8.

**JA-13**

22.     Nigeria attempted to have the Liability Award set aside by the English courts, which, under the United Kingdom's Arbitration Act 1996, have supervisory jurisdiction over U.K.-seated arbitrations.  In December 2015, Nigeria applied to the Commercial Court in London for "[a]n order setting aside and/or remitting for further consideration all or part of the" Liability Award.  (Andrew Decl. ¶ 16 and Ex. 9.)  Nigeria understood that the seat of arbitration was in England: In a witness statement submitted in support of Nigeria's set-aside application, Folakemi Adelore, the Ministry's Director of Legal Services, explained Nigeria's delay in filing the application by writing that Nigeria "understood that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge would have had to be before the English courts under the English Arbitration Act 1996."  (Andrew Decl. Ex. 9 at 21.)  Ms. Adelore further informed the Commercial Court that "[t]he issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered."  (*Id.* at 23.)

23.     On February 10, 2016, the Commercial Court dismissed Nigeria's set-aside application, finding (1) that the application was filed more than four months too late, and (2) that Nigeria's objections to the Tribunal's liability finding had "no merit."  A true and correct copy of the Commercial Court's order dismissing Nigeria's application to set aside the Liability Award is attached to the Andrew Declaration as Exhibit 10.

24.     Two weeks after the Commercial Court in London denied Nigeria's application to set aside the Liability Award, Nigeria decided to try for a better outcome in its own courts by initiating proceedings in the Federal High Court of Nigeria to set aside the Tribunal's Liability Award and to restrain the parties from acting further in the Arbitration.  (Andrew Decl. ¶ 20 and Ex. 11.)  After conducting the Arbitration in London for three years—consistent with the Agreement—and seeking (and failing) to have the Liability Award set aside by the English

**JA-14**

courts, Nigeria did an about-face and suddenly took the position that the seat of arbitration was Nigeria and that the Nigerian courts therefore had exclusive supervisory jurisdiction over the arbitration.

25.     After P&ID had learned of the Nigerian proceedings (in which it did not participate), it asked the Tribunal to issue a ruling on the seat of the Arbitration, which would determine the effect—if any—of the Nigerian proceedings on the Arbitration.  By order dated April 26, 2016, the Tribunal determined that the parties had consented to London as the seat of Arbitration, both in the Agreement and through their conduct throughout the Arbitration.  A true and correct copy of the Tribunal's April 26, 2016 order (entitled "Procedural Order No. 12") is attached to the Andrew Declaration as Exhibit 12.  As Lord Hoffmann later wrote to the parties, given the Tribunal's decision "that the seat of the arbitration is in England," "the Federal High Court [of Nigeria] had no jurisdiction to set aside" the Liability Award.  (Andrew Decl. ¶ 24 and Ex. 14.)

26.     When the Federal High Court of Nigeria subsequently granted the order requested by Nigeria (purporting to set aside the Liability Award and suspend further proceedings in the Arbitration), the Arbitration nonetheless proceeded.  Nigeria claimed to "maintain[] its position on the award on liability" (Andrew Decl. ¶ 25 and Ex. 15), yet it continued to participate in the Arbitration.[1]

---

[1] Nigeria separately asked that the Nigerian court set aside Procedural Order No. 12 and remove the arbitrators from the Tribunal.  (Andrew Decl. ¶ 26 and Ex. 16 at 1.)  That request was not granted and the proceeding was dismissed.  (Andrew Decl. ¶ 26.)

**JA-15**

27.     On January 31, 2017, following multiple written submissions and two days of hearings on the issue of P&ID's damages, the Tribunal issued a 34-page Final Award.[2]  The Tribunal found that "[i]f the contract had been performed, P&ID would have received for 20 years an income from the sale of natural gas liquids extracted from the wet gas supplied by the Government."  (Andrew Decl. Ex. 17 at 16.)  Accordingly, P&ID's damages were measured as the present value of that 20-year income, less capital and operating expenditures which would have been incurred in the course of building and running the facility.  (*Id.*)  Based on this calculation, a majority of the Tribunal found as follows:

> We, Leonard, Lord Hoffmann and Sir Anthony Evans, having read the parties' written evidence, pleadings and submissions and having heard their oral evidence and submissions, and having carefully considered the same and for the reasons stated above, make our Final Award as follows, namely we order the Respondent to pay the Claimant the sum of $6,597,000,000 together with interest at the rate of 7% from 20 March 2013 until the date of this award and at the same rate thereafter until payment.

(Andrew Decl. Ex. 17 at 33–34.)

28.     As of March 16, 2018, interest has accrued on the Final Award in the amount of $2,303,889,287.67, and interest continues to accrue at a rate of $1,265,178.08 per day.  (Andrew Decl. ¶ 27.)

29.     Nigeria has not applied to have the Final Award set aside in the United Kingdom (or anywhere else), and the time for doing so expired nearly a year ago.  The United Kingdom's Arbitration Act 1996 requires that a party seeking to overturn an arbitration award do so within 28 days after the award is provided to the parties.  The parties here received the Final Award on

---

[2] Chief Ojo, the arbitrator appointed by Nigeria, issued a dissenting decision stating that he would have awarded a lower sum.  (Andrew Decl. ¶ 28 and Ex. 18.)  Chief Ojo's dissent did not dispute the Tribunal's finding on liability.

**JA-16**

February 10, 2017.  Nigeria's time for applying to set aside the Final Award expired on March

10, 2017.  (Andrew Decl. ¶ 29.)

## BASIS FOR CONFIRMATION OF THE FINAL AWARD

30.     The Final Award is a well-reasoned award, issued by prominent jurists, in a

proceeding in which both parties actively participated.  There is no reason why the award should

not be confirmed.

31.     Under the New York Convention, as incorporated into U.S. law through the

Federal Arbitration Act, an arbitral award must be confirmed unless one of a limited number of

grounds for refusal or deferral applies: "Within three years after an arbitral award falling under

the Convention is made, any party to the arbitration may apply to any court having jurisdiction

under this chapter for an order confirming the award as against any other party to the arbitration.

The court shall confirm the award unless it finds one of the grounds for refusal or deferral of

recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.

32.     The party opposing confirmation has the burden of showing that such a ground

applies.  *See Int'l Trading Indus. Inv. Co. v. DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 20

(D.D.C. 2011).  (Under the New York Convention, "confirmation proceedings are generally

summary in nature. . . . The showing required to avoid summary confirmation is high and the

burden of establishing the requisite factual predicate to deny confirmation of an arbitral award

rests with the party resisting confirmation.").  Nigeria cannot meet that burden here.

33.     The grounds on which a court can refuse or defer confirmation are:

- the lack of a valid arbitration agreement between the parties;
- that the award resolves a dispute outside the scope of the parties' arbitration agreement;
- that the award resolves a dispute that, under the laws of the country where confirmation is sought, cannot be resolved through arbitration;

- that the award debtor had no notice of the arbitration proceedings or was unable to meaningfully participate;

- that the tribunal was composed and/or the arbitration used procedures inconsistent with the parties' arbitration agreement;

- that the award is not yet binding or has been set aside by a competent authority of the country in which, or under the law of which, the award was made; or

- that confirming the award would contravene the public policy of the country where confirmation is sought.

*See* New York Convention art. V.

34.     As explained further in the accompanying Memorandum of Law, none of these grounds applies here.  The plain language of Article 20 of the Agreement makes clear that P&ID and Nigeria agreed that certain disputes could be resolved by arbitration.  (Andrew Decl. Ex. 1 at 14–15.)  The Arbitration concerned precisely such a dispute—i.e., one "concerning the interpretation or performance of [the] Agreement."  (*See id.* at 14.)  Nothing in the laws of the United States prohibits resolving this type of dispute through arbitration; to the contrary, the United States has long favored arbitration for the resolution of international commercial disputes. *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (noting Supreme Court's endorsement of "an emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce") (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  Nigeria had notice of the Arbitration and actively participated in each of its stages.  The Tribunal was composed and followed the procedures according to the parties' agreement to arbitrate.  The award is binding on the parties, as provided in the arbitration clause, and the Final Award has not been set aside at the seat of arbitration (i.e., the United Kingdom).  Finally, confirming the award would offend no public policy of the United States.

**JA-18**

35.     Accordingly, the New York Convention requires confirmation of the Final

Award.

## COUNT I
## (CONFIRMATION OF FINAL AWARD UNDER 9 U.S.C. § 207)

36.     P&ID incorporates each and every allegation in the preceding paragraphs as if set

forth fully herein.

37.     The Final Award is governed by the New York Convention (made applicable in

this proceeding by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*) because the

Final Award arises out of a commercial contract between P&ID and Nigeria, neither of which are

citizens of the United States.  *See* 9 U.S.C. § 202.  In addition, the Final Award was made in the

United Kingdom, a nation that is a State party to the New York Convention, and which is a State

other than the State where recognition and enforcement is hereby sought.

38.     9 U.S.C. § 207 provides that, in an action to confirm an award governed by the

New York Convention, the "court shall confirm the award unless it finds one of the grounds for

refusal or deferral of recognition or enforcement of the award specified in the said Convention."

9 U.S.C. § 207.

39.     None of the New York Convention's enumerated grounds for refusing or

deferring recognition apply to the Final Award.  Under 9 U.S.C. § 207, the Final Award should

therefore be confirmed.

40.     P&ID respectfully requests that the Court confirm the Final Award by entering

judgment in favor of P&ID and against Respondents Federal Republic of Nigeria and Ministry of

Petroleum Resources of the Federal Republic of Nigeria in the amount of the Final Award with

interest as provided therein, plus the costs of this proceeding.

**JA-19**

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner Process and Industrial Developments Limited respectfully

requests:

a.      an order of this Court pursuant to 9 U.S.C. § 207 confirming the Final Award and
        entering judgment thereon;

b.      a judgment in favor of Petitioner and against the Federal Republic of Nigeria and
        the Ministry of Petroleum Resources of the Federal Republic of Nigeria that
        conforms to the Final Award, including interest at 7% annually to be calculated
        from March 20, 2013, and costs;

c.      an award of post-judgment compound interest under 28 U.S.C. § 1961;

d.      an award of costs incurred by Petitioner in bringing this proceeding, including
        reasonable attorneys' fees;

e.      an order of this Court retaining jurisdiction over the matter for any further
        proceedings as may be necessary to enforce the Final Award and any further
        awards or judgments which may be obtained by Petitioner against Nigeria; and

f.      any other relief that this Court, in the interests of justice, deems necessary and
        proper.

**JA-20**

Dated: March 16, 2018
       Washington, D.C.


                                    /s/ Marcus J. Green
                                    Michael S. Kim
                                        D.C. Bar No. 1032401
                                        michael.kim@kobrekim.com
                                    Josef M. Klazen (*pro hac vice* application
                                    forthcoming)
                                        D.C. Bar No. 1003749
                                        josef.klazen@kobrekim.com
                                    Marcus J. Green
                                        D.C. Bar No. 999223
                                        marcus.green@kobrekim.com
                                    KOBRE & KIM LLP
                                    1919 M Street NW
                                    Washington, DC 20036
                                    Telephone:  (202) 664-1900

                                    *Attorneys for Petitioner Process and Industrial
                                    Developments Limited*

**JA-21**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,                              :

                      Petitioner,             :

v.                                                :       Civil Action No. 18-594

FEDERAL REPUBLIC OF NIGERIA and                   :
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,                  :

                   Respondents.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DECLARATION OF SEAMUS RONALD ANDREW IN SUPPORT OF PETITION TO CONFIRM ARBITRATION AWARD

In support of the Petition to Confirm Arbitration Award filed by Process and Industrial Developments Limited ("P&ID"), I, Seamus Ronald Andrew, do hereby declare and state as follows:

1.     I am over the age of 18 and am competent to give this Declaration.

2.     All statements set forth in this Declaration are based on my personal knowledge.

3.     I am an English Solicitor and the Managing Partner of the London-based law firm SCA Ontier LLP, a position in which I have served (including in respect of the predecessor firms of SCA Ontier LLP) since October 2004.

4.     I acted as counsel for P&ID in the arbitration proceeding captioned *In the Matter of the Arbitration Act 1996 (England & Wales) and In the Matter of an Arbitration Under the Rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) Between Process and Industrial Developments Limited, Claimant, and the Ministry of Petroleum Resources of the Federal Republic of Nigeria, Respondent* (the "Arbitration").

**JA-22**

5.      The Arbitration arose out of a Gas Supply and Processing Agreement (the "Agreement") dated January 11, 2010, between P&ID and the Ministry of Petroleum Resources for and on behalf of Federal Government of Nigeria (collectively, "Nigeria").  A duly certified true and correct copy of the Agreement is attached as Exhibit 1.

6.      The Agreement provided, *inter alia*, that in the event of "any difference or dispute . . . concerning the interpretation or performance of [the] Agreement," either party could submit the dispute for arbitration by "serv[ing] on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004)."  Ex. 1 at 14–15.

7.      On August 22, 2012, P&ID commenced the Arbitration by serving a Notice of Arbitration.  A true and correct copy of the Notice of Arbitration is attached as Exhibit 2.

8.      Nigeria had notice of, participated in, and was represented by counsel at each stage of the Arbitration.

9.      Consistent with the procedure set forth in the Agreement, the parties appointed arbitrators to the arbitral tribunal (the "Tribunal") presiding over the Arbitration.  P&ID appointed Sir Anthony Evans, Q.C., a former justice of the Court of Appeal of England and Wales.  Nigeria selected Chief Bayo Ojo, S.A.N., a former Attorney General of Nigeria.  Sir Evans and Chief Ojo then appointed as presiding arbitrator Lord Leonard Hoffman, former Lord of Appeal in Ordinary, or Law Lord, of the Appellate Committee of the House of Lords, then the highest court in the United Kingdom (and since replaced by the UK Supreme Court).

10.      On June 28, 2013, P&ID served upon the Tribunal and upon Nigeria's legal representatives a Statement of Case setting forth the grounds for its claim in the Arbitration.  A true and correct copy of P&ID's Statement of Case is attached as Exhibit 3.

11.      On October 3, 2013, Nigeria filed a Notice of Preliminary Objection, asserting that the Agreement was void.  A true and correct copy of Nigeria's Notice of Preliminary

2

**JA-23**

Objection is attached as Exhibit 4.  Among other things, Nigeria argued that the Agreement was

void because the Ministry "is a policy instrument of the government of the Federal Republic of

Nigeria; it is not a juristic person" and therefore lacks the capacity to enter into contracts.

(Andrew Decl. Ex. 4 at 4.)

12.       As part of its response to Nigeria's Notice of Preliminary Objection, P&ID

submitted a written witness statement by the Chairman of P&ID, and an expert report on

Nigerian law from the Honorable S.M.A. Belgore, a former Justice of the Nigerian Supreme

Court.  A true and correct copy of P&ID's February 10, 2014 Witness Statement is attached as

Exhibit 5, and a true and correct copy of Justice Belgore's expert opinion is attached as Exhibit

6.  In his expert opinion, Justice Belgore agreed with Nigeria's contention that "the Ministry of

Petroleum Resources of the Federal Republic of Nigeria does not have a separate legal

personality," but explained that the Agreement was still valid because the Ministry "is perfectly

able to enter into a contract," but "[w]hen it does so, it does not act as an entity separate from

Government – rather it acts *as* Government."  (Andrew Decl. Ex. 6 at 4–5 (emphasis in

original).)

13.       On July 8, 2014, the Tribunal issued to the parties a unanimous Part Final Award

dated July 3, 2014, determining that it had jurisdiction over the Arbitration and rejecting the

challenges to the validity of the Agreement raised in Nigeria's Notice of Preliminary Objection

and supporting submissions.  A true and correct copy of the Part Final Award dated July 3, 2014

is attached as Exhibit 7.  The Tribunal rejected Nigeria's capacity-to-contract defense, explaining

that "the distinction between the various Ministries and the Government is illusory," such that

"[t]he Ministries *are* the Government, operating in different spheres."  (Andrew Decl. Ex. 7 ¶ 40

(emphasis in original).)

**JA-24**

14.     Over the following year, the parties litigated Nigeria's liability to P&ID, with each party submitting several written arguments.  Each side also relied on witness-statement evidence.  In addition, P&ID submitted another expert report from Justice Belgore.

15.     On July 17, 2015, the Tribunal issued a second unanimous Part Final Award (the "Liability Award"), determining, *inter alia*, that Nigeria "repudiated the [Agreement] by failure to perform its obligations" thereunder and that P&ID was "entitled to damages (in an amount to be assessed) for the Government's repudiation of the [Agreement]."  A true and correct copy of the Liability Award is attached as Exhibit 8.

16.     On December 23, 2015, Nigeria applied to the Commercial Court in London, under Section 68 of the Arbitration Act 1996, for "[a]n order setting aside and/or remitting for further consideration all or part of the" Liability Award.  A true and correct copy of Nigeria's application to the Commercial Court in London is attached as Exhibit 9.

17.     Under the Arbitration Act 1996, an English court only has jurisdiction to set aside an arbitral award if the seat of the arbitration is within the Court's jurisdiction.  *See* Arbitration Act 1996, s. 2(1) ("The provisions of this Part apply where the seat of the arbitration is in England and Wales or Northern Ireland.").

18.     In its application to the Commercial Court in London to have the Liability Award set aside, Nigeria submitted a witness statement from Folakemi Adelore, the Director of Legal Services of the Ministry.  *See* Exhibit 9 at 18–29.  In her witness statement, Ms. Adelore wrote, "The Ministry understood that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge would have had to be before the English courts under the English Arbitration Act 1996."  *Id.* at 21.  In explaining Nigeria's delay in filing the application, Ms. Adelore stated that "[t]he issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered."  *Id.* at 23.

4

**JA-25**

19.     On February 10, 2016, the Commercial Court in London dismissed Nigeria's application to set aside the Liability Award, finding, *inter alia*, that (1) the application was "made more than 4 months after the expiry of the 28 day time limit" for such applications, and (2) "the grounds of the appeal have no merit."  A true and correct copy of the Commercial Court's February 10, 2016 Order is attached as Exhibit 10.

20.     On February 24, 2016, after the Commercial Court had dismissed Nigeria's set-aside application, Nigeria filed an Originating Motion initiating a proceeding in the Federal High Court of Nigeria, where it sought, *inter alia*, an order setting aside and/or remitting for further consideration all or part of the Liability Award.  A true and correct copy of Nigeria's February 24, 2016 Originating Motion is attached as Exhibit 11.  In its Originating Motion, Nigeria contended that the seat of arbitration was in fact Nigeria and that the "Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings." (Andrew Decl. Ex. 11 at 2.)

21.     P&ID did not contest the Nigerian proceedings.  After P&ID had become aware of the Nigerian proceedings, it notified the Tribunal and subsequently requested that the Tribunal make a ruling on the seat of the arbitration to determine the significance, if any, of the Nigerian proceedings to the Arbitration.

22.     On April 26, 2016, the Tribunal issued a reasoned decision (entitled "Procedural Order No. 12") determining that London, United Kingdom, was the seat of the Arbitration.  A true and correct copy of Procedural Order No. 12 is attached as Exhibit 12.

23.     Nearly one month after the Tribunal issued Procedural Order No. 12, the Federal High Court of Nigeria issued a three-page order, without analysis, "setting aside and/or remitting for further consideration all or part of the" Liability Award.  A true and correct copy of the Federal High Court of Nigeria's order, dated May 24, 2016, is attached as Exhibit 13.

**JA-26**

24.     After having been informed of the Federal High Court of Nigeria's decision, Lord Hoffmann informed the parties that the Tribunal would be proceeding with the Arbitration. He explained: "As the parties will be aware from Procedural Order No. 12, the Tribunal has decided that the seat of the arbitration is in England. It follows that the Federal High Court had no jurisdiction to set aside its award." A true and correct copy of Lord Hoffman's May 27, 2016 e-mail is attached as Exhibit 14.

25.     Notwithstanding the Nigerian court's order, the parties continued with the Arbitration and litigated the damages (or "quantum") phase of the proceedings. On June 21, 2016, Nigeria wrote to the Tribunal that it intended "to participate in the damages phase of the arbitration while maintaining its position on the award on liability." A true and correct copy of Nigeria's June 21, 2016 e-mail is attached as Exhibit 15. Thus, while the Nigerian order purported to have set aside the Liability Award, Nigeria continued to participate in the quantum phase of the Arbitration.

26.     On May 6, 2016, Nigeria filed another Originating Motion with the Federal High Court of Nigeria, which requested that the court set aside Procedural Order No. 12 (in which the Tribunal determined that London, United Kingdom, was the seat of the arbitration) and disempanel the Tribunal. A true and correct copy of Nigeria's May 12, 2016 Originating Motion filed on May 6, 2016 is attached as Exhibit 16. This Originating Motion appears to have been refiled on May 9, 2016. Reports from P&ID's Nigerian counsel, who monitored but did not participate in the Nigerian proceedings on behalf of P&ID, suggested that this Originating Motion was filed yet again on May 13, 2016, and had been entitled Suit No. FHC/L/CS/624/2016. No such relief was granted by the Nigerian court, and P&ID's Nigerian counsel have confirmed that, on November 21, 2016, the court struck out Suit No. FHC/L/CS/624/2016 for lack of appearance of counsel for Nigeria.

**JA-27**

27.     On February 10, 2017, the Tribunal issued to the parties a Final Award dated January 31, 2017.  A duly certified true and correct copy of the Final Award is attached as Exhibit 17.  The Final Award ordered the Ministry to pay damages to P&ID in the amount of $6,597,000,000 plus interest to be calculated at a rate of 7 percent per annum from March 20, 2013.  By my calculation, as of March 16, 2018, $2,303,889,287.67 in interest had accrued on the Final Award.  Interest continues to accrue at a daily rate of $1,265,178.08.

28.     Chief Ojo issued a Dissenting Final Award dated January 31, 2017.  A true and correct copy of Chief Ojo's Dissenting Final Award is attached as Exhibit 18.

29.     To my knowledge, Nigeria has made no attempt to set aside the Tribunal's Final Award.  Under Section 70(3) of the Arbitration Act 1996, the time within which Nigeria could have filed any such challenge or appeal with the English courts pursuant to Sections 67–69 of the Arbitration Act 1996 expired at latest on March 10, 2017, which was 28 days after the Tribunal issued the Final Award to the parties.

30.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 16th day of March, 2018.

_____
Seamus Ronald Andrew

**JA-28**

# EXHIBIT 1

# SAVILLE & CO.

—— SCRIVENER NOTARIES ——

One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

**KINGDOM OF ENGLAND** }
**CITY OF LONDON** } SS

TO ALL TO WHOM THESE PRESENTS SHALL COME, I
CHRISTOPHER GERARD HIGGINS of the City of London
NOTARY PUBLIC by royal authority duly admitted and sworn DO
HEREBY CERTIFY the genuineness of the signature of SEAMUS
RONALD ANDREW subscribed at foot of the **certification**
hereunto annexed, such signature having been subscribed today in
my presence in London, England by the said Seamus Ronald
Andrew, whose personal identity and capacity I attest, a solicitor of
the Senior Courts of England and Wales and designated member and
the managing partner of the law firm styled **SCA ONTIER LLP** of
London, England;

AND I DO FURTHER CERTIFY THAT the said SCA ONTIER
LLP is a limited liability partnership duly organised and existing in
accordance with the laws of England and Wales, registered with the
Registrar of Companies for England and Wales under number
OC327289 and with registered office at One New Ludgate, 60
Ludgate Hill, London, EC4M 7AW, England.

IN FAITH AND TESTIMONY WHEREOF I the said notary have
subscribed my name and set and affixed my seal of office at London
aforesaid this fourteenth day of March two thousand and eighteen.



My Commission expires at Death




**JA-30**   Regulated by the Faculty Office of the Archbishop of Canterbury

SCA Ontier LLP
One New Ludgate
5th Floor
60 Ludgate Hill
London EC4M 7AW
T: +44(0)20 7183 1701
F: +44(0)20 7183 1702
DX248 London/Chancery Lane
www.scaontier.com

# SCA ONTIER

### **CERTIFICATION**

I, the undersigned Seamus Ronald Andrew, English solicitor and Managing Partner of SCA Ontier LLP, hereby certify that the attached document consisting of one covering page and 19 numbered pages is, to the best of my information and belief, a true, faithful, and complete photocopy of a Gas Supply and Processing Agreement for Accelerated Gas Development, entered into on or about January 11, 2010, by the Ministry of Petroleum Resources of the Federal Republic of Nigeria and Process and Industrial Developments Limited. This certification is made on information and belief as counsel instructed by Process and Industrial Developments Limited to represent it in an arbitration proceeding arising out of the attached Gas Supply and Processing Agreement for Accelerated Gas Development.


Seamus Ronald Andrew

14 March 2018

SCA Ontier LLP is a limited liability partnership registered in England
Registered No.OC327289. A list of the members is open to inspection at the registered office

Authorised and Regulated by the Solicitors Regulation Authority



**GAS SUPPLY AND PROCESSING AGREEMENT**


**FOR**


**ACCELERATED GAS DEVELOPMENT**


**BETWEEN**


**THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA**


**AND**


**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**


**DATED THE 11TH DAY OF JANUARY 2010**


*Ministry of Petroleum Resources*

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATIONS...................................... 3

ARTICLE 2 OBJECTIVE ................................................................ 6

ARTICLE 3 SCOPE OF WORK ......................................................... 6

ARTICLE 4 FUNDING ................................................................ 7

ARTICLE 5 DURATION OF THE AGREEMENT........................................... 7

ARTICLE 6 RESPONSIBILITIES OF THE GOVERNMENT ............................ 7

ARTICLE 7 RESPONSIBILITIES OF P&ID ........................................... 8

ARTILCE 8 COMMERCIAL TERMS..................................................... 8

ARTICLE 9 JOINT OPERATING COMMITTEE ......................................... 10

ARTICLE 10 NIGERIAN CONTENT..................................................... 10

ARTICLE 11 FORCE MAJEURE ......................................................... 11

ARTICLE 12 CONFIDENTIALITY......................................................... 11

ARTICLE 13 PROPRIETARY INFORMATION ........................................... 12

ARTICLE 14 INDEMNITY ................................................................ 13

ARTICLE 15 CHANGES TO AGREEMENT............................................... 13

ARTICLE 16 ASSIGNMENT ............................................................. 13

ARTICLE 17 THIRD PARTIES ........................................................... 13

ARTICLE 18 LANGUAGE ............................................................... 14

ARTICLE 19 WRITTEN PRESS RELEASES ............................................. 14

ARTICLE 20 APPLICABLE LAW AND DISPUTE RESOLUTION.................... 14

ARTICLE 21 ENTIRE UNDERSTANDING ............................................... 15

ARTICLE 22 WARRANTIES.............................................................. 15

ARTICLE 23 NOTICES .................................................................. 16

APPENDIX A ............................................................................ 18

APPENDIX B ............................................................................ 19

Page 1 of 19

**JA-33**

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010.

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government") whose office address is situated at the 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria hereby represented by .DR........R.R...................................., the Honourable Minister of Petroleum Resources, which expression shall where the context so admits includes its assigns and successors in office of the first part.

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** a corporation organised and existing under the laws of the British Virgin Islands and it's assignees (which expression shall, where the context so permits means and include _ any successors or permitted assigns) hereby represented by.....MICHAEL.Quin.hereinafter referred to as "P&ID") of the other part.

Each of the Parties may be referred to individually as "Party" or collectively as "the Parties".

**WHEREAS:**

a) The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b) The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves, developed gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators.

c) The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allocated to the international operators.

Page **2** of 19

**JA-34**

d)   The Government desires to develop and utilise it's gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

e)   The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f)   The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g)   The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h)   P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i)   P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the project in accordance with the terms of this Agreement.

j)   The Parties are entering into this Agreement to ensure the fastrack implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

1.   **DEFINITIONS AND INTERPRETATIONS**

i.   "Affiliate" means with respect to a Party, any company or legal entity that Controls, or is controlled by, such Party or is controlled by a company or legal entity that also controls such Party. For purposes of this Agreement, "control" means the right, directly or indirectly, to exercise fifty percent (50%) or more of the voting rights in the election of directors, or if there are no such voting

Page 3 of 19

rights, ownership of fifty percent (50%) or more of the equity share capital or other ownership interests, and "controls and "controlled shall be construed accordingly;

ii.    "Agreement" means this Gas Processing Agreement;

iii.   "CDM Project" means a clean development project as provided for in the Kyoto Convention and a CDM Project is duly authorised to engage in approved market based mechanisms in relation the Carbon Credits;

iv.    "Effective Date" means the date of signing of this Agreement;

v.     "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi.    "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane;

vii.   "MMSCuFD" means Millions of Standard Cubic Feet per Day;

viii.  "NGLs" means all hydrocarbons remaining after processing the Wet Gas removing the Lean Gas;

ix.    "Parties" means the Ministry of Petroleum Resources of the Federal Government of Nigeria represented by the Honourable Minister of Petroleum Resources and Process and Industrial Developments Limited;

x.     "Pioneer Status" means tax free status in Nigeria for P&ID and its assignees in relation to the Project encompassing the provision of equipment and materials for the project and as operators of the plant for the first 5 years of operations.

xi.    "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement;

xii    Project Team" means the management team appointed by P&ID to carry out the implementation of the Project and shall include the P&ID nominees to the Joint Operating Committee.

xiii."Proprietary Information" means all data and information generated pursuant to the work carried out by the parties including but not limited to reports, documents, drawings and graphs, and any patentable inventions made during and as a

**Page 4 of 19**

result of all work carried out by the P&ID Project Management Team for this project, inclusive of any and all patents or patent applications with regard thereto;

xiv. "Site" means the land in Calabar on which the GPFs are located.

xv. "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi. "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site;

Except where expressly provided to the contrary in this Agreement:

the Schedules and the Appendices form part of this Agreement and in the event of any conflict between the main body of this Agreement and a Schedule the main body of this Agreement shall prevail;

reference to any Party or any Person includes that Party's or that Person's successors and permitted assigns;

reference to any consent not to be unreasonably withheld is deemed to be qualified by the requirement that such consent shall not be unreasonably conditioned or delayed;

reference to include and including is deemed to be qualified by the additional term without limitation;

reference to any publication, statute, rule, regulation, instrument or standard means the same as amended, supplemented or replaced from time to time;

reference to any agreement means the same as amended, supplemented or replaced from time to time;

in the computation of periods of time from a specified day or Day to a later specified day or Day:

(i)     from means from and including and until and to means to and including; and



Page 5 of 19

**JA-37**

(ii)   any requirement that an action may or shall be taken within a specified number of Days means that such action may or shall be taken within the number of Days so specified starting at 00:00 hours local Nigerian time on the Day on which the requirement to take such action arose;

## 2.   OBJECTIVE

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3.   SCOPE OF THE WORK

The scope of works of this Agreement is as follows:

a.   P&ID shall construct GPFs on the Site allocated to them by Cross River State Government with related ancillary plant and equipment off-shore as required. The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b.   To ensure this fastrack is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities, maintenance and support facilities at the Site in accordance with the schedule of works forming Appendix B hereto.

c.   The Government shall make available at the P&ID Site boundary, 400 MMSCuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8% mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

Page 6 of 19

JA-38

    d.   P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume In the form of Lean Gas at the Site boundary.

## 4.   FUNDING

a. Save as otherwise provided in this Agreement, each Party shall bear the costs and expenses of its own personnel during the period of this Agreement.

## 5.   DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement after which it shall automatically terminate without prior notice to the Parties except where extended by a mutual agreement of the Parties or until the Capital Cost of the Project is fully repaid whichever occurs latest subject to the Government at all times having the right to audit the Accounts of the P&ID .

## 6.   RESPONSIBILITIES OF THE GOVERNMENT

a)   The Government shall deliver to the Site boundary the agreed quantities and quality of gas as defined under Article 3c and in the manner set out In Appendix A of this Agreement;

b)   The Government shall ensure that all necessary pipelines and associated infrastructure are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)   The Government agrees to assist P&ID, and where necessary intercede with the relevant Government agencies, to obtain all requisite permits, licenses and approvals required from the relevant Government agencies or others for the fastrack implementation of this project.

**JA-39**

d) If the Government or any of its agencies changes or amends any statute, rule, regulation, instrument or standards, and such change or amendment adversely affects the rights of P&ID under this Agreement, the Parties shall amend the terms of this Agreement in a manner that will restore the rights of P&ID. The Government shall grant to P&ID all such waivers and exemptions necessary to ensure that the rights of P&ID are not adversely affected by any change or amendment to statute, rule, regulation, instrument or standards.

## 7. RESPONSIBILITIES OF P&ID

a) P&ID shall use best endeavours to ensure the fastrack implementation of this Project to construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD together with all utilities maintenance and support facilities at the Site. Thereafter P&ID shall maintain and operate the GPFs on a professional basis to ensure a regular supply of Lean Gas (approximately 340 MMSCuFD) for power generation;

b) c) P&ID shall, during the Project implementation period, submit to the JOC as set out in Article 9 updated work programs or such other documentation as may be necessary to enhance the development of the Project;

c) P&ID shall do all that is necessary to obtain relevant approvals required for the success of the Project.

## 8. COMMERCIAL TERMS

a) The Government shall deliver to the Site boundary, 400 MMSCuFD of Wet Gas as set out in Article 3 c) and in Appendix A of this Agreement having a minimum C3 (Propane) content of 3.5% mol and C4 (Butane) of 1.8% mol at No Cost to P&ID.

b) P&ID will process the Wet Gas, recompress the residual Lean Gas, representing approximately 85% of the Wet Gas feed, and make it available, for power generation or other Industrial usage at the discretion of the Government, at the Site boundary at No Cost to the Government.

c) Title to and ownership of the Wet Gas to be delivered by the Government to the Site shall remain vested in the Government and shall be delivered back to the Government at the Site boundary



Page 8 of 19

after processing in the form of Lean Gas but the NGLs removed from the Wet Gas during processing shall be retained by P&ID and shall be deemed the sole property of P&ID and the said NGLs may be sold by P&ID either domestically within Nigeria or exported in accordance with commercial criteria.

d) P&ID shall provide all funding necessary for the timely construction, implementation and efficient operation of the GPFs and the said GPFs will be the sole property of P&ID and may be sold or otherwise disposed of by P&ID subject always to the provisions of this Agreement PROVIDED that Government shall be given the right of first refusal.

e) As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID in the following manner:

    (i)    P&ID shall transfer to the Government or it's nominee five percent (5%) the Equity of P&ID upon the commencement of the delivery of not less than 150 MMSCuFD of Wet Gas to the Site as set forth as Phase 1 in Appendix A

    (ii)    P&ID shall transfer to the Government or its nominee a further five percent (5%) of the Equity of P&ID the said Equity to be transferred pro rata as the delivery of the remaining 250 MMSCuFD is successfully implemented as set forth as Phase 2 in Appendix A.

    (iii)    All of the Equity to be transferred under this Article 8 (f) shall consist of fully paid Ordinary Shares free of all liens and charges and no sums whatsoever shall be payable by the Government in respect of the Equity so transferred.

f) Following the initial transfer of five percent (5%) Equity to the Government or its nominee as provided for at Article 8 (e) above no new shares whether Ordinary, Preference or otherwise may be issued without the written agreement of the Government such agreement not to be unreasonably withheld and the Government shall be entitled to representation on the Board of P&ID in proportion to the Equity held by the Government at any given time.

g) The Parties are aware that the 24inch Adanga pipeline presently  under construction from the Addax operated OML 123 directly to  Calabar and due for completion in 2010 will have a throughput capacity of 600 MMSCUFD and can adequately provide the required first delivery of 150 MMSCuFD of Wet Gas to the Site and that an additional pipeline of up to 70km in length may be required to link up to the Adanga pipeline in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas to the Site from other sources to be



Page 9 of 19

chosen by the Government. It such a requirement is necessary, P&ID undertakes to build and install the said additional pipeline to provide for the delivery of the remaining 250 MMSCuFD of Wt Gas to the Site, at no cost to the Government, and P&ID will retain the ownership and provide the maintenance for the pipeline.

h) P&ID shall enjoy Pioneer Status with no import duties, clearance charges or taxes payable within Nigeria in respect of all equipment and materials utilised in the construction and commissioning of the GPFs and with no taxes payable in respect of the operation of the GPFs for a period of five (5) years from the commencement of commercial operations at the GPFs.

i) The Government will actively support the designation of the Project    as a CDM Project and P&ID will take all necessary steps to achieve such designation. All earnings or revenues arising from the Project status as a CDM Project will accrue 50% (fifty percent) to P&ID and 50 (fifty percent) to the Government.

9. **JOINT OPERATING COMMITTEE**

a) The Joint Operating Committee (JOC) established by the Parties under the previous Memorandum of Understanding dated 22nd July 2009 and comprising of two representatives from the Ministry of Petroleum Resources and two representatives from NNPC nominated by the Government and two representatives nominated by P&ID, shall meet at regular intervals during the Project implementation period to discuss in detail the implementation progress of the Project. Where deemed necessary by any JOC member of the Government or P&ID shall nominate such other expert support from other agencies as may be necessary to ensure that Project timelines are maintained.

b) The JOC shall carry out further activities as may be determined by the Parties.

c) Any cost that may accrue from the JOC activities shall be borne equally by the Parties.

10. **NIGERIAN CONTENT**

a) The Nigerian content of project development, construction and operation shall be maximised to the extent reasonably possible without detracting from the fastrack implementation schedule.

11. **FORCE MAJEURE**

a)  Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable. A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and, acts of or orders of the Government. If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

b)  The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating the cause, and both Parties shall do all that is reasonably within their powers to remove such cause.

12. **CONFIDENTIALITY**

Each of the Parties, their employees, agents and representatives hereby undertake that they shall not, whether during the period of this Agreement or at any time after the expiration or termination thereof, disclose any information acquired by it, from or through the other Party (either directly or indirectly, oral or written) to any person, firm or company. Such information shall include all information, data, designs, drawings, computer programmes, recordings, writings, correspondences and any other technical, commercial or operational information relating to the other Party's business and activities or any of its Affiliate companies ("Confidential Information").

The above provisions shall not extend to information which:

*Ministry of Petroleum Resources*

**JA-43**

(i)     Prior to the time of disclosure or acquisition has become lawfully in the public domain or was obtained by the Party disclosing it without any confidentiality obligations, or was obtained from a third party who is lawfully entitled to be in possession of such information;

(ii)    Any Party shall disclose, where such disclosure is demanded by an order of a court of competent jurisdiction, or a tax authority, or a lawfully constituted commission of inquiry, provided that prior to making such disclosure, written notification of the demand received by such Party has been given to the other Party and thereafter the Party being compelled to make the disclosure can do so.

## 13.   PROPRIETARY INFORMATION

(i)     All intellectual property and other proprietary rights in and to the Proprietary Information shall be the joint property of the Parties;

(ii)    The Parties and their Affiliates shall only be entitled to use the Proprietary Information in the evaluation, pursuit and development of the project and for no other purpose.

(iii)   The Parties agree that Proprietary information shall be confidential and that no Party or its Affiliates shall use, copy, sell, trade, publish or otherwise disclose the Proprietary information to anyone save as otherwise provided in this Agreement or with the written approval of the other Party. Notwithstanding the foregoing, a Party may disclose Proprietary information if and to the extent:

(a)     that such information is already in the public domain, other than as a result of a breach of the obligation with respect to Proprietary information and Confidential Information under this Agreement by any of the Parties;

(b)     required to be disclosed under applicable laws including rules of applicable stock exchange, tax authority, Governmental authorities or courts or competent panel of enquiry;

Page 12 of 19

(c) such disclosure is to be made to its Affiliates and the directors agents, officers and employees of the Party and their Affiliates; and

(d) such disclosure to professional advisers and consultants of any Party and its Affiliates on a need to know basis.

### 14. INDEMNITY

Each Party shall be responsible for any claims made by or injury to its representative(s) and in respect of damage to such Party's property while such representative is providing services arising from the activities under this Agreement. In that regard, each Party agrees to indemnify, defend and hold harmless the other Party from and against any claims, or causes of action arising out of or in connection with such personal injury or damage to property.

### 15. CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both Parties.

### 16. ASSIGNMENT

Either Party may assign its rights and obligations to an Affiliate as defined in this Agreement or to a designated financial institution where such an assignment comprises an integral constituent element of the financing structure of the Project but assignment to a non-affiliate shall not be permitted without the written consent of the other party such consent not to be unreasonably withheld but in all cases of assignment the assignor shall not be released of any of its liabilities and responsibilities under this Agreement.

### 17. THIRD PARTIES

a) This Agreement is intended for the Parties hereto, and nothing contained in this Agreement shall be construed to create any duty to, standard of care with reference to, or rights in any person not a Party to this Agreement. This Agreement shall not confer any right to any third party claiming the right to entitlement or benefits under this Agreement.

Page 13 of 19

**JA-45**

b)   No Partnership: None of the provisions of this Agreement shall be deemed to constitute a Partnership between the Parties, and no Party shall have the authority to bind or shall be deemed to be the agent of the other Parties in any way.

18.   **LANGUAGE**

The language for the purposes of administering this Agreement shall be English.

19.   **WRITTEN PRESS RELEASES**

The Parties shall consult, coordinate and agree on the release of any written press releases, announcements or responses to media enquiries concerning this Agreement in advance of any such announcement. If a Party or its Affiliate wishes to issue or make a press release, it shall not do so unless prior to its release, such Party furnishes to the other Party a copy of such press release for its review and written approval (which approval shall not be unreasonably withheld).

The Party shall provide a copy of such press release and related background information to the other Party within a minimum of seven (7) days, if practical, but in any event not less than seventy-two (72) hours, prior to its planned release.

20.   **APPLICABLE LAW and DISPUTE RESOLUTION**

The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.

The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal. In the event that the arbitrators do not agree on the



Page 14 of 19

JA-46

appointment of such third arbitrator within the aforementioned fifteen (15) days, or any extension of such deadline that the Parties may mutually agree, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of International Chamber of Commerce ("ICC") in accordance with the relevant ICC rules on the application of either Party (notice of the intention to apply having been duly issued to the other) and, when appointed, the third arbitrator shall convene meetings of the arbitration panel, act as chairman thereof and decide the differences or dispute should the arbitrators fail to reach a unanimous decision. No arbitrator shall be appointed if such person has been employed or contracted by either of the Parties or their respective Affiliates within five (5) years prior to the notice of arbitration.

When an arbitrator refuses or neglects to act, or is incapable of acting or dies, a new arbitrator shall be appointed in his place and the above provisions of appointing arbitrators shall, mutatis mutandis, govern the appointment of such arbitrator.

The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties. The costs of the arbitration shall be borne equally by the Parties. Each Party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language.

The Parties shall agree to appropriate arbitration terms to exclusively resolve any disputes arising between them from this Agreement.

21. **ENTIRE UNDERSTANDING**

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

22. **WARRANTIES**

Each Party represents and warrants that it has the right and authority to enter into this Agreement and to perform and observe all of its

Page 15 of 19

obligations under this Agreement and that the execution, delivery and performance of this Agreement has been duly and validly authorised by all necessary corporate or other action, and that by entering into this Agreement, it will not violate, conflict with, or cause a material default under any other contract, agreement, indenture, decree, judgement, undertaking, conveyance, lien, or encumbrance to which it is a party or by which it may become subject.

### 23.   <u>NOTICES</u>

Any notice, request, demand or other correspondence required under this Agreement or any notice which either Party may desire to give to the other Party shall be in writing and shall be hand-delivered, sent by facsimile, or similar means of delivery to the Party intended to receive the same, as the case may be, and shall be effective upon receipt at the following addresses:

**If to Government:** Honourable Minister of Petroleum Resources
NNPC Towers
Herbert Macaulay Way
Abuja, Nigeria

**If to: Process and Industrial Developments Limited (P&ID)**

The Chairman
Process and Industrial Developments Limited
15B Buchanan Crescent,
Off Aminu Kano Crescent
Wuse II, Abuja
FCT, Nigeria

Attention: Mr. Neil C. Hitchcock, Projects Director

*Ministry of Petroleum Resources*

**JA-48**

**IN WITNESS** whereof the Parties have executed this AGREEMENT by their duly authorised signatories effective the day and year first above written:

**SIGNED, SEALED AND DELIVERED**

By the within named .....................................................

**HON. MINISTER OF PETROLEUM RESOURC**

In the presence of:

Name: ...... GRACE  E. O. TAIGA .......................

Address: MINISTRY  OF PETROLEUM  RESOURCES

Occupation: ...... DIRECTOR  LEGAL ...................

Signature: ...............................................

**SIGNED, SEALED AND DELIVERED**

By the within named .....................................................

**PROCESS AND INDUSTRIAL DEVELOPMENTS LTD**

In the presence of:

Name: .... MUHAMMAD  KUCHAZI ..................

Address: ... 43 MADEIRA ST. IMANI ESTATE MAITAMA ABUJA

Occupation: ...... BUSINESS ..........................

Signature: ...............................................

Page 17 of 19

# APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1    During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2    On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1    During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

Phase 2    On or before the third quarter of 2012 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site boundary, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

Page 18 of 19

# APPENDIX B

## SCHEDULE OF WORK

*Ministry of Petroleum Resources*

**JA-51**

USCA Case #18-7154      Document #1780490         Filed: 04/01/2019      Page 56 of 242

# EXHIBIT 2



# Process and Industrial Developments Limited

### Engineers, Consultants and Managing Contractors

> LIAISON OFFICE: 12, VAAL STREET,
> OFF RHINE STREET,
> MINISTERS HILL, MAITAMA,
> ABUJA, FCT, NIGERIA
> TEL: +234 9 413 4098
> EMAIL: INFO@PANDID.NET

The Honourable Minister of Petroleum Resources,
Federal Ministry of Petroleum Resources,
Block D, 11th Floor,
NNPC Towers,
Herbert Macaulay Way,
Central Business District,
P.M.B. 449, Abuja.

OFFICE OF THE HONOURABLE MINISTER

2 2 AUG 2012

22nd August 2012

Honourable Minister,

Re:     **Gas Supply and Processing Agreement for Accelerated Gas Development
between the Ministry of Petroleum Resources of the Federal Republic of
Nigeria and Process and Industrial Developments Limited dated 11 January
2010 - Notice of Arbitration**

We refer to the above-referenced agreement dated 11 January 2010 ("the
Agreement"). As you will be aware, a dispute has arisen between the parties in respect
of the performance of the Agreement concerning the failure of the Government of
Nigeria ("the Government") to make available to Process and Industrial Developments
Ltd ("P&ID") the quantity of wet gas stipulated in clause 3(c) and Appendix A of the
Agreement for Phase 1 of the Project.

P&ID have sought to resolve this matter amicably with the Government. We have
written to you and to other Government departments and officials on a number of
occasions identifying the Government's failure to comply with its obligations under the
Agreement, seeking assistance and intervention with other parties, and, more recently,
making proposals for the amendment of the Agreement so as to permit the parties to
work together to progress the implementation of the Project. We appreciate that you,
your department, and many others, have taken steps to resolve the issues that have

> TRIDENT CHAMBERS, P.O. BOX 146, ROAD TOWN, TORTOLA,
> BRITISH VIRGIN ISLANDS.
> EMAIL: INFO@PANDID.NET

**231**

**JA-53**

arisen. Unfortunately, however, the Government remains in breach of its obligations to P&ID under the Agreement.

In the circumstances, P&ID is compelled to refer this dispute to arbitration in accordance with clause 20 of the Agreement and would respectfully ask that you treat this letter as its Notice of Arbitration for those purposes.

For convenience, we set out the terms of clause 20 in full:

*"**20. APPLICABLE LAW and DISPUTE RESOLUTION***
*The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.*

*The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to compete the tribunal. In the event that the arbitrators do not agree on the appointment of such third arbitrator within the aforementioned fifteen (15) days, or any extension of such deadline that the Parties may mutually agree, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with the relevant ICC rules on the application of either Party (notice of the intention to apply having been duly issued to the other) and, when appointed, the third arbitrator shall convene meetings of the arbitration panel, act as chairman thereof and decide the differences or dispute should the arbitrators fail to reach a unanimous decision. No arbitrator shall be appointed if such person has been employed or contracted by either of the parties or their respective Affiliates within five (5) years prior to the notice of arbitration.*

*When an arbitrator refuses or neglects to act, or is incapable of acting or dies, a new arbitrator shall be appointed in his place and the above provisions of appointing arbitrators shall, mutatis mutandis, govern the appointment of such arbitrator.*

*The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the parties. The costs of the arbitration shall be borne equally by the Parties. Each Party shall, however, bear its own lawyers' fees.*

Page 2 of 4

**232**

**JA-54**

*The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language*

*The Parties shall agree to appropriate arbitration terms to exclusively resolve any disputes arising between them from this Agreement."*

In accordance with the provisions of Article 3 of Schedule 1 to the Nigerian Arbitration and Conciliation Act:

(1) Please accept this letter as P&ID's demand that any and all disputes concerning the interpretation or performance of the Agreement be referred to arbitration, including but not necessarily limited to the dispute identified above in respect of the Government's breach(es) of clause 3 and Appendix A of the Agreement.

(2) The names and address of the parties are:

(a) (for the Ministry of Petroleum Resources (for an on behalf of the Federal Government of Nigeria)

> The Honourable Minister of Petroleum Resources
> NNPC Towers
> Herbert Macaulay Way
> Abuja
> Nigeria

(b) (for P&ID)

> The Chairman
> Process and Industrial Developments Ltd
> 15B Buchanan Crescent
> Off Aminu Kanu Cresent
> Wuse II, Abuja, FCT
> Nigeria
>
> Attn: Mr. Neil C. Hitchcock, Projects Director

(c) Please note that the current address of P&ID is as follows:

> 12, Vaal Street,
> off Rhine Street, Ministers Hill,
> Maitama,
> Abuja,
> FCT, Nigeria

(3) The arbitration agreement is contained in clause 20 of the Agreement set out above.

Page 3 of 4

**233**

**JA-55**

(4) The dispute arises out of the Agreement.

(5) The claim is for breach of contract as described above. P&ID reserves the right to make such further or alternative claims as it may be advised to make in relation to the matters referred to above. At present, P&ID estimates its loss of profit as a result of the matters referred to above over the 20 year term of Phase 1 of the Project to be not less than US$1,991,816,709 (one billion nine hundred and ninety one million eight hundred and sixteen thousand seven hundred and nine US Dollars). P&ID reserves the right to modify the amount of its claim, including so as to claim in respect of other losses and/or in respect of expenses. P&ID will also claim interest on such sums as may be awarded to it as well as its legal costs and the costs of the arbitration.

(6) P&ID will be seeking damages and/or other relief.

(7) Clause 20 of the Agreement provides for the constitution of the arbitral tribunal. P&ID shall appoint its arbitrator within 30 days of the date of receipt by the Government of this notice.   P&ID calls on the Government to appoint its arbitrator also within 30 days of the date of receipt of this notice.

For the avoidance of doubt, nothing in this letter is intended to amount to an acceptance on the part of P&ID of any repudiatory breach of the Agreement on the part of the Government.  So far as P&ID is concerned, the Agreement remains in full force. In particular, P&ID intends notwithstanding the present dispute and the commencement of arbitration to proceed with Phase 2 of the Agreement.

As with our letter of 27 July 2012, the necessity of writing to you in these terms and that it has been necessary to give this notice of commencement of arbitration is very much regretted.  Notwithstanding that, it remains our earnest hope that the present difficulties can be resolved to the satisfaction of both parties so that the Project can be implemented for the benefit of all concerned as originally envisaged.

Yours respectfully,

Neil C. Hitchcock
Projects Director

Page 4 of 4

**234**

**JA-56**

# EXHIBIT 7

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)

AND

AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>**Claimant**</u>

**and**

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

<u>**Respondent**</u>

---

## PART FINAL AWARD

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo

Sir Anthony Evans

June 2014

**JA-58**

## A.    THE PARTIES AND THEIR LAWYERS

1. The Claimant ("P&ID") is an engineering and project management company
   registered at Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British
   Virgin Islands with a Nigerian office at 12 Vaal Street, off Rhine Street, Ministers
   Hill, Maitama, Abuja.   It is represented by Harcus Sinclair, 3 Lincoln's Inn
   Fields, London WC2A 3AA, United Kingdom.

2. The Respondent ("the Government" or "the Ministry") is the Ministry of
   Petroleum Resources of the Federal Government of the Federal Republic of
   Nigeria whose office address is 11th Floor, Block D, NNPC Towers, Herbert
   Macaulay Way, Central Business District, Abuja, Nigeria.  It was first represented
   by Ajumogobia & Okeke, 2nd Floor, Sterling Towers, 20 Marina, Lagos, Nigeria
   and is now represented by Twenty Marina Solicitors LLP, 2nd Floor, Sterling
   Towers, 20 Marina, Lagos, Nigeria.

## B.    SUMMARY OF THE DISPUTE

3. On 11 January 2010 Claimant and Respondent ("the parties") entered into a
   written Gas Supply and Processing Agreement ("GSPA") whereby the
   Government agreed that for a term of 20 years it would make to available to P&ID
   400 MMScuFD of Wet Gas and P&ID agreed to process the gas and return
   approximately 85% by volume to the Government in the form of Lean Gas.

4. For the purpose of enabling the Wet Gas to be processed, P&ID agreed to
   construct two or more process streams with ancillary facilities.

5. The supply of Wet Gas by the Government was to take place in two phases.  In
   Phase 1, the Government was to supply 150 MMScuFD "during or before the last
   quarter of 2011".  In Phase 2, the remaining 250 MMScuFD were to be supplied
   "on or before the third quarter of 2012".

**JA-59**

6.  The Claimant alleges that the Government, in breach of its obligations, did not provide any Wet Gas by the dates stipulated or at all.  On 20 March 2013, no Wet Gas having been delivered, P&ID wrote to the Ministry alleging that it had repudiated the GSPA and accepting the repudiation.  It claims about US$ 6 billion damages for lost profits.

## C.      GOVERNING LAW AND ARBITRATION CLAUSE

7.  Clause 20 of the GSPA, so far as relevant, provides:

> "The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement.  Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal…
>
> The arbitration award shall be final and binding upon the Parties.  The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties.  The costs of the arbitration shall be borne equally by the Parties.  Each party shall, however, bear its own lawyers' fees.
>
> The venue of the arbitration shall be London, England or otherwise as agreed by the Parties.  The arbitration proceedings and record shall be in the English language…"

## D.      PROCEDURAL HISTORY

8.  The arbitration was commenced by a Notice of Arbitration served by the Claimant on 22 August 2012.  By letter dated 19 September 2012 the Claimant appointed Sir Anthony Evans as arbitrator and by letter dated 30 November 2012 the

3

**JA-60**

Ministry, acting by Ibrahim H Dikko, its Legal Adviser, appointed Chief Bayo
Ojo S.A.N. as arbitrator. On 29 January 2013 Sir Anthony Evans and Chief Bayo
Ojo appointed Lord Hoffmann as Presiding Arbitrator.

9. On 13 May 2013 Messrs Twenty Marina Solicitors, on behalf of the Respondent,
agreed a procedural timetable as follows:

> 1. The Claimant shall serve a Statement of Claim complying with Article 18 of
> the Rules of the Nigerian Arbitration and Conciliation Act 1990 ("the Rules") on
> or before [28 June 2013].
>
> 2. The Respondent shall serve a Statement of Defence complying with Article 19
> of the Rules on or before [31 July 2013].
>
> 3. There shall be a Procedural Conference on the earliest convenient date after [31
> July 2013].
>
> 4. For the purpose of Article 2 of the Rules all timings shall be at London, United
> Kingdom.

10. By e-mail dated 14 May 2013 the Presiding Arbitrator approved the timetable on
behalf of the Tribunal as Procedural Order No 1.

11. The Claimant served a Statement of Case on 28 June 2013.

12.    On 7 August 2013 the Presiding Arbitrator sent an e-mail to the parties in the
following terms:

> The Tribunal notes with concern that the Respondent has neither complied
> with Procedural Order No 1, requiring it to serve a Statement of Defence on or
> before 30 July 2013, or applied for an extension of the time within which to do
> so.
>
> The Tribunal proposes to discuss the future progress of the arbitration with the
> parties at a telephone conference on 21 August 2013. The parties are
> requested to arrange a convenient time on that date with my clerk, Ms Kate
> Trott.

**JA-61**

12. On 14 August 2013 the solicitors for the Claimant and the Respondent notified the Tribunal that a telephone hearing on 21 August 2013 would be convenient.

13. On 16 August 2013 the Respondent's solicitors sent an e-mail to the Tribunal and the Claimant in the following terms:

> We regret to bring to your attention the fact that it has only become apparent to us as counsel that we will not have complete instructions that will enable us provide proper representation for the Respondent at the telephone hearing scheduled for 21 August 2013.
>
> Indeed the need to secure detailed information correspondence, reports and further instructions is also responsible for the delay in the submission of our statement of defence.
>
> In the circumstances, we are constrained to seek for a postponement of the telephone hearing to a date in the week commencing 2 September 2013. We also seek an extension of time within which to submit a statement of defence by 30 days from the date of the telephone hearing.

14. On 19 August 2013 the Claimant sent an e-mail to the Tribunal and the Respondent proposing that the Tribunal should make Procedural Order No 2 in the following terms:

> UPON the Respondent having failed to serve any Statement of Defence on or before 31 July 2013;
>
> AND UPON the Respondent having failed, on or before 31 July 2013, to show sufficient cause for such failure, as required by Article 28 of the Arbitration Rules set out in the First Schedule to the Arbitration and Conciliation Act of Nigeria ("the Rules").
>
> IT IS ORDERED [BY CONSENT] THAT
>
> 1. The arbitral proceedings shall continue;
>
> 2. The Respondent shall serve a Statement of Defence complying with Article 19 of the Rules on or before Friday 4 October 2013;
>
> 3. There shall be a Procedural Conference on a date after Friday 4 October 2013;
>
> 4. In the event that the Respondent fails to serve a Statement of Defence in accordance with paragraph 2 above, the Arbitral Tribunal

shall be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act 1990;

5. For the purpose of Article 2 of the Rules all timings shall be at London, United Kingdom.

15. On 19 August 2013 the Presiding Arbitrator sent an e-mail to the parties in the following terms:

> 1.  The Tribunal is minded to make an order in the terms of the draft submitted by the Claimant's solicitors in their e-mail of 19 August 2013. If the Respondent has any objection, the Tribunal should receive it before 6 pm London time on Friday 23 August 2013.
> 2.  The telephone conference arranged for 21 August 2013 is vacated.

16. No objection was received and on 14 September 2013 the Tribunal made Procedural Order No 2 in the terms of paragraphs 1 to 5 of the Claimant's draft.

17. On 3 October 2013 the Respondent served a Notice of Preliminary Objection in which it alleged that the GSPA was void under Nigerian law because the Ministry lacked legal capacity to contract and because the Claimant had failed to comply with  section 54 of the Companies and Allied Matters Act Cap 20 LFN 2004.  It also alleged that the arbitration agreement was itself void for lack of capacity and that the tribunal therefore lacked jurisdiction.

18. On 11 October 2013 the Claimant's solicitors wrote to the Respondent's solicitors inviting them to agree that the Tribunal should rule upon its jurisdiction pursuant to section 31(4) of the Arbitration Act 1996 (England and Wales):

> Where an objection is duly taken to the tribunal's substantive jurisdiction and the tribunal has power to rule on its own jurisdiction, it may-
>
> (a)   rule on the matter in an award as to jurisdiction, or
> (b)   deal with the objection in its award on the merits.
>
> If the parties agree which of these courses the tribunal should take, the tribunal shall proceed accordingly.

6

**JA-63**

19. On 14 October 2013 the Respondent's solicitors replied accepting the proposal that the Tribunal should rule in an award on its jurisdiction.

20. On 6 November 2013 the Presiding Arbitrator sent an e-mail to the parties in the following terms:

> 1. The Tribunal agrees with the parties that it would be desirable that it should rule, as a preliminary issue, as to whether or not it has jurisdiction to decide upon the validity of the arbitration clause.

> 2. The Tribunal also considers that as this question is bound to involve an investigation of whether the contract was in fact void for the reasons advanced by the Respondent, the Tribunal should also (but only in the event that it decides that it has jurisdiction to do so) proceed as a preliminary issue to decide whether the contract was void or not.

21. On 22 November 2013 the Respondent's solicitors replied in the following terms:

> The Respondent agrees that the question on whether or not the Tribunal has jurisdiction to decide upon the validity of the arbitration clause, is bound to involve an investigation of whether the contract was in fact void, therefore the Tribunal may decide on this latter point as a preliminary issue (but only in the event that it decides that it has jurisdiction to do so).

22. The Claimant's solicitors also agreed and on 7 January 2014 the Tribunal accordingly made the following Procedural Order No 3:

> IT IS ORDERED BY CONSENT THAT:

> 1.    The arbitral proceedings shall continue;

> 2.    The following questions shall be decided as preliminary issues ("the Preliminary Issues"):

>> (a) Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;

>> (b) If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties;

**JA-64**

(c) If the answer to question (b) is yes, whether the contract is void for any of the reasons stated in the Notice of Preliminary Objection;

3.          The Respondent shall serve its submissions in relation to the Preliminary Objection and the Preliminary Issue with documents and evidence in support on or before Friday 24 January 2014;

4.          The Claimant shall serve its Response to the Respondent's submissions with documents and evidence in support on or before Friday 14 February 2014;

5.          The Respondent shall serve its Reply to the Claimant's Response with documents and evidence in support on or before Friday 28 February 2014;

6.          There shall be a telephone conference upon a date to be arranged not later than 25 January 2014 to fix a date for an oral hearing on the preliminary  issues and to deal with any other procedural matters.

7.          The parties shall exchange skeleton arguments and serve them upon the Tribunal four clear days before the date of the oral hearing.

8.          For the purpose of Article 2 of the Rules all timings shall be at London, United Kingdom.

9.          The parties have leave to apply to vary the provisions of this Order.

23. In accordance with paragraph 3 of Procedural Order No 3, the Respondent served its submissions on the preliminary issues on 24 January 2014.  No evidence or documents were served in support.

24. In accordance with paragraph 4 of Procedural Order No 3, the Claimant served its submissions on 14 February 2014, together with a witness statement by Mr Michael Quinn, Chairman of P&ID (together with exhibits) and an expert report by the Hon Justice Belgore.

**JA-65**

25. On 15 February 2014 the Tribunal made by consent Procedural Order No 4 fixing 14 May 2014 as the date for an oral hearing of the preliminary issues at the International Disputes Resolution Centre, 70 Fleet Street, London EC4Y 1EU.

26. On 28 February 2014 the Respondent served a Reply to the Claimant's submissions.

27. On 17 April 2014 the Respondent notified the Tribunal that it was unable to serve an expert report in response to that of Justice Belgore by 18 April but hoped to be able to say when it would be able to do so by 25 April.

28. On 7 May 2014 the Respondent's solicitors notified the Tribunal that "due to the inability of our client to provide us with complete instructions for the engagement of an expert to prepare a statement in rebuttal to the statement of Justice Belgore (Rtd)" it would be unable to serve its skeleton argument as provided in Procedural Order No 3 and might not be able to attend the hearing on 14 May 2014.

29. On 8 May 2014 the Presiding Arbitrator asked the Respondent's solicitors for confirmation as to whether or not they would be attending the hearing on 14 May 2014, indicating that if they were not going to attend, the Tribunal might decide to dispense with a hearing and rule on the preliminary issues on the basis of the written material which had been submitted.

30. On 9 May 2014 the Respondent's solicitors replied:

> Due to the inability of our client to provide us with complete instructions in respect of this arbitration, we are constrained to inform the Tribunal that it appears we will be unable to attend the hearing scheduled for the 14th of May 2014.

31. No application was made for an adjournment of the hearing. On 11th May 2014 the Tribunal notified the parties that it proposed to dispense with an oral hearing and by e-mail dated 11 May 2014 the Claimant notified the Tribunal that it did not require an oral hearing.

9

**JA-66**

32. The materials before the Tribunal for the purposes of its rulings on the preliminary issues are accordingly the Claimant's Request for Arbitration and Statement of Case, the Notice of Preliminary Objection and the Respondent's Submissions in support and Reply; the Claimant's Submissions on the Preliminary issues, the witness statement of Mr Quinn and the expert report of Justice Belgore.

## E.  THE EVIDENCE

33. We have been assisted by the expert report of Justice Belgore, who is a distinguished Nigerian jurist and former Chief Justice of his country.  Although the Respondent adduced no expert evidence of its own, it cited a number of cases in its submissions.  We have read and considered these, although for the most part we have not thought it necessary to refer to them.  As the English law relevant to the preliminary issues is very similar to Nigerian law, the members of the Tribunal whose legal background is solely English have also been able to compare the views of Justice Belgore with the conclusions which they consider an English court would have reached.

34. The witness statement of Mr Quinn has provided helpful background on uncontroversial matters but the only facts which we found it necessary to mention are the dates of incorporation of the Claimant and its sister company in  Nigeria.

## F.     THE PRELIMINARY ISSUES

*Issue (a):   Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration*

35. This question did not appear to be in dispute.   Article 21 of the Arbitration Rules scheduled to the Nigerian Arbitration and Conciliation Act is clear upon the point:

> 1. The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of separate arbitration agreement.
>
> 2. The arbitral tribunal shall have the power to determine the existence

10

**JA-67**

> or the validity of the contract of which an arbitration clause forms a part…
>
> 4. In general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question. However, the arbitral tribunal may proceed with the arbitration and rule on such a plea in their final award.

36. By the law of the seat of arbitration, England, section 30(1) of the Arbitration Act 1996 confers a similar jurisdiction:

> **30.    Competence of tribunal to rule on its own jurisdiction.**
>
> (1)    Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as to—
>
> (a)whether there is a valid arbitration agreement,
>
> (b)whether the tribunal is properly constituted, and
>
> (c)what matters have been submitted to arbitration in accordance with the arbitration agreement.

*Issue (b)    If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties.*

37. Issue (b) has been separated from issue (c) because the Respondents recognize that even if the principal contract is for some reason invalid, the arbitration agreement is a separate contract and may nevertheless be valid, thereby giving the Tribunal jurisdiction to decide whether the principal contract is valid or not.  This principle of severability is expressed in Article 21.2 of the Nigerian Arbitration Rules ("an arbitration clause…shall be treated as an agreement independent of the other terms of the contract") and section 7 of the English Arbitration Act 1996.  The Respondent's contention is that the grounds of invalidity upon which it relies affect the validity of both the principal contract and the arbitration clause, thereby depriving the Tribunal of jurisdiction.

38. In practice, however, the dispute is about whether the alleged grounds of invalidity impair any part of the GSPA, whether its principal provisions or the arbitration clause.  Thus an answers to issues (b) and (c) will be the same.  Before

11

**JA-68**

answering either (b) or (c), we shall therefore discuss in general terms the grounds of invalidity upon which the Respondent relies.

### (i) Lack of capacity

39. The Respondent submits that it does not have capacity to contract because only persons recognized as such by the law, whether natural or juristic, can have such capacity and the Respondent is neither. No one suggests that the Ministry is a natural person and so the question is whether it is a juristic one. The GSPA is expressed to be made between the Claimant and "the Ministry of Petroleum Resources for and on behalf of the Federal Government of Nigeria". Is the Federal Government of Nigeria a juristic person, able to enter into contracts? It is hard to see how the contrary argument could be advanced and the Respondent does not attempt to do so. It accepts that "the Government of the Federation…is constitutionally endowed with a legal personality".[1] But it says that the Ministry, by contrast, is an "unincorporated department of government", lacking in a separate legal personality.

40. Quite apart from the fact that the Ministry is expressed to contract for and on behalf of the Government, we think that the distinction between the various Ministries and the Government is illusory. The Ministries *are* the Government, operating in different spheres.[2] As Justice Belgore points out, section 5(1) of the Constitution of the Federal Republic of Nigeria 1999 provides that the executive powers of the Federation are vested in the President and may be exercised by him "through…Ministers of the Government of the Federation". By section 147 of the Constitution, the President may assign to any Minister "responsibility for any business of the Government".

41. There may in some cases be room for argument over whether a public body is an organ of government or a separate legal entity but there appears to us no room for doubt that a Ministry is part of the Government.

---

[1] Submission of 24 January 2014, p. 5.
[2] Report of Justice Belgore, paragraph 10.

**JA-69**

**(ii) The Companies and Allied Matters Act 2004**

42. Section 54 of the Companies and Allied Matters Act 2004 ("CAMA") deals with foreign companies "intending to carry on business in Nigeria":

> (1)    [E]very foreign company which before or after the commencement of this Decree was incorporated outside Nigeria, and having the intention of carrying on business in Nigeria shall take all steps necessary to obtain incorporation as a separate entity in Nigeria for that purpose, but until so incorporated, the foreign company shall not carry on business in Nigeria or exercise any of the powers of a registered company and shall not have a place of business or an address for service of documents or processes in Nigeria for any purpose other than the receipt of notices and other documents, as matters preliminary to incorporation under this Decree.

(2)    (2)    Any act of the company in contravention of subsection (1) of this section shall be void.

43. The Respondent's submission is that the act of entering into the GSPA counted as an act of carrying on business in Nigeria and was therefore void.

44. The facts, according to the uncontradicted witness statement of Mr Quinn, are that in 2006, with a view to carrying on the project envisaged by the GSPA, he and his colleagues caused two companies to be incorporated: the Claimant, incorporated on 30 May 2006 in the British Virgin Islands and Process and Industrial Developments (Nigeria) Ltd ("P&ID Nigeria"), incorporated on 21 July 2006 in Nigeria.  The GSPA provided that when the project was operative, the Government was to receive a 10% carried interest in its equity.

45. The Claimant accepts that the business contemplated by the GSPA would have had to be carried on  by P&ID Nigeria, in order to comply with section 54.  But it submits that no such business was being carried on when the GSPA was executed and its execution was not in itself the carrying on of business.

46. The Respondent relies upon the decision of the Court of Appeal (Abuja Division) in *Pawa Complex International Inc and Pawa Associates (Nig) Ltd v Petroleum (Special) Trust Fund* (2008) 9 CLRN 16.  The first appellant ("Pawa Florida")

**JA-70**

was incorporated in Florida and the second appellant ("Pawa Nigeria") in Nigeria. The Trust Fund appointed Pawa Florida as consultant in connection with a development project. It caused Pawa Nigeria to be incorporated and at some indeterminate date gave it power of attorney to perform the consultancy contract. However, the judge found[3] that –

> "apart from not effecting the legalization of [Pawa Nigeria] prior to commencing its intended business [Pawa Florida] went ahead to run that business itself despite the appointment of [Pawa Nigeria] as its attorney. Despite that purported appointment, [Pawa Florida] continued to run the business as if the irrevocable power of attorney had not been donated…"

47. Giving the judgment of the Court of Appeal, Peter-Odile JCA declined to interfere with these findings of fact. He approved an earlier dictum that section 54 prohibited only "running business in Nigeria", which meant conducting it "as continuous operations or permanent occupation". But in this case, that was what Pawa Florida had done. The case is no authority for the proposition that merely entering into a contract which contemplates a business which will be run by a Nigerian company can infringe section 54.

48. Justice Belgore in his expert report likewise expresses the view that "entering into a contract to do business in Nigeria entity is not per se 'carrying on business' [in Nigeria]". We think that the authorities cited by the Justice support this proposition. Indeed, the language of the section may be said to contemplate that a foreign company will take steps which indicate an intention to carry on business in Nigeria (such as entering into the GSPA) and to require that a Nigerian company be incorporated only at the stage when such business is actually about to be commenced.

49. We therefore consider that section 54 does not render any part of the GSPA unlawful.

*Issue (c): If the answer to question (b) is yes, whether the contract is void for any of the reasons stated in the Notice of Preliminary Objection.*

---

[3] At pp. 24–25.

14

**JA-71**

50. It follows from our reasons for the answer to issue (b) that the answer to issue (c) is no.

## G.    DISPOSITION

51. We, Leonard, Lord Hoffmann, Chief Bayo Ojo and Sir Anthony Evans, having read the parties submissions and pleadings and written evidence, and having carefully considered the same and for the reasons stated above, make our Part Final Award as follows:

> (1)    We declare that –

> (a)    The Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;

> (b)    The Tribunal has jurisdiction to decide whether the contract (i.e the GSPA) is valid and binding between the parties;

> (c)    The contract (i.e. the GSPA) is not void for any of the reasons stated in the Notice of Preliminary Objections.

> (2)    We reserve for later decision all other matters in dispute in the reference.

Place of arbitration:  London, United Kingdom.

Signed:

Leonard, Lord Hoffmann

15

**JA-72**

Chief Bayo Ojo

Sir Anthony Evans

~~June~~ 2014
July

# EXHIBIT 8

**IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)**

**AND**

**AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT 1988**

**BETWEEN:**

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>**Claimant**</u>

**and**

### THE MINISTRY OF PETROLEUM RESOURCES
### OF THE FEDERAL REPUBLIC OF NIGERIA

<u>**Respondent**</u>

---

## PART FINAL AWARD

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo, SAN

Sir Anthony Evans

17 July 2015

**JA-75**

## A.    THE PARTIES AND THEIR LAWYERS

1.      The Claimant ("P&ID") is an engineering and project management company registered at Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British Virgin Islands with a Nigerian office at 12 Vaal Street, off Rhine Street, Ministers Hill, Maitama, Abuja.   It is represented by SC Andrew LLP of Napier House, 24 High Holborn, London WC1V 6AZ, United Kingdom.

Contact: Mr Seamus Andrew
Telephone +44(0) 20 7183 1701
E-mail seamus.andrew@scaontier.net

2.      The Respondent ("the Government" or "the Ministry") is the Ministry of Petroleum Resources of the Federal Government of the Federal Republic of Nigeria whose office address is 11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central Business District, Abuja, Nigeria. It is represented by Mr Olasupo Shashore SAN of counsel and Twenty Marina Solicitors LLP, 2nd Floor, Sterling Towers, 20 Marina, Lagos, Nigeria (Ms Lateefat Hakeem-Bakare).

Contacts:
Mr Olasupo Shashore SAN
olasupo@shashore.com
Ms Lateefat Hakeem-Bakare
lateefat.hakeem-bakare@tmslip.com

## B.    SUMMARY OF THE DISPUTE

3.      On 11 January 2010 P&ID and the Government ("the Parties") entered into a written Gas Supply and Processing Agreement ("GSPA") whereby the Government agreed that for a term of 20 years it would make to available to P&ID 400 MMScuFD of Wet Gas and P&ID agreed to process the gas and return approximately 85% by volume to the Government in the form of Lean Gas.   The relevant terms of the GSPA (other than the governing law and arbitration clause set out in paragraph 7 hereafter) are in the Annexure to this Award.

4.      For the purpose of enabling the Wet Gas to be processed, P&ID agreed to construct two or more process streams with ancillary facilities.

5.      The supply of Wet Gas by the Government was to take place in two phases. In Phase 1, the Government was to supply 150 MMScuFD "during or before the last quarter of 2011".   In Phase 2, the remaining 250 MMScuFD were to be supplied "on or before the third quarter of 2012".

6.      There is no dispute that the Government never supplied any Wet Gas.   On 20 March 2013 P&ID wrote to the Government alleging that it had repudiated the GSPA and accepting the repudiation.   It claims about US$ 6 billion damages for lost profits. The Government alleges that the agreement was on various grounds invalid or subsequently frustrated, varied or discharged by force majeure.

## C.   GOVERNING LAW AND ARBITRATION CLAUSE

7.   Clause 20 of the GSPA, so far as relevant, provides:

> "The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.
>
> The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act 1988 which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement. Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed, appoint a third arbitrator to complete the tribunal…
>
> The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties. The costs of the arbitration shall be borne equally by the Parties. Each party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as agreed by the Parties. The arbitration proceedings and record shall be in the English language…"

## D.   PROCEDURAL HISTORY

8.   The arbitration was commenced by a Notice of Arbitration served by the P&ID on 22 August 2012. By letter dated 19 September 2012 P&ID appointed Sir Anthony Evans as arbitrator and by letter dated 30 November 2012 the Ministry, acting by Ibrahim H Dikko, its Legal Adviser, appointed Chief Bayo Ojo S.A.N. as arbitrator. On 29 January 2013 Sir Anthony Evans and Chief Bayo Ojo appointed Lord Hoffmann as Presiding Arbitrator.

9.   On 9 May 2013 the parties agreed a procedural timetable by which P&ID was to serve a Statement of Claim on or before 28 June 2013 and the Government was to serve a Statement of Defence on or before 31 July 2013. By e-mail dated 14 May 2013 the Presiding Arbitrator approved the timetable on behalf of the Tribunal as Procedural Order No 1.

10.   P&ID served a Statement of Case on 28 June 2013.

11.   On 14 September 2013, no Statement of Defence having been served, the Tribunal made Procedural Order No 2 which directed that the Government serve a Statement of Defence by 4 October 2013 and that in default of such pleading the

**JA-77**

Tribunal would be entitled to continue the proceedings in accordance with section 21(b) of the Nigerian Arbitration and Conciliation Act 1990.

12.     On 3 October 2013 the Government served a Notice of Preliminary Objection in which it alleged that the GSPA was void under Nigerian law because the Ministry lacked legal capacity to contract and because P&ID had failed to comply with section 54 of the Companies and Allied Matters Act Cap 20 LFN 2004.  It also alleged that the arbitration agreement was itself void for lack of capacity and that the Tribunal therefore lacked jurisdiction.

13.     On 7 January 2014 the Tribunal by consent made Procedural Order No 3 by which it directed that the following questions shall be decided as preliminary issues:

>   (a)    Whether the Tribunal has jurisdiction to rule upon its own jurisdiction to decide any of the matters in issue in the arbitration;
>   (b)    If the answer to question (a) is yes, whether it has jurisdiction to decide whether the contract is valid and binding upon the parties;
>   (c)    If the answer to question (b) is yes, whether the contract is void for any of the reasons stated in the Notice of Preliminary Objection.

14.     On 3 July 2014 the Tribunal issued a Part Final Award in which it ruled that it had jurisdiction to decide the matters in issue in the arbitration, that it had jurisdiction to decide whether the contract was valid and binding and that the contract was not void for any of the reasons stated in the Notice of Preliminary Objections.

15.     On 21 July 2014 the Tribunal issued Procedural Order No 5, directing that the Government serve its Statement of Defence by 19 September 2014.

16.     On 14 February 2015 P&ID tendered the witness statement of Michael Quinn and the documents exhibited thereto as the factual evidence upon which it intended to rely in support of its Statement of Claim.

17.     On 16 February 2015, the Government not having served a Statement of Defence, the Tribunal made by Procedural Order No 6 a peremptory order within the meaning of section 42 of the Arbitration Act 1996 (UK) directing the Government to serve its Statement of Defence by 27 February 2015.

18.     On 27 February 2015 the Government served a Statement of Defence.

19.     On 6 March 2015 P&ID served a Reply to the Government's Statement of Defence.

20.     On 9 April 2015, by Procedural Order No 7, the Tribunal directed that –
(a)     the Government should by 17 April 2015 serve upon P&ID and the Tribunal the documents and other evidence upon which it intended to rely in support of its Statement of Defence;

**JA-78**

4

(b)     Nigerian law should be treated as a question of law and not required to be proved as a question of fact but that the parties should be at liberty to adduce evidence of Nigerian law by 1 May 2015.

21.     On 22 April 2015, the Government not having served its documents and evidence according to Procedural Order No 7, the Tribunal made Procedural Order No 8 by which it ordered it to do so by 1 May 2015.

22.     On 1 May 2015 P&ID served an expert report of the Hon. Justice Belgore on Nigerian law.

23.   On 4 May 2015 the Government served the witness statement of Mr Ikechukwu Oguine in support of its Statement of Defence.

24.     On 4 May 2015, after consultation with the parties, the Tribunal directed that there should be a Case Management Conference on 6 May 2015 at 10 am BST. On the same date the Presiding Arbitrator sent an e-mail to the parties in the following terms:

> Dear colleagues
>
> The Tribunal would be grateful if the parties would send it, by 6 pm BST tomorrow Tuesday 5 May, an agenda for the Case Management Conference, preferably agreed but otherwise with each party's list of the matters to be discussed.  Presumably these will include (a) bifurcation of liability and damages (b) requests for documents, if any (c) payment of the deposit (d) hearing date and arrangements for the hearing (e) timing of delivery of bundles and written submissions (f) cross-examination of witnesses, if any.
>
> Yours sincerely
>
> Leonard Hoffmann

25.     On 5 May 2015 P&ID's lawyers replied to the Presiding Arbitrator's e-mail:

> Dear Lord Hoffmann,
> Further to your emails of yesterday, the Claimant proposes the following agenda for discussion at the Case Management Conference tomorrow morning:
>
> (a) bifurcation of liability and damages;
> (b) payment of the deposit;
> (c) hearing date and arrangements for the hearing;
> (d) timing of delivery of bundles and written submissions.
>
> The Claimant has written to the Respondent's lawyers to seek agreement to the above agenda, although none has yet been forthcoming.

**JA-79**

26.     This proposal omitted discussion of requests for documents or the cross-examination of witnesses. On 5 May 2015 Mr Shashore on behalf of the Government replied:

> Dear Presiding Arbitrator
>
> Respondent agrees with the proposed agenda for tomorrow's meeting….

27.     On 6 May there was a Case Management Conference by telephone at which P&ID was represented by Mr Seamus Andrew and the Respondent by Mr Olasupo Shashore.  Neither side requested the attendance of a witness for cross-examination at the hearing.

28.     On 6 May 2015 the Tribunal made Procedural Order No 9 by which it ordered that –

> (a)     the proceedings should bifurcated and that there should first be a hearing on liability and then, if P&ID was successful, a hearing on damages;
> (b)     the Government should serve by 8 May 2015 a statement of any primary facts in the witness statement of Michael Quinn which were challenged and of any other facts alleged to be relevant to the question of liability.

29.     On 12 May 2015 the Government served a notice pursuant to Procedural Order No 9 stating the six facts in Mr Quinn's witness statement which it challenged.

30.     On 25 May 2015 P&ID served a written skeleton argument stating the arguments which it intended to advance at the oral hearing on 2 June 2015.

31.     On 28 May 2015 the Government served a written statement of the arguments which it intended to advance on the oral hearing on 2 June 1015.

32.     On 31 May 2015 P&ID served a written statement in reply to the Government's statement of 28 May 2015.

33.     On 1 June 2015 the Tribunal held a hearing at the International Disputes Resolution Centre, 70 Fleet Street London.  Mr Seamus Andrew made submissions on behalf of P&ID and Mr Olasupo Shashore made submissions on behalf of the Government.

34.     At the hearing the Government applied for leave to cross-examine Mr Quinn and Justice Belgore.  The Tribunal refused leave on the following grounds:

> (a)     both parties had been invited by the Presiding Arbitrator on 4 May 2015 to discuss at the Case Management Conference on 6 May 2015 the question of whether any witnesses should be cross-examined and the Government had made no application at that stage;

**JA-80**

6

(b)    The provision in Procedural Order No 9 requiring the Government to serve notice of any primary facts in the witness statement of Mr Quinn that it challenged was intended to enable the parties to know which, if any, relevant facts were in dispute.  In the event, P&ID said that none of the six disputed facts were essential to their claim and they did not intend to rely upon them. It followed that there was nothing upon which cross-examination was required.

(c)    Mr Quinn had died since making his witness statement and, as Justice Belgore had not been notified of any wish to cross-examine him, he was not in attendance.

35.    P&ID did not cross-examine Mr Ikechukwu Oguine on witness statement and the Government has submitted that the Tribunal is therefore "duty bound to accept the evidence of Mr Ikechukwu Oguine as the truth in this arbitral dispute and to find in favour of the Respondent".[1]  The Tribunal rejects this submission.  First, there is no rule that a court or tribunal is bound to accept the evidence of a witness who has not been cross-examined.  There is only a general principle of fairness which requires a court or tribunal, if asked to reject the evidence of a witness, to take into account whether he or the party calling him has been given a fair opportunity, by cross-examination or otherwise, to deal with the grounds upon which it is said that his evidence should be rejected. Secondly, although Mr Ikechukwu Oguine made what was called a witness statement, he gave no relevant evidence.  His statement consisted of references to documents on the record and submissions in similar terms to those made by Mr Shashore.  Accordingly, he has not deposed to any facts which the Tribunal is being invited to reject.

36.    On 12 June 2015 the Government served a written Response to P&ID's reply of 28 May 2015.  We shall call this the "Final Submission" or "FS".

### E.    EVENTS PRECEDING THE GSPA

37.    The following is an account of the events which formed the background to the GPSA.  It is taken from those parts of the witness statement of Mr Michael Quinn which have not been contested by the Government. Footnote references are to the paragraphs of this statement.

(a)    Besides producing oil, an oil well also discharges gas, called "associated gas" or "Wet Gas".  Wet Gas consists of natural gas combined with liquids (condensate and a mixture of propane and butane, called "Natural Gas Liquids" or "NGLs").  Wet Gas is not suitable for power generation but the NGLs can be stripped out of the gas stream and sold as condensate and Liquid Petroleum Gas, while the remaining dry or lean gas can be supplied to power stations or for commercial use.[2]

---

[1] Final Submission paragraph 43.

[2] 23-24

**JA-81**

(b)     There is a chronic shortage of electric power in Nigeria, causing unemployment and poor economic performance outside the pure oil and gas sector.[3]

(c)     Although the Government has built a number of gas turbine power plants, many stand unused for lack of lean gas feedstock.  International oil companies ("IOCs") have for various reasons been unwilling to produce lean gas.[4]

(d)     The Government was anxious to increase the supply of lean gas to the domestic market.  In November 2007 it published a Gas Master Plan, designed to encourage investment in the supply and use of gas for power generation and industry.[5]

(e)     P&ID put to the Government a proposal which, shortly stated, was that the Government should supply it with Wet Gas free of charge.  It would then process the gas and return the resulting Lean Gas to the Government free of charge and retain the NGLs for its own account.[6]  This proposal was in principle accepted by the Government.

(f)     During the negotiation of the GSPA, there was discussion of where the Government would obtain the Wet Gas which it was contracting to supply.  Part was expected to come from OML (Oil Mining Lease) 123, which was being operated by Addax Petroleum ("Addax").[7]  At the time of execution of the GSPA the Government was constructing the Adanga Pipeline from OML 123 to Calabar, with a throughput capacity of 600 MMSCuFD.  It contemplated that this would be sufficient capacity to carry the 150 MMSCuFD required for Phase 1.  For Phase 2, some other source was needed.  OML 67, operated by Exxon Mobil ("Exxon"), appeared to be a likely source, but would require the construction of an additional length of pipeline.  P&ID agreed that if this was needed, it would at its own expense construct a pipeline up to 70 km in length.[8]

## F.     EVENTS SUBSEQUENT TO THE GSPA

38.     The following account of events which followed the signature of the GSPA is again taken from the uncontested parts of the affidavit of Michael Quinn:

(a)     In March 2011 Mr Quinn was informed that Addax was unwilling to supply more than 100 MMSCuFD as it needed 50 MMSCuFD for reinjection to maintain pressure.[9]  Mr Quinn wrote to NNPC proposing variation by which P&ID would receive the 150 MMSCuFD of wet gas from the Addax field and return 50 MMSCuFD of *lean gas* to Addax for reinjection.  It would thereby still be able to secure the NGLs from 150 MMSCuFD.[10]

---

[3]  26
[4]  27
[5]  35
[6]  65
[7]  86
[8]  92-93
[9]  121
[10]  123

(b)     This proposal was not acceptable to NNPC, which suggested instead that P&ID should be supplied with gas from a non-associated gas field. As such gas would not yield NGLs, the proposal was that P&ID should instead be paid for the lean gas supplied to the Government.[11]

(c)     P&ID was in principle willing to enter into such an arrangement but negotiations progressed slowly.[12]

(d)     Addax (on whose OML the associated gas would be found) was at first willing to agree but in June 2012 withdrew its support.[13]

(e)     On 27 July 2012 Mr Quinn wrote to the Government saying unless a formal amendment had been agreed and executed by 10 August 2012, the offer to amend the GSPA would be withdrawn.[14] No formal amendment was executed.

(f)     On 22 August 2012 P&ID delivered the Request for Arbitration.

## G.     THE ISSUES

39.     The issues raised by the Government in its Statement of Defence, the written submissions ("WS") supplied to the Tribunal by Mr Shashore for the purposes of the hearing, and the Final Submission are as follows:

(a)     Did the Government have authority to enter into the GSPA?[15]

(b)     Was the Government's obligation to supply Wet Gas limited to such as Addax and Exxon were willing to provide?[16]

(c)     Did the Government have any obligations under the GSPA before it commenced the supply of Wet Gas?[17]

(d)     Was the Government's obligation to supply Wet Gas conditional upon the Claimant having previously constructed the gas processing facilities?[18]

(e)     Was the GSPA vitiated by a misrepresentation by P&ID or a mistaken belief on the part of both Parties that the OMLS contained 250 MMSCuFD[19] or 400MMSCuFD[20] of Wet Gas?

(f)     Was the GSPA frustrated by the refusal of Addax to provide Wet Gas?[21]

---

[11] 126

[12] 130

[13] 133

[14] 149

[15] Defence paragraphs 1 and 2; WS paragraphs 8-16; FS paragraphs 2-36.

[16] Defence paragraphs 4 and 14; WS 37-49; FS paragraphs 44-45.

[17] Defence paragraph 6; WS paragraphs 70-74

[18] Defence paragraph 7; WS paragraphs 17-36 and 75; FS paragraphs 46-49.

[19] Defence paragraphs 8-9; WS paragraphs 50-58

[20] Defence paragraph 10; WS paragraphs 59-64

[21] Defence paragraph 12.

(g)     Was the Government discharged by force majeure?[22]

(h)     Is the validity of the GSPA affected by the P&ID's alleged motives for entering into it?[23]

(i)     Is the validity of the GSPA affected by the P&ID's alleged lack of a legitimate expectation that the Government would be able to perform its obligations?[24]

(j)     Was the GSPA void as illegal or contrary to public policy?[25]

(k)     Did the GSPA become extinct by the P&ID's acceptance of a bilateral offer?[26]

40.     We shall discuss each of these issues in turn.


**H        DISCUSSION**

**(a)     Capacity**

41.     It was clear from the argument at the oral hearing on 2 June 2015 and even clearer from the Government's subsequent written Response that great stress is laid upon the lack of capacity of the Minister of Petroleum Resources to enter into the GSPA on behalf of the Government.  The Government's submission described the holder of the office at the time of the GSPA as having been a "friendly" Minister who purported to commit the Government to obligations and concessions which exceeded his powers.

42.     The question of capacity to enter into the GSPA was raised by way of preliminary objection and considered by the Tribunal in its first Part Final Award. At that stage, however, the objection took a rather different form.  It was argued that the Ministry of Petroleum Resources was not a juristic person and therefore unable to enter into contracts. The Tribunal decided that the contracting party was the Federal Government of Nigeria, on whose behalf the GSPA said the Minister was acting. The Government was admittedly a juristic person capable of entering into contracts. The powers being exercised were the executive powers of the Government, vested in the President but exercisable on his behalf in accordance with sections 5(1) and 147 of the Constitution.

43.     Mr Andrew submitted that, as a result of the first Part Final Award, the question of the Minister's capacity to enter into the GSPA on behalf of the Government was *res judicata* or, alternatively, that the present form of objection should have been raised at the time and that it would be an abuse of process to take

---

[22]  Defence paragraphs 13-14, WS 65-69
[23]  Defence paragraphs 15
[24]  Defence paragraphs 17 and 18; WS paragraphs 86-91
[25]  Defence paragraph 21; WS paragraphs 92-101
[26]  Defence paragraph 20; WS paragraphs 82-85

**JA-84**

the point now.  We think that the argument now put forward is not the same as that which the Tribunal considered in the first Part Final Award and therefore not *res judicata.*  As for abuse of process, we would agree that if the first Part Final Award had been intended to deal with all questions of capacity, the Government should not be allowed to raise the question of capacity again.  But the Preliminary Objections with which the Tribunal dealt at that stage were only points which the Government had selected as providing it with a defence which did not involve looking into the merits and we do not think that they precluded the Government from raising different points later.

44.      Mr Shashore's submission was that the Minister of Petroleum Resources lacked the capacity to commit the Government to the sale of gas and the other privileges and concessions granted by the GSPA.  Prima facie, it would appear to us that dealing with natural gas from Nigerian oil fields was a matter within the remit of the Minister of Petroleum Resources.  Section 1(1) of the Petroleum Act[27] provides that "the entire ownership and control of all petroleum in, under or upon any lands to which this section applies shall be vested in the State."  Petroleum is defined to include natural gas and the section applies to Nigeria and the sea offshore. The power to grant licences to prospect for and develop oil and gas and to sell or otherwise deal in oil and gas is vested in the Minister of Petroleum Resources.[28] As we have seen, recitals (b) and (c) to the GSPA explained the Government's access to the gas it was proposing to supply to P&ID:

> b)      The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators
>
> c)      The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

45.      It appears to us that *prima facie* it was a matter for the Government acting by the Minister of Petroleum Resources to deal with these gas resources which belonged to the State under section 1 of the Petroleum Act.

46.      It is of course true that if there was legislation which specifically allocated exclusive responsibility for entering into contracts for the supply of such gas to some other body or Ministry, it would not be within the power of the Minister of Petroleum Resources to enter into a contract such as the GSPA.  Mr Shashore referred us to a number of cases in support of this proposition,[29] which we accept. He also cited in support *Knight, Frank Rutley* v *Attorney General of Kano State*[30]*,* in which the Court

---

[27] 1990, Chap P10.

[28] Sections 2(1) and 4(1).

[29] *Eleso* v *Government of Ogun State* [1990] 2 NWLR at 443; *P.H.M.B.* v *Ejitagha* [2000] 11 NWLR (Pt. 677) at pp. 163-70; *Oikherhe* v *Inwanfero* [1997] 7 NWLR (Pt. 512) at p. 247; *Emuze* v *Chancellor* [2003] 8 M.J.S.C. at p. 16.

[30]  [1990] 4 NWLR (Pt. 142) 210

**JA-85**

of Appeal decided that upon the true construction of the Constitution, the exclusive power to value tenements for rates was vested in the Local Government Council.  It was therefore *ultra vires* for the Kano State Government to contract with Knight, Frank Rutley to carry out such a valuation.

47.     In Mr Shashore's first written submissions, his candidate for a body with "the exclusive right to possess and supply gas" was the Nigerian National Petroleum Corporation ("NNPC")".

48.     Before entering into question of whether statute had conferred such exclusive rights on the NNPC, we should observe that the objection is technical in the highest degree.  Pursuant to a Memorandum of Understanding which preceded the GSPA[31], a Joint Operating Committee ("JOC") was established to "discuss in detail regarding the implementation of the Project."  The Legal Director of the NNPC was a member of the JOC.[32]  Dr Lukman, the Minister of Petroleum Resources who signed the GSPA, was chairman of the NNPC.[33]  The Board of Directors of the NNPC were members of or appointed by the Government.[34]  If the Minister thought (as he must have done) that the GSPA was in the public interest, there would have been no difficult in making the NNPC a party.

49.     Be that as it may, and looking at the technicalities of the matter, we do not think there is anything in the constitution and powers of the NNPC to prevent the Government from entering into a contract to provide Wet Gas.  Section 5 of the Nigerian National Petroleum Corporation Act sets out the *duties* of the Corporation:

> **5.**   (1)       Subject to the provisions of this Act, the Corporation shall be charged with the duty of-
>
> (a)        exploring and prospecting for, working, winning or otherwise acquiring, possessing and disposing of petroleum;
> (b)        refining, treating, processing and generally engaging in the handling of petroleum for the manufacture and production of petroleum products and its derivatives;
> (c)        purchasing and marketing petroleum, its products and by-products;
>
> (d)        providing and operating pipelines, tanker-ships or other facilities for the carriage or conveyance of crude oil, natural gas and their products and derivatives, water and any other liquids or other commodities related to the Corporation's operations;
> (e)        constructing, equipping and maintaining tank farms and other facilities for the handling and treatment of petroleum and its products and

---

[31] Article 8 a)
[32] Quinn Witness Statement, paragraph 80.
[33] Nigerian National Petroleum Company Act, section 1(3).
[34] Ibid., section 1(2).

derivatives;

(f)      carrying out research in connection with petroleum or anything derived from it and promoting activities for the purpose of turning to account the results of such research;

(g)      doing anything required for the purpose of giving effect to agreements entered into by the Federal Government with a view to securing participation by the Government or the Corporation in activities connected with petroleum;

(h)      generally engaging in activities that would enhance the petroleum industry in the overall interest of Nigeria;  and

(i)      undertaking such other activities as are necessary or expedient for giving full effect to the provisions of this Act.

50.    None of these duties can be regarded as conferring exclusive powers.  In fact, sub-paragraph (g) specifically contemplates that the Government will be entering into contracts within the scope of the NNPC's remit.

51.    In his oral submissions and written Final Submission, Mr Shashore submitted that the body with exclusive powers was the Ministry of Energy. These powers, he said, were derived from the National Gas Supply and Pricing Policy, published by the Government in 2008, and the National Domestic Gas Supply and Pricing Regulations 2008.

52.    The main object of the Policy was to make more gas available for the "strategic domestic sector", including in particular the generation of electricity. The policy document points out that Nigerian (wet) gas is rich in liquids –

"such that the residue (lean) gas can be delivered at relatively little or no cost as the project remains profitable to the supplier on the strength of the liquids contract alone."

53.    This of course was the business model which P&ID was proposing to the Government.  The Policy proposes legislation by way of implementation (a "Downstream Gas Act"), but there is nothing in the document which allocates responsibility to any particular Ministry.[35]  The Regulations create Department of Gas within the Ministry of Energy and confer upon it certain regulatory powers but nothing to suggest that it will enter into the business of selling gas, still less that it will have the exclusive power to do so.

54.    It therefore appears to us that the Ministry of Petroleum Resources was an appropriate entity to enter into the GSPA on behalf of the Government and we reject the submission that it lacked the authority to do so.

---

[35] It is interesting to notice that the Regulations were made by the President as Minister of Energy under a rule-making power conferred by section 9 of the Petroleum Act upon the Minister of Petroleum Resources.

**JA-87**

**(b)      Specific or unascertained Wet Gas?**

55.      Mr Shashore submits that the contract was for the supply of Wet Gas from OML 123 (Addax) and OML 67 (Exxon).  He draws attention to Recital (i), which states that P&ID had "undertaken all necessary studies, including the identification of suitable associated gas fields".  These were OML 123 and OML 67.  P&ID located its proposed plant in a place convenient for receiving Wet Gas from OML 123 and offered to construct a new length of pipeline to bring gas from OML 67. In the course of negotiations P&ID wrote letters to the Minister of Petroleum Resources identifying OML 123 and OML 67 as fields from which its requirements of Wet Gas could be satisfied.  It follows, he says, that the contract was for the supply of Wet Gas from OML 123 and 67.

56.      The difficulty is that this is not what the GSPA says.  Article 6 a) says that the responsibility of the Government is to deliver to the Site boundary "the agreed quantities and quality of gas as defined under Article 3c and in the manner set out in Appendix A…"  Appendix A specifies quantities and quality but says nothing about where the gas should come from. Article 3c, under the heading "Scope of the Work" says that the gas would be from OMLs 123 and OML 67 "or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements…"

57.      It is clear from these provisions that although the parties regarded OML 123 and 67 as the most likely source of Wet Gas for P&ID's plant, there was no contractual term that it should have to come from those fields and nowhere else. The Government was at liberty to discharge its obligation to supply Wet Gas from any of the substantial sources which recital b) said were at its disposal.

58.      It is therefore unnecessary for us to decide whether, if the contract had been for the supply of Wet Gas specifically from those two fields, the unco-operative attitude of Addax and Exxon would have excused the Government from performance throughout the life of the agreement. That may have been a large question on which we have little evidence.  In our opinion, however, this was a contract for the supply of unascertained Wet Gas and therefore the Government's inability to obtain it from OML 123 or OML 67 is not relevant.

**(c)      When did the Government's obligations begin?**

59.      Article 5 says "the Agreement shall come into being on the Effective Date". The duration of the Agreement is (subject to extension) 20 years "with the effect from the Start Date", which is defined to mean the earliest date on which the Government starts to deliver the Phase 1 quantities of 150 MMSCuF of Wet Gas.

60.      The Government obligations which P&ID says it has failed to perform and which constituted a repudiatory breach are those in Article 6 a) and b): to deliver the gas to the Site boundary and to ensure that all the necessary pipelines and infrastructure and arrangements with Third Parties are in place to "facilitate the timely implementation of gas processing".

**JA-88**

USCA Case #18-7154      Document #1780490      Filed: 04/01/2019      Page 93 of 242

61.     Mr Shashore submits that the Government's obligations commenced only at the "Start Date", that is, when it first started to deliver gas.  In other words, it was under no obligation to deliver gas until it had started to deliver gas.

62.     This extraordinary proposition is in our opinion the result of a misunderstanding about the significance of the term "Start Date".  Its sole function is to determine the duration of the contract and to ensure that P&ID's 20 year franchise is not to be reduced by the Government's delay in starting to deliver gas.  But the obligations of the Government under Article 6 b) began on the Effective Date, when the contract took effect.  That was the date on which it was signed.

**(d)     Did the Government not have to do anything till the GPFs had been built?**

63.     Mr Shashore submits that the Government had no obligation to deliver gas until there was a plant to receive it.  That, no doubt is true, but the Government's obligations were not confined to the delivery of gas.  By Article 6 b) it was also obliged to –

> "ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement."

64.     There is nothing in the GSPA to suggest that these obligations were conditional upon the completion by P&ID of the construction of the GPFs. It would have been commercially absurd for P&ID to go to the expense of building GPFs when the Government had done nothing to make arrangements for the supply of the Wet Gas.

65.     In his oral argument and written Final Submission, Mr Shashore put forward a modified version of this argument. Article 3(c) said that the Government was to deliver the gas at "the Site Boundary".  The "Site" was defined as "the land at Calabar on which the GPFs are located".  Mr Shashore says that the Government could not have complied with this obligation until P&ID had a site.  It had, it is true, been allocated and offered a site but had not yet bought it.  So there was no possibility of compliance with an obligation to deliver to the Site boundary until P&ID has a Site.

66.   We think this argument takes the matter no further than the first version.  Of course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it.  But that does not excuse the Government's failure to comply with 6 b).  There is no suggestion that its failure to comply with those obligations was caused by uncertainty as to where the Site was going to be. It was assumed by everyone that it would be on the land allocated in Calabar.

**JA-89**

**(e)      Misrepresentation or mistake**

67.      The Government next submits that it was induced to enter into the GSPA by a false representation that OML 123 had at least 180 – 200 MMSCuFD or at any rate over 150 MMSCuFD or alternatively that it was the subject of a common mistake and that "the GSPA was therefore void and unenforceable from inception."[36]

68.      One of the difficulties about these defences is that the Government has called no evidence to support them.  The only witness statement submitted on behalf of the Government is that of Mr Ikechukwu Oguine, a lawyer who works for NNPC and who does not claim to have first-hand knowledge of any of the relevant events.  All he says is that he has read the documents. His reading of the documents appears to have been somewhat imperfect because, in alleging misrepresentation, he had read the statement in Article 8 g) that "the Adanga pipeline…will have a throughput capacity of 600 MMSCuFD" to mean that "OML 123 [will] contain…600 MMSCuFD", which he says was untrue.  Perhaps it was, but that was not what Article 8 g) said.

69.      The allegations of misrepresentation (and reliance thereon by the GSPA) therefore depend upon such inferences as can be drawn from the documents and the evidence of Mr Quinn.

70.      Mr Quinn said in his witness statement:

> "51.…[T]here were numerous natural gas fields off the coast of Calabar, such as those contained in [OML 123 and OML 67]…
>
> "52.  From information available in the public domain and from our own researches it was clear that there was more than enough Wet Gas off the coast of Calabar to support a gas stripping and propylene plant operation in the Calabar area processing a Wet Gas throughput of 400 MMSCuFD…
>
> 73.      There were discussions about the possible locations from which to source Wet Gas for the Project.  On 15 June I wrote to the Honourable Minister to explain the potential benefits of using, for Phase 1, the 180-200 MMSCuFD of Wet Gas which was at that time being flared by Addax Petroleum off the coast of Calabar in a concession known as OML 123.
>
> 84.      [In September 2009] a series of meetings commenced, some of which included *"stakeholders"* such as P&ID, the Government and Addax, some of which were between P & ID and Addax, and, I believe, some of which were between the Government and Addax.

---

[36] Shashore Written Submissions paragraph 51.

> 86.    [At a meeting chaired by Engineer Tijani, technical
> adviser to the Ministry, on 13 November 2009] …Addax
> Petroleum confirmed their willingness to deliver 100
> MMSCuFD of natural gas from the 168 MMSCuFD Wet
> Gas that they were currently flaring to the P&ID site…to
> comply with its domestic obligations."

71.    It appears from this evidence that in June 2009 Mr Quinn wrote to the
Minister saying that Addax were flaring 180-200 MMSCuFD and that in November
Addax said they were flaring 168 MMSCuFD.   Both of these may have been right,
but even if Mr Quinn's estimate was wrong, we cannot infer that the Government
relied upon it when entering into the contract.  Addax was the concessionaire and best
placed to know how much gas was available. It was making regular returns to the
NNPC.  The Government had been having meetings with Addax and other
stakeholders and at the 13 November meeting Addax provided its own estimates.
Accordingly, the evidence does not support the conclusion that the Government relied
upon a misrepresentation by P&ID as to the gas which could be obtained from OML
123.

72.    For the same reasons, there is no evidence to support the conclusion that the
Government made a mistake. As a result of its meetings with Addax, it is likely that it
knew exactly how much gas was available.  It is therefore unnecessary to decide
whether the mistake was such as to vitiate the contract or one of which the
Government took the risk.  Prima facie we think that it is the obligation of a party
who offers to provide something to ensure that it is there to be provided and that he
cannot rely upon his mistake if this turns out not to be the case.

**(f)    Frustration**

73.    The Government next says that the contract became impossible of
performance when Addax refused to provide the necessary 150 MM SCuFD of Wet
Gas.   But there is no evidence that the contract was incapable of performance. All we
know is that Addax and Exxon were unco-operative. But there is nothing to show that
upon suitable terms the Government could not have obtained gas from their fields, as
provided for an contemplated in Article 3 c) under the heading "Scope of the Work".
In any case, our finding that the GSPA, upon its true construction, was for the supply
of specified quantities and qualities of unascertained gas, must be fatal to a claim of
frustration. There is nothing to show that the Government could not have obtained the
gas from the other sources mentioned in recitals b) and c).

**(g)    Force majeure**

74.    In its first written submissions the Government relied upon the *force majeure*
clause but Mr Shashore abandoned this submission at the hearing.  We think he was
right to do so.

**(h)     The profit motive**

75.     The Government said, in its Statement of Defence[37], and Mr Oguine said in his witness statement[38] that P&ID was motivated by the wish to make a profit.  It is unusual for anyone to enter into a business transaction for any other purpose and Mr Shashore said at the hearing that he did not rely upon this feature as a defence.

**(i)     Legitimate expectation**

76.     The Government's submissions contain numerous references to the concept of legitimate expectations. It is said that P&ID could not have had a legitimate expectation that the Government would do all the things it had promised to do in the GSPA.  Some of these (such as the ability to obtain gas from OMLs operated by Addax and Exxon) are irrelevant once it is appreciated that the contract was for the supply of Wet Gas from any source and not from any particular OML. Others, like the grant of "Pioneer status", are not presently in issue and the Government's powers in that respect have not been investigated.  But we think that the references to legitimate expectations and the citation of public law cases on the subject demonstrate a serious confusion between public and private law.  A body exercising public law functions may have a duty in public law, enforceable by public law remedies, to act in accordance with the legitimate expectations of persons who may be affected by its acts or omissions.  But although one party to the GSPA was the Government, it was nevertheless a contract, enforceable as a matter of private law. P&ID's rights are rights to the enforcement of the contract or compensation for its breach, exactly as if the other party had been a private person. In this situation, the concept of legitimate expectations has no role to play.

**(j)     Illegality and public policy**

77.     Finally, the Government claims that the GSPA was illegal and contrary to public policy.  The grounds appear to be that the Government promised various permits, licences and approvals and "Pioneer status" (carrying exemption from various taxes and duties) for 5 years which were not within the remit of the Ministry of Petroleum Resources.  However, as we explained in our first Part Final Award, the GSPA was not a contract with the Ministry of Petroleum Resources.  It was a contract with the Federal Government of Nigeria.  It may at some stage become an issue as to whether the Government can avoid liability for such matters as the grant of Pioneer status on the ground that some approval or consent internal to the Government had not been obtained.  But no such issue arises at the moment.  We do not think that the Government has demonstrated any ground upon which it can be said that the GSPA was unlawful or contrary to public policy.

**Conclusion**

78.     We therefore reject all the defences put forward by the Government and find that it repudiated its obligations under the GSPA.  P&ID was entitled to terminate the

---

[37] Paragraph 2
[38] Paragraph 24

**JA-92**

contract on 20 March 2013 and claim damages for the Government's failure to perform.

## I.   COSTS

79.     Article 20 of the GSPA provides that in the event of an arbitration, each party shall bear its own lawyers' fees but that the costs of the arbitration (i.e. fees of the tribunal, hire of the arbitration room, shorthand writers' fees and other such administrative costs of the parties) shall be borne equally by the parties.

## J.   DISPOSITION

80.     We, Leonard, Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans, having read the parties' written evidence, pleadings and submissions and having heard their oral submissions, and having carefully considered the same and for the reasons stated above, make our second Part Final Award as follows:

(1)     We declare that –

   (a)     The Government repudiated the GSPA by failure to perform its obligations under Articles 6 a) and b) thereof;

   (b)     P&ID was entitled to and did accept the Government's repudiation on 20 March 2013;

   (c)     P&ID is entitled to damages (in an amount to be assessed) for the Government's repudiation of the GSPA;

   (d)     The parties are jointly and severally liable for the unpaid costs of the arbitration and that a party which has paid or pays more than an equal share of such costs is entitled to recover the excess from the other party.

(2)     We order the parties to consult with each other and the Tribunal to agree upon a procedure and date for hearing to determine the amount of damages to which P&ID is entitled;

(3)     We reserve to ourselves for later decision all other matters in dispute in the reference.

Place of arbitration:  London, United Kingdom.

Signed:


Leonard, Lord Hoffmann

**JA-93**

19

Chief Bayo Ojo SAN

Sir Anthony Evans

**ANNEXURE**

**THIS GAS SUPPLY AND PROCESSING AGREEMENT** is entered into this 11th day of January 2010

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES FOR AND ON BEHALF OF THE FEDERAL GOVERNMENT OF NIGERIA (FGN)** (hereinafter referred to as "the Government")…of the first part

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED** (hereinafter referred to as "P&ID") of the other part

**WHEREAS:**

a)      The Government holds as a key strategic objective, the production of adequate quantities of natural gas to satisfy the power generation and other domestic uses needed for national economic growth.

b)      The Government of Nigeria has substantial undiscovered potential gas reserves, discovered but undeveloped gas reserves and associated gas reserves in its onshore and offshore territories largely in acreage allocated to international and indigenous operators

c)      The Government through the NNPC owns approximately fifty-seven (57) percent of the gas resources in acreage allotted to the international operators.

d)      The Government desires to develop and utilize [its] gas resources at optimal capacity to meet the growth in gas demand at the various sectors of the economy including domestic, regional and export markets;

**JA-94**

e)    The Government is currently engaged in the development of a strategic natural gas policy, to ensure the smooth achievement of its objective for the effective development of gas in Nigeria to meet short term supply requirement for power generation;

f)    The Government has explored viable structures that could be used to meet the highlighted objectives and considered P&ID as capable of implementing and executing the Project;

g)    The Government has identified certain number of oil/gas flared points and desires to eliminate gas flaring and wishes to set up a domestic LPG production base as well as make the lean gas produced available for various other domestic uses.

h)    P&ID possesses the requisite finance, technology and competence for the fast track development of the Project.

i)    P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the [Project] in accordance with the terms of this Agreement.

j)    The Parties are entering into this Agreement to ensure the fast track implementation of the Project and to ensure the timely provision of pipeline quality Lean Gas for power generation.

**IN CONSIDERATION OF THE MUTUAL RIGHTS, INTERESTS, COVENANTS AND OBLIGATIONS CONTAINED HEREIN IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:**

1.    **DEFINITIONS AND INTERPRETATIONS**

iv.    "Effective Date" means the date of signing of this Agreement;

v.    "GPFs" means the Gas Processing Facilities to be constructed and operated at the Site and off-shore from the Site where applicable;

vi.    "Lean Gas" means pipeline quality gas having a composition of not less than 95 mol percent Methane and Ethane.

vii.   "MMSCuFD" means Millions of Standard Cubic Feet per Day

xi.   "Project" means the establishment of the GPFs and the supply of Wet Gas thereto and the delivery of Lean Gas and their successful operation by the Parties as set out in this Agreement

xiv.   "Site" means the land in Calabar on which the GPFs are located

xv.   "Start Date" means the earliest date on which the Government commences the regular supply and delivery of not less than 150 MMSCuFD of Wet Gas to the Site;

xvi.   "Wet Gas" means associated gas removed, during oil production, at the separator having a Propane content of not less than 3.5 mol percent and a Butane content of not less than 1.8 mol percent, compressed and delivered, via pipeline to the Site.

## 2.   **OBJECTIVE**

The objective of this Agreement is to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of Wet Gas by the Government and the processing of the said Wet Gas by P&ID utilising two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner.

## 3.   **SCOPE OF THE WORK**

The scope of works of this Agreement is as follows:

a.   P&ID shall construct GPFs on the Site allocated to them by Cross River State Government…   The GPFs shall be constructed on a timely basis to ensure the earliest possible delivery to the Government, or its nominees, of approximately 340 MMSCuFD Lean Gas for power generation and industrial use by third parties.

b.　　To ensure this [fast track] is achieved P&ID will construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD…in accordance with the schedule of works forming Appendix B hereto.

c.　　The Government shall make available at the P&ID Site boundary, 400 MMScuFD Wet Gas (free of water) in the manner set out in Appendix A having a minimum $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) content of 1.8 mol from OMLs 123 and OML 67 or such other locations as the Government may decide from time to time to ensure the ongoing feedstock delivery volume and quality requirements for the duration of this Agreement as defined under Article 5 of this Agreement.

d.　　P&ID will process the Wet Gas to be supplied by the Government and shall provide to the Government or its nominees approximately 85% of the wet gas feedstock molecular volume in the form of Lean Gas at the Site Boundary.

### 5.　DURATION OF THE AGREEMENT

This Agreement shall come into being on the Effective Date being the date of signing of the Agreement as defined in Article 1 herein and shall remain in force for a period of twenty (20) years with effect from the Start Date of the Agreement…

### 6.　RESPONSIBILITIES OF THE GOVERNMENT

a)　　The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;

b)　　The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.

c)　　The Government agrees to assist P&ID, and where necessary to intercede with the relevant Government agencies, to obtain all requisite permits, licences and

**JA-97**

approvals required from the relevant Government agencies and others for the [fast track] implementation of this [Project].

### 7.   RESPONSIBILITIES OF P&ID

a)    P&ID shall use best endeavours to ensure the [fast track] implementation of this Project to construct and incorporate two or more process streams with a total capacity of 400 MMSCuFD…   Thereafter P&ID shall maintain and operate the GPFs on a professional basis to ensure a regular supply of Lean Gas (approximately 340 MMSCuFD) for power generation.

### 8.   COMMERCIAL TERMS

a)    The Government shall deliver to the Site boundary 400 MMScuFD of Wet Gas as set out in Article 3 c) and in Appendix A of this Agreement having a minimum of $C_3$ (Propane) content of 3.5% mol and $C_4$ (Butane) of 1.8% mol at No Cost to P&ID.

b)    P&ID will process the Wet Gas, recompress the residual Lean Gas, representing approximately 85% of the Wet Gas feed, and make it available, for power generation or other industrial usage at the discretion of the Government, at the Site boundary at No Cost to the Government.

e)    As further consideration P&ID shall transfer to the Government or its nominee a total of ten percent (10%) of the Equity of P&ID…

g)    The Parties are aware that the 24 inch Adanga pipeline presently under construction from the Addax operated OML 123 directly to Calabar and due for completion in 2010 will have a throughput capacity of 600 MMSCuFD  and can adequately provide the first required delivery of 150 MMSCuFD of Wet Gas to the Site and that an additional pipeline of up to 70 km in length may be required to link up the Adanga pipeline in order to facilitate the delivery of the remaining 250 MMSCuFD of Wet Gas to the site from other sources to be chosen by the Government.  If such a requirement is necessary, P&ID undertakes to build and install the said additional pipeline to provide for the delivery of the remaining 250MMSCuFD of Wet Gas to the Site, at no cost to the Government, and P&ID will retain the ownership and provide the maintenance for the pipeline.

## 11.   FORCE MAJEURE

a)     Any failure or delay on the part of either Party in the performance of its obligations or duties under this Agreement, shall be excused to the extent attributable to force majeure save for obligations to pay sums due and payable.  A force majeure situation includes delays, defaults or inability to perform under this Agreement due to any event beyond the reasonable control of either Party. Such event may be, but is not limited to, any act, event, happening, or occurrence due to natural causes, acts or perils of navigation, fire, hostilities, war (declared or undeclared), blockage, labour disturbances, strikes, riots, insurrection, civil commotion, quarantine restrictions, epidemics, storms, floods, earthquakes, accidents, blowouts, lightning, and acts of or orders of the Government.  If activities under this Agreement are delayed, curtailed or prevented by force majeure, then the time for carrying out the obligation and duties thereby affected, and rights and obligations hereunder, shall be extended for a period equal to the period of such delay.

b)     The Party who is unable to perform its obligations as a result of the force majeure event shall promptly notify the other Party thereof not later than forty-eight (48) hours after becoming aware of the establishment of the force majeure event, stating their cause, and both parties shall do all that is reasonably within their powers to remove such cause.

## 15.   CHANGES TO AGREEMENT

No amendments, modifications or changes to this Agreement shall be valid unless approved in writing by both parties.

## 21.   ENTIRE UNDERSTANDING

This Agreement including Appendix A and Appendix B comprises the full and complete understanding of the Parties hereto with respect to all the matters addressed in this Agreement and the said Appendix A and Appendix B shall form an integral part of this Agreement.

### APPENDIX A

**Delivery of Wet Gas to P&ID**

Phase 1     During or before the last quarter of 2011 a continuous supply of 150 MMSCuFD of Wet

**JA-99**

Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

Phase 2    On or before the third quarter of 2012 a further additional continuous supply of 250 MMSCuFD of Wet Gas, having a minimum Propane content of 3.5 mol% and minimum Butane content of 1.8 mol%, will be supplied to the Site for processing by P&ID.

**Delivery of Lean Gas to the Government**

Phase 1    During the last quarter of 2011 following supply of the 150 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided.  The Lean Gas will be compressed to 92 bar G.

Phase 2    On or before the third quarter of 2011 following supply of the additional 250 MMSCuFD of Wet Gas to the Site, P&ID will process the gas and return to the Government, at the Site, a continuous supply of Lean Gas amounting to approximately 85% by volume of the Wet Gas provided. The Lean Gas will be compressed to 92 bar G.

**JA-100**

USCA Case #18-7154   Document #1780490      Filed: 04/01/2019   Page 105 of 242

# EXHIBIT 9



# Claim Form
### (arbitration)

NOT FOR SERVICE OUT
OF THE JURISDICTION



| In the |
| --- |
| COMMERCIAL COURT |

| | for court use only |
| --- | --- |
| Claim No. | CL - 2018 - 000917 |
| Issue date | 23 | 12 | 18 |

SEAL
HIGH COURT OF JUSTICE
2 3 DEC 2018
ADMIRALTY AND COMMERCIAL COURT

## In an arbitration claim between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria
Block D, 11th Floor, NNPC Towers
Herbert Macaulay Way, Central Business District
Abuja, Nigeria

**Defendant(s)**

Process and Industrial Developments Limited
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

## In the matter of an [intended] arbitration between

**Claimant**

The Ministry of Petroleum Resources of the Federal Republic of Nigeria

**Respondent**(s)    *Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

Process and Industrial Developments Limited (Claimant in the arbitration proceedings)
Trident Chambers, P.O. Box 146, Road Town
Tortola, British Virgin Islands
Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria.

Other persons required to be served with this Claim Form pursuant to CPR Part 62:

(1) Lord Leonard Hoffman (Presiding arbitrator in the arbitration proceedings)
Brick Court Chambers, 7-8 Essex Street, London WC2R 3LD. U.K. (leonard.hoffman@brickcourt.co.uk)

(2) Sir Anthony Evans (Party-appointed arbitrator in the arbitration proceedings)
24 Lincoln's Inn Fields, London WC2A 3EG. U.K. (atighe@essexcourt.net)

(3) Chief Bayo Ojo (Party appointed arbitrator in the arbitration proceedings)
ITF House, 4th Floor, No. 6 Adetokunbo Ademola Crescent, Wuse 2, Abuja, Nigeria. (cabayoojo@aol.com)

| Defendant's name and address | Process and Industrial Developments Limited (Claimant in the arbitration proceedings) |
| --- | --- |
| | Trident Chambers, P.O. Box 146, Road Town |
| | Tortola, British Virgin Islands |
| | Registered office: 12 Vaal Street, off Rhine Street, Minister's Hill, Maitama, Abuja, Nigeria. *Service address:* SC Andrew LLP |

[  ]  This claim will be heard on:

at        am/pm

[  ]  This claim is made without notice.

The court office at
When corresponding with the court, please address forms or letters to the Court Manager and quote the case number
N8 Claim form (arbitration)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

## JA-102

Napier House,
24 High Holborn
London WC1V 6AZ
UK
DX 248 London/Chancery Lane

| Claim No. | |
|-----------|--|
| | |

Remedy claimed and grounds on which claim is made

REMEDY CLAIMED

1.

An order under Part 62.9(1) of the Civil Procedure Rules extending the 28-day time period under section 70(3) of the Arbitration Act 1996 in which to apply to the Court under section 68 of the Arbitration Act. (Draft order attached). The Claimant seeks the extension of time on the grounds that:

   a. As an arm of the Federal State of Nigeria, during a period of Governmental transition between March 2015 and November 2015, the Claimant was unable promptly to progress the consideration of and preparation for the current application within the 28 day period

   b. Once the internal impediments arising from a change of administration over the summer of 2015 were dealt with (and a new Attorney General in post at at 11 November 2015) the Claimant has moved expeditiously to bring the current application.

   c. If the extension were granted, the Defendant would not suffer any or any irremediable prejudice if this application proceeded (in particular, given that the Claimant is co-operating fully with the ongoing preparations for the future quantum hearing (which hearing is unlikely to come on prior to the disposal of the current application - assuming permission were granted); and/or

   d. Given the size of the sums at stake (and their further substantial growth since the making of the Award), it would be unjust to the Claimant for it to be denied the opportunity of having the application determined, above all by reason of the fact that there is merit in its application and/or that the amount claimed against the Claimant (which was already substantial at the date of the Award and (since the Award) has increased from US$ 6.7 bn to US$ 8.6 bn.

2. An order setting aside and/or remitting for further consideration all or part of the arbitration award of Lord Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated July 2015(the "**Award**") under section 68(2)(d), alternatively under section 68(2)(f) of the Arbitration Act 1996, as further set out in detail below, together with, or otherwise such order under the Arbitration Act 1996, as may be appropriate, on the grounds identified below:

In brief severally or in combination, the said irregularities identified below amount to serious irregularities within the meaning of s 68(1) of the 1996 Act, in that they either (i) make the difference between a finding of liability or not or (ii) (at the least) fundamentally alter the nature and scope of the damages enquiry. The magnitude of the financial seriousness of the implications of each of the above challenges is clear. Equally, in terms of the arbitral process, the subject-matter of each of the proposed challenges goes to issues of principle (not detail), which are central to critical findings of liability, ie what breach, seriousness of breach, and rescission. As to quantum, the critical point is whether the breach was of a provision which did not of itself bring a liability to deliver gas (ie cl. 6(b)) or one that did (ie Cl 6(a)). The point here is that if there was (as the Tribunal found – at least at one point – no breach of Cl. 6(a)), any quantum enquiry regarding a cl 6(b) breach would in the first instance turn on (*inter alia*) whether or not (or when) a plant would have been successfully built by the Defendant. On that basis, it may be that no loss and damage at all was suffered.

The detailed grounds are as follows: [see separate sheets]

| Claim No. | |
|---|---|

<u>Relief claimed, in detail and in the alternative</u>

1   In the event that the application succeeds in one or more respects, the following orders are sought:

2   Insofar as the application succeeds on <u>Ground A,</u> the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) [ 'the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

3   Insofar as the application succeeds on <u>Ground B</u>, the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

4   Insofar as the application succeeds on <u>Ground C</u>, the like relief is sought as under Ground A above.

5   Together with such further or other order as is just, including an order for costs.

Statement of Truth

*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.

* I am duly authorised by the claimant to sign this statement

Full name _____ Kamal Rasiklal Shah

_____

Name of claimant's solicitor's firm _____ Stephenson Harwood LLP

_____

signed _____     position or office held _____ Partner

_____

*(Claimant)(Claimant's solicitor)                                   (if signing on behalf of firm or company)

*delete as appropriate

Stephenson Harwood LLP                     Claimant's or claimant's solicitor's address to
1 Finsbury Circus                          which documents should be sent if different
London                                     from overleaf. If you are prepared to accept
EC2M 7SH                                    service by DX, fax or e-mail, please add details.
Attn: Kamal Shah, Stephen Ashley, Jide
Adesokan

## GROUNDS

### Introduction

1      The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Ministry of Petroleum Resources of the Federal Republic of Nigeria ['the Ministry'] whereby the Ministry allegedly agreed to construct certain infrastructure in Nigeria, with a view to using it to make available to PIDL 400 MMScuFD of Wet Gas for a term of 20 years in return for which PIDL agreed to construct Gas Processing Facilities (**"GPFs"**) at a delivery site in Nigeria order to receive delivery of and then to process the Wet Gas and to return approximately 85% by volume to the Ministry in the form of Lean Gas, being at liberty to dispose of the balance    This was essentially a barter transaction, allegedly made directly by a Federal Nigerian Ministry and a BVI registered company.

2      By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the **"Arbitration"**) against the Ministry alleging that the Ministry was in breach of the GSPA repudiated the GSPA. The allegation of repudiatory conduct was one based on a failure to perform.

3      As of today, the damages claimed by the Defendant are alleged to be US$ 8,627,000,000.

4      On 1 June 2015, a hearing took place at the International Disputes Resolution Centre in London.   The hearing was restricted to issues of liability.  Issues of quantum (if any) were postponed.

5      On 17 July 2015, the Tribunal issued the Award.  The reference to "July 2014" on the front page of the Award is incorrect. The Award was issued to the Claimant by email on the date of issue.

6      In the dispositive part of its Award, the Tribunal declared, *inter alia*, that PIDL was entitled to damages (in an amount to be assessed) in respect of certain specified breaches by the Ministry of the GSPA, which breaches it also held to be cumulatively repudiatory, and thus entitling PIDL to rescind

**JA-107**

7       The following three heads of challenge each disclose a serious irregularity within the meaning of s 68 of the 1996 Act.

        Ground A: internal inconsistency, successful defence not acknowledged in dispositive paragraph

8       The dispositive paragraph (para [80]) of the Award is *ex facie* inconsistent with the conclusions of the Tribunal in the related passages of its reasoning.  The focus is specifically on the following sentence of the dispositive paragraph, namely '*We declare that (a) the Government repudiated the GSPA by its failure to perform its obligations under Article 6 a) and b) thereof.*'.

9       The Tribunal set out the two clauses referred to therein in the attachment to the Award).  They were (respectively):

10      Art. 6(a): an obligation on the part of the Government to deliver certain agreed quantities of gas to the Site boundary;

11      Art. 6(b): an obligation on the part of the Government to ensure that all necessary pipelines and associated infrastructures were in place to facilitate performance of the Claimant's obligation to supply and deliver Wet Gas in accordance with Art. 3

12      A breach of each clause was alleged.  In both cases, the alleged breaches were denied.

13      The issue of possible breaches, and of which provision (or sub-provision) any such breaches may have been, was dealt with by the Tribunal at paras [63]-[66] of the Award, under the heading: '*(d) Did the Government  not have to do anything till the GPFs had been built?*'.

14      In those paragraphs, the Tribunal reached a conclusion to the effect that the Government did in fact have to do something before the gas processing facilities had been built, namely that it was obliged to construct the necessary pipelines and associated infrastructure as contemplated by Art. 6(b), and that (not having done so) it was accordingly in breach of cl 6(b).  That conclusion is clear and is not the subject of this Application.

**JA-108**

15    However, in those paragraphs, the Tribunal did not reach a similar conclusion as to the allegation of breach of cl 6(a) of the contract. The allegation of breach of that clause was resisted by the Government on the grounds (*inter alia*) that (as the Tribunal put it, at para [63], referring to the Government's submissions): '*Mr Shashore submits that the Government had no obligation to deliver gas until there was a plant to receive it.*' In the next sentence, the Tribunal concludes: '*That, no doubt is true, but the Government's obligations were not confined to the delivery of gas.*' It then went onto the cl 6(b) point, noted above.

16    At para [66], the Tribunal reiterated its acceptance of the part of Mr Shashore's argument referred to in the first sentence of para [63] (quoted above). It said (of another version of the Government's argument): '*We think this argument takes the matter no further than the first version. Of course the Government could not actually deliver gas until there was a Site and, as we have said until there was a plant to receive it. But that does not excuse the Government's failure to comply with 6 b).*'

17    Accordingly, it would appear clearly that the Tribunal did not conclude that there was a breach of Art. 6(a). Certainly, no such words appear in paras [63]-[66]. On the contrary, what is said in those paragraphs, as just quoted, would be inconsistent with the Tribunal's having found a breach of Art. 6(a), since the only actual breach of that article could be by a failure to make delivery to the Site boundary – and the Tribunal has rightly held that until there was a plant to which to deliver the gas, there could have been no delivery. The Claimant takes this to mean that there was not yet any obligation to deliver. If the obligation had not arisen, it could not be broken.

18    The Tribunal did not return to the point, or otherwise dilute or contradict its understandable conclusion that there could, in effect, have been no breach of cl 6(a) in the circumstances prevailing.

19    Accordingly, it is presumed that the presence of a reference to cl 6(a) in paragraph [80] was a slip.

20    Whatever the explanation, the terms of the Award are ambiguous, given the internal inconsistency above-mentioned. Further, it may be that the (apparently successful)

**JA-109**

defence on cl. 6(a) was not independently recalled or considered when it came to drafting the dispositive paragraph [80].

21    The Tribunal has been asked to acknowledge the need for a correction (by letter dated 18th November 2015) and to give an opportunity for submissions to be made as to the consequence of correcting the above-mentioned internal inconsistency. However, given the lapse of time since the making of the Award, this application is made out of an abundance of caution.

22    <u>Ground B: lack of factual authority defence not separately dealt with from legal capacity defence</u>

23    Two of the defences put forward by the Ministry were that it neither had (i) legal capacity nor (ii) actual (factual) authority to perform the GSPA

24    The two issues, i.e. capacity and authority are and have always been obviously discrete. However, the Tribunal, in its Award, appears in its reasoning only to have dealt with its views on the first (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in its reasoning. That said, in its concluding paragraph to that section, it made a parting reference not to capacity, but used the word 'authority' [54]. However, given the use of the word 'capacity' throughout the prior paragraphs, and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the Tribunal to the issue of factual, actual authority. What is clear, is that there is no separate reasoning on the point. It may be that the Tribunal erroneously assumed that the issue of authority was just another way of putting the legal (capacity) point, in which case it will have failed, by mistake, to deal with the distinct issue of factual capacity.

25    At best, this is a point of ambiguity, which should be revisited, and distinctly dealt with. Alternatively, it is a failure to deal distinctly or at all, with a free-standing factual defence. To have conflated both issues, addressing them interchangeably both in description and in substance as issues of law, would have been in effect not to decide the factual, actual authority point.

26    The above analysis is confirmed by the fact that the Tribunal based its decision on prima facie findings which are more closely connected with capacity than authority. Further, it should be noted that the sole heading for the relevant part of the Award in

section H of the Award (page 10) as "capacity" (rather than authority). Further, at paragraph 53 of the Award, (while considering whether another Ministry (the Ministry of Energy) may have had exclusive powers to enter into agreements similar to the GSPA), the Tribunal found that there "*was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas.*" As there was similarly nothing to suggest that the Ministry would enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

27      Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that "*the [Ministry] was an appropriate entity to enter into the GSPA...*" (addedemphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

Ground C

28      This Ground focusses on the defence raised at para 7 of the Ministry's defence. This is a denial that the alleged conduct of the Ministry was repudiatory. This denial survives a finding of breach and raises the question of the seriousness of the breach. Although the Tribunal made findings as to the existence of breaches of contract on the Ministry's part (see above), it did not expressly discuss or evaluate the nature of those findings in terms of their being repudiatory or otherwise. Further, nowhere did it consider whether a breach solely of cl 6(b) was or could in the circumstances have been repudiatory. The only statement on the point is to be found in the dispositive paragraph (quoted above). No express reasoning appears. This suggests that the Tribunal did not consider the issue, or at least did not consider the Ministry's argument in that paragraph as an independent point (ie, even if there were a breach, was it repudiatory?).

29      The point here is that the consequences of a breach of cl 6(b) alone are not necessarily repudiatory. The creation of infrastructure by the Ministry was not an end in itself. It is commercially significant only if that infrastructure has to be used to deliver gas (and only if that infrastructure was the only means to do so). Given the express findings that there was no active obligation to deliver gas until the Defendant carried out its part of the bargain and built the plant, the effect of the failure to build infrastructure by any particular date (though a serious breach) did not

**JA-111**

on any view deprive the Defendant of its bargain.  That could only happen when it had brought into existence the means to accept delivery – which it never did.

30      This point was not considered, along with any separate repudiation analysis based solely on the breach of cl 6(b).

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**                                        Claim No.[            ]

Before the Honourable Mr Justice
**In an arbitration claim**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                                                                    Claimant

- and -

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                                                    **Defendant**

**In the matter of an arbitration**

**BETWEEN**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

                                                                **Claimant in the arbitration**

- and –

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

                                                                **Respondent in the arbitration**

---

**Draft Order**

---

UPON the Claimant's application under section 68 of the Arbitration Act 1996 to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the "**Part Final Award**")

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

AND UPON HEARING Counsel for the Claimant and Counsel for the Defendant

IT IS ORDERED THAT:

1. In respect of <u>Ground A,</u> the Award should (i) be set aside in part – namely the contents of dispositive paragraph [80](1)(a) of the Partial Final Award (save for the conclusion that there was a breach by the Ministry of cl 6(b)) ['the Conclusion']; (ii) alternatively, the Conclusion (save for holding in respect of the cl 6(b) breach) should be declared to be of no effect; (iii) (in the further alternative) the Award should be remitted for further consideration of the Conclusion.

2. In respect of <u>Ground B</u>, the Award should be remitted for further consideration of the issue of fact as to whether the Ministry had authority as a matter of fact (as opposed to capacity as a matter of law) to conclude the alleged contract.

3. In respect of <u>Ground C</u>, the like relief is granted as is granted under Ground A above.

4. Further, or alternatively, there be such other order under the Arbitration Act as is just.

5. The Claimant's costs of and occasioned by the Claimant's Application be paid by the Defendant to the Claimant, such costs to be referred to detailed assessment by the Court if not agreed.


Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**                                    Claim No.[           ]

Before the Honourable Mr Justice

**In an arbitration claim**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

Claimant

– and –

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Defendant**

**In the matter of an arbitration**

**BETWEEN**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Claimant in the arbitration**

– and –

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

**Respondent in the arbitration**

---

**Draft Order**

---

UPON the Claimant's application under Part 62.9 of the Civil Procedure Rules to extend the 28-day time period in which to apply to challenge the Part Final Award of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans dated 17 July 2015 (the **"Part Final Award"**)

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015

IT IS ORDERED THAT:

1. The Claimant's application under Part 62.9 of the Civil Procedure Rules be allowed.

2. The time period, set out in section 70(3) of the Arbitration Act 1996, in which the Claimant may apply to challenge the Part Final Award be extended to 23 December 2015.

3. No order as to costs.


Dated:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

**Claimant**

**And**

**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

**Defendant**

---

**Draft Order**

---

**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:**    **+44 20 7809 2384**
**Fax:**    **+44 20 7003 8240**
**Ref:**    **[]\01-54-03644**

**Solicitors for the Claimant**

**Folakemi Adelore**
**Claimant**
**First**
**22 December 2015**
**Exhibit "FA1"**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN AN ARBITRATION CLAIM AND**
**IN THE ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM RESOURCES**
**OF THE FEDERAL REPUBLIC OF NIGERIA**

**Claimant/Respondent in the Arbitration**

**And**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**

**Defendant/Claimant in the Arbitration**

---

**FIRST WITNESS STATEMENT OF FOLAKEMI ADELORE**

---

1    I, Folakemi Adelore of the Federal Ministry of Petroleum Resources, Block D, 11th Floor, NNPC Towers, Herbert Macaulay Way Central Business District Abuja will say as follows:

2    I am the Director of Legal Services at the Claimant, which I shall hereinafter refer to as the **"Ministry"**. I make this witness statement in support of:

2.1    the Ministry's application for an extension of time in which to challenge the Part Final Award on liability dated 17 July 2015 (the **"Award"**) of Lord Leonard Hoffmann, Chief Bayo Ojo SAN and Sir Anthony Evans (the **"Tribunal"**); and

2.2    the Ministry's application to challenge the Award under section 68 of the Arbitration Act 1996 (both applications hereinafter referred to as the **"Applications"**.

3        I make this witness statement from facts and matters within my own knowledge.
         Where they are not within my knowledge they are true to the best of my knowledge
         and belief.

4        There is now produced and shown to me a paginated bundle of documents entitled
         "Exhibit FA1" which is exhibited to this witness statement. All references in this
         document are to Exhibit FA1 unless otherwise stated.

**Background**

5        The Defendant (hereinafter **"PIDL"**) alleges the existence of a Gas Supply and
         Processing Agreement dated 11 January 2010 (the **"GSPA"**) with the Claimant
         (hereinafter the **"Ministry"**) whereby the Ministry allegedly agreed to make available
         to PIDL 400 MMScuFD of Wet Gas for a term of 20 years and PIDL agreed to
         construct Gas Processing Facilities (**"GPFs"**) to process the Wet Gas and return
         approximately 85% by volume to the Ministry in the form of Lean Gas [**P.1-20**].

6        By Notice of Arbitration dated 22 August 2012, PIDL commenced arbitration (the
         **"Arbitration"**) against the Ministry alleging that the Ministry had repudiated the
         GSPA [**P.21-24**].

7        On 1 June 2015, a hearing took place at the International Disputes Resolution Centre
         in London.

8        On 17 July 2015, the Tribunal issued the Award to the Claimant by email on the
         same date [**P.25-50**].

9        In its Award, the Tribunal declared, *inter alia*, that PIDL is entitled to damages (in an
         amount to be assessed) in respect of breaches by the Ministry of the GSPA, which it
         also held PIDL was entitled to rescind.

**Out of time: explanation of the political situation in Nigeria at the time the Award
was issued**

10       This proposed claim is brought 4 months, 8 days out of time (the relevant period was
         28 days from the date of the Award on 17 July 2015, i.e. 14 August 2015). This
         delay was not in any way deliberate or calculated. As explained below, the
         explanation is to be found in the nature of the Ministry as part of the central
         government machinery, in a post-election period, where no Government had yet
         been formed (and the chief law officer - the Attorney General of the Federation had
         not been appointed). Furthermore, as explained below, since it does not normally
         trade in products, the Ministry has little or no experience in responding to
         international arbitral proceedings – such matters usually involve the State

Corporation, the Nigerian National Petroleum Corporation (the **"NNPC"**), which, in that capacity, operates separately from the Ministry.

11      In order to properly understand the Ministry's inability to challenge the Award on time, it is necessary to briefly address the political situation in Nigeria at the time the Award was issued.

12      The President Goodluck Jonathan administration had been in power from 2 May 2010 to 29 May 2015. Following general elections on 28 and 29 March 2015, the new president, President Muhammadu Buhari of the opposition party, was declared winner and was sworn in as president on 29 May 2015. This was the first time that an incumbent party had lost a general election in democratic Nigeria. This was acclaimed as historic by the world media (http://www.bbc.co.uk/news/world-africa-32139858, http://www.independent.co.uk/news/world/africa/nigeria-2015-election-apc-declares-victory-for-muhammadu-buhari-10146740.html) [**P.51-61**].

13      I mention the historic and surprising nature of the opposition party winning the presidential election because it may explain the functioning of government ministries in the period immediately following the swearing in of the new President: although it is to be expected that any new government, particularly the government of a new political party would take time to settle into office, this was even more so in circumstances where the election results were particularly surprising.

14      Although the President was sworn in on 29 May 2015, it was not until 11 November 2015 that ministers, including the Attorney-General of the Federation (**"AGF"**), were appointed.

**Chain of command at the Ministry with regard to the Arbitration**

15      As stated above, the Ministry does not normally trade in products, and therefore has little or no experience in responding to international arbitral proceedings. Furthermore, and importantly, the AGF as the chief law officer is responsible for the conduct of all dispute resolution involving all governmental agencies or ministries. As a matter of practice and law in Nigeria, the AGF is always made a party to all disputes involving the Federal Government of Nigeria or its ministries.

16      The conduct of disputes involving the Federal Government of Nigeria or its ministries and instructions to external counsel to represent the government or its ministries can only be given by the AGF as a matter of Nigerian law and practice.

17      The present arbitral proceedings between PIDL and the Ministry is no exception. Instructions to represent the Ministry in the arbitration were given to Mr. Olasupo Shasore, SAN of TMS by the former AGF Mr. Bello Adoke.

18      Thus, the chain of command for the conduct and directives pertaining to the arbitral proceedings has always been from the AGF to the Ministry.

19      However, due to the elections in March 2015, the tension generated by it and the attendant dissolution of cabinet on 28th May 2015 by the immediate past President of Nigeria, it was impossible for TMS or the Ministry to get necessary directives from the AGF in respect of this arbitration.

20      With elections out of the way and the appointment of a new AGF, lawful instructions and directives have now emanated from the office of the AGF with respect to the conduct of this arbitration.

**Difficulty in initiating challenge of the Award**

21      As set out above, the Award was issued on 17 July 2015 and was immediately reviewed by the Ministry and its legal representatives in Nigeria, Twenty Marina Solicitors (**"TMS"**).

22      On 21 July 2015, TMS advised me as to whether the Award failed completely and/or clearly to address the issues presented by the Respondent and as to whether or not it should be challenged accordingly. The Ministry understood that in order to challenge the Award, it would need to instruct a firm of solicitors in the U.K. given that any such challenge would have had to be before the English courts under the English Arbitration Act 1996. (Nothing set out in this statement shall constitute a waiver of privilege.)

23      This presented an issue for the Ministry because an application to challenge the Award in the U.K. constituted a new legal action which, together with the need to appoint foreign legal representatives, required approval of the AGF. The Constitution of the Federal Republic of Nigeria 1999 stipulates that "there shall be an Attorney General of the Federation who shall be the chief law officer and a Minister of the government of the Federation". In addition several Nigerian cases have held that the AGF is responsible in law for government's actions and misactions.  In the case **Guardian Newspapers Ltd v. AG Fed (1995) 5 NWLR (Pt. 398) 703 – CA,** the court held that "Both at common law and by virtue of our constitution, the Federal Attorney-General is the Chief Law Officer of the Republic and the conscience of the people. He represents the state in all actions against the state; this he can do in person or through the other law officers in his ministry. The office of the Attorney General is so unique that in the exercise of his functions as the Chief Law officer, he **cannot even take a dictation from the Head of State**".

24      In  **AG Rivers State v. AG Akwa Ibom State (2011) 8 NWLR (Pt. 1248) 31 ,** the main functions of the Attorney General  was explained as  – "...........advising the

Federal or State government including their parastatals on legal matters and prosecuting or defending court cases for or against their respective governments".

25   However, as I have set out above, at the relevant time, the AGF's office was vacant. The office of the AGF is a political appointment.

26   It is necessary to explain that it is Nigerian administrative and government practice in all Federal Government Ministries when it comes to dispute resolution, particularly highly contentious matters involving huge financial exposure to the nation (such as was the case in the Arbitration) to always operate through the AGF. The Ministry's legal department had been able to continue its oversight of the Arbitration during the period that the office of the AGF was vacant because TMS had extant instructions from the previous AGF to act in that matter. However, the Ministry did not have the authority to unilaterally approve a new legal action albeit connected with the Arbitration. This was even more so given that the amount potentially in issue was in the billions of dollars.

27   On 11 November 2015, after a five and a half month period, the Government finally appointed Mr Abubakar Malami SAN as AGF.

28   Despite having to deal with other challenges associated with his new role, one of the first matters the new AGF addressed upon assumption of office was this matter. He and his team had to be briefed on the details of the matter, the outcome of the Arbitration and to take advice on the available options and suggested next steps.

29   Following his review of the relevant documents in the Arbitration and TMS' opinion, the AGF gave his approval for the Ministry to instruct U.K. solicitors.

30   Accordingly on 13 November 2015, TMS asked Stephenson Harwood to assess the merits of the English Court Applications.

31   Later on 13 November 2015, Stephenson Harwood confirmed that they had cleared conflicts and were therefore able to act on behalf of the Ministry. Stephenson Harwood also recommended that Counsel be instructed on the matter.

32   Since 13 November 2015, the Ministry and its legal representatives have sought to progress this matter with expedition. All relevant documents from the arbitration (amounting to five lever arch files) had to be gathered and sent to Stephenson Harwood in London. Most of the documents could only be sent on 23 November 2015 and Stephenson Harwood only received them on 25 November 2015. The remaining documents were sent over the following weeks.

33   Since receipt of the documents on 25 November 2015, Stephenson Harwood and Leading Counsel have been considering the merits of the Applications, advising the

Ministry on the same and preparing the Applications. The issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered, in particular given the differing headings on the various procedural orders and the Part Final Award dated June 2014 [**P.62-77**].

34    To conclude, the permanent staff at the Ministry did all in its power to obtain the necessary approval to challenge the Award within the 28 day period after issuance. After expiry of that period, the Ministry continued to apply all its efforts to obtain approval. Unfortunately, the Ministry was unable to obtain approval on time. The Ministry tried all that was possible legally to obtain the necessary approval, including attempting to seek directives from the Vice President of the Federation in November, notwithstanding the fact that the only person that had the power to instruct counsel was the AGF. The delay was not out of choice but was forced on the Ministry by circumstances beyond its control.

35    It is important to understand the limitations on the Ministry's capabilities in this matter:

35.1    The Ministry is seldom involved in arbitration proceedings and therefore lacks experience of the distinct features of international arbitration, including its cross-border nature and strict short time limits. Further its legal department is not accustomed to dealing with disputes of the type that the Arbitration was concerned with. The legal department at the Ministry (like the Ministry itself) is accustomed to dealing with the activities that the Ministry was expressly set up for and authorised to undertake, predominantly the licensing of petroleum exploration and production.

35.2    These are the normal strategic and regulatory activities that the Ministry has been undertaking since 1975 when it was established and can therefore undertake without the need for external approval or interference. The situation would have been different if the arbitration involved the NNPC, which is the state oil corporation established in 1977 with the power to enter into commitments similar to those in the GSPA. Unlike the Ministry, the NNPC is a commercial entity which is regularly involved in, and therefore accustomed to dealing with international arbitration.

35.3    Lastly, it is important to understand that the Nigerian Government has never been faced with a situation where it has had to operate for a long period without an AGF. The length of time without an AGF was unprecedented in the nation's history.

36     As a result of the above circumstances, it would be unfair for the Ministry to be denied the opportunity of having the Applications determined, particular that each of them impacts on the existence or extent of the considerable sum now claimed.

**The proposed s 68 Arbitration Act 1996 challenges**

37     I understand that the Ministry has potentially good grounds to challenge the Award on the grounds of serious irregularity. While I understand that the Court would not be conducting a detailed inquiry at this stage, it is worth setting out briefly why the Ministry submits there is a serious irregularity affecting the Award, in that the Tribunal may have failed to deal (or deal distinctly) with all the issues put to it.

37.1     Capacity/authority: two of the defences put forward by the Ministry were that it neither had (i) legal capacity nor (ii) actual (factual) authority to perform the GSPA [**P.78**]. The two issues, i.e. capacity and authority are and have always been obviously discrete. However, the Tribunal, in its Award, appears in its reasoning only to have dealt with its views on the first (the legal) issue (see Award [41]-[54]). It mentioned 'capacity' 10 times in its reasoning. That said, in its concluding paragraph to that section, it made a parting reference not to capacity but used the word authority [54]. However, given the use of the word 'capacity' throughout the prior paragraphs, and the clear legal focus of the analysis therein, it appears that no separate consideration was given by the Tribunal to the issue of factual, actual authority. What is clear, is that there is no separate reasoning on the point. It may be that the Tribunal erroneously assumed that the issue of authority was just another way of putting the legal (capacity) point, in which case it will have failed, by mistake, to deal with the distinct issue of factual capacity. At best, I am advised, it is a point of ambiguity, which should be revisited, and distinctly dealt with. To have conflated both issues, addressing them interchangeably both in description and in substance as issues of law, would have been in effect not to decide the factual, actual authority point.

37.1.1     See for example the sole heading for the relevant part of the Award in section H of the Award (page 10) as "capacity".

37.1.2     I also understand that the Tribunal based its decision on prima facie findings which are more closely connected with capacity than authority.

37.1.3     At paragraph 53 of the Award, in considering whether another Ministry (the Ministry of Energy) may have had exclusive powers to enter into agreements similar to the GSPA, the Tribunal found that

there "*was nothing to suggest that [the Ministry of Energy] will enter into the business of selling gas.*" As there was similarly nothing to suggest that the Ministry will enter into the business of selling gas, the Tribunal's statement at paragraph 53 strongly suggests that the Tribunal did not consider the lack of authority defence put forward by the Ministry.

37.1.4   Importantly, in the final paragraph of the section, which purportedly addresses the defence of lack of authority, the statement that "*the [Ministry] was an appropriate entity **to enter** into the GSPA...*" (my emphasis) is entirely indicative of a Tribunal considering capacity rather than authority.

**No breach of Article 6a**

37.2   In the second place, the Award is internally inconsistent, and therefore ambiguous, as to whether one of the Ministry's defences was successful. Two distinct breaches of contract were alleged against the Ministry.  I set out the two clauses:

> "**6. RESPONSIBILITIES OF THE GOVERNMENT**
>
> *a) The Government shall deliver to the Site boundary the agreed quantities and quality of gas defined under Article 3c and in the manner set out in Appendix A to this Agreement;*
>
> *b) The Government shall ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure the supply and delivery of Wet Gas in accordance with Article 3 so as to facilitate the timely implementation of gas processing by the GPFs as provided for in this Agreement.*"

37.3   The first, of clause 6(a) of the contract, was an alleged failure actually to deliver product. It was the centre-piece of PIDL's pleaded case on breach (see PIDL's Statement of Case, paragraphs [87]-[89] [**P.100**]).   The second, of clause 6(b) was an alleged failure to ensure that infrastructure was in place. (See PIDL's Statement of Case, paragraph [90] [**P.100**]).

37.4   The Ministry defended the first allegation on the basis that the obligation to deliver product could not have arisen until PIDL had constructed its treatment plant.   This, it never did.   The Ministry's defence on this point succeeded.   Specifically, at paragraph 63 of the Award, the Tribunal appears to accept that "*the Government had no obligation to deliver gas*

*until there was a plant to receive it*", in other words confirming that the Government was not in breach of Article 6(a) of the GSPA.

37.5   Furthermore, at paragraph 66 of the Award, the statement that: *"[o]f course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it."*

37.6   However, in the "Disposition" section, at paragraph 80(1)(a), the Tribunal declares that "*[t]he Government repudiated the GSPA by failure to perform its obligations under Articles 6a and 6b thereof.*"

37.7   This apparent internal contradiction is of great importance. Not only does the nature of the breach go fundamentally to the extent and nature of damages recoverable, it also goes to the very basis of the Tribunal's finding of repudiatory conduct.   That finding (see above and see Award at paragraph [80]) *"The Government repudiated the GSPA by failure to perform its obligations under Articles 6a) and b) thereof"* is made on a dual-breach basis, ie clauses 6(a) & (b).   The two are interwoven as a combined basis for the conclusion of repudiation.   What the Tribunal appears to have done is give as one half of its basis for concluding that there was repudiatory conduct a breach of a provision which it had earlier held not to have been broken or even fallen due for performance.   I am advised that the Tribunal appears not to have afforded any alternative basis for its conclusion that there was a repudiation (e.g. on the basis of just a breach of clause 6(b).   Nor should it be assumed.

38   The above point on breach of Article 6a goes to quantum and is therefore critical to the Ministry's preparation for the damages stage of the arbitration. It is worth noting that having initially estimated in August 2012 that its loss of profit would be no less than USD1.9bn [**P.24**], under a year later, PIDL put its damages claim at around USD5.9bn [**P.102**], however, PIDL now appears to be claiming damages in the amount of around USD8.6bn [**P.225**]. Given this creeping astronomical figures, the Parties and the process would undoubtedly benefit from certainty and clarity on the key issues. Therefore the ambiguity caused by the Award could lead to complications and potential injustice at the damages stage. Although the Court would not be conducting a detailed enquiry into the merits of the challenge at this stage, I think it is necessary for the Court to bear in mind the above facts in order to assess the unfairness that would be done to the Ministry if it were allowed to go into the damages stage without having the key issues properly considered and determined.

**No prejudice to PIDL or to the future conduct of the arbitration**

39    Further, it does not follow that (if permission were granted) the Applications would
      have a detrimental effect on the Arbitration, particularly given that any hearing on
      quantum will be substantial, and is unlikely to occur within 12 months.  Of course,
      the Ministry intends to co-operate fully with the preparations of that hearing.    The
      below are the major steps ordered by the Tribunal in Procedural Order No. 10 dated
      27 October 2015 [**P.261-263**]:

      39.1    PIDL was ordered to serve upon the Ministry and the Tribunal on or before 4
              December 2015, all documents and evidence upon which it intends to rely in
              relation to the amount of damages to which PIDL is entitled;

      39.2    The Ministry was ordered to serve upon PIDL and the Tribunal, within 6
              weeks of service by PIDL of the above documents, all documents and
              evidence upon which the Ministry intended to rely in relation to the amount
              of damages to which PIDL is entitled;

      39.3    PIDL was ordered to serve its documents and evidence in Reply (if any)
              within 4 weeks of service by the Ministry of the above documents.

      39.4    It was ordered that there is to be a procedural conference on a date to be
              fixed by the Tribunal after service by PIDL of its documents and evidence in
              Reply at which, *inter alia*, the issue of a date and any necessary directions
              for the hearing on quantum is to be determined.

40    The Ministry has made several attempts to engage professional consultants to
      provide assistance in the damages stage of the arbitration. Unfortunately, for the
      same reasons affecting the Ministry's inability to engage foreign counsel, the Ministry
      has not been able to engage professional consultants. TMS advised the Ministry on
      the need to appoint experts to provide an evaluation of damages with regard to the
      claim. The Ministry agreed with the advice and informed TMS on the need to get
      approval from the AGF. However because an AGF was yet to be appointed, the
      Ministry was unable to secure the approval. Consequently, the Ministry has been
      unable to prepare for the damages stage of the arbitration as well as is required for
      an arbitration of this size.

41    On 4 December 2015, PIDL served a very substantial report of four experts in
      various disciplines as evidence it intends to rely on in relation to the amount of
      damages claimed ("**PIDL's Damages Evidence**") in the Arbitration. PIDL's
      Damages Evidence amounts to 126 pages and over 40 megabytes of material. As
      indicated above, the figures are quite different from those mentioned in the
      Statement of Case at [95]-[97], but there is no sign of any application for any

amendment being lodged, which leaves the Ministry in an unnecessarily difficult situation. That is compounded by the lack of any supporting disclosure or additional factual evidence.

42  Even leaving aside the Ministry's inability to engage professional consultants on time, the size and content of PIDL's Damages Evidence, the disconnect with the pleadings, the lack of any supporting factual evidence, and the lack of disclosure, are all such that more than six weeks would be required for the Ministry to properly consider all the material and prepare its own supporting documents in relation to damages.

43  I anticipate an application will be made shortly to the Tribunal to (i) oblige PIDL to regularise its pleadings and (ii) serve any factual evidence it needs to serve.

44  As a result of the above, TMS on behalf of the Ministry, have applied to the Tribunal for an extension of time in which to serve the documents and evidence it intends to rely on in relation to the amount of damages to which PIDL is entitled.

45  Therefore, on any view, the quantum stage is likely to be protracted. Consequently, it is unlikely that the Applications (and the Court's determination of the same) would have a detrimental effect on the arbitration.

**Absence of irremediable prejudice to PIDL**

46  Further, PIDL is unlikely to suffer any irremediable prejudice as a result of the Applications or the Court's determination of the same. The Ministry has not dissipated any assets as a result of the award. Being a ministry of the Government, the Ministry is extremely unlikely to dissipate any assets or put the same out of reach of a judgement creditor in a way that a private entity might.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed................................................

Mrs. Folakemi Adelore

Dated this 22nd day of December 2015

**Folakemi Adelore**
**Claimant**
**First**
**22 December 2015**
**Exhibit "FA1"**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN AN ARBITRATION CLAIM AND IN THE**
**ARBITRATION**

**BETWEEN**

**THE MINISTRY OF PETROLEUM**
**RESOURCES OF THE FEDERAL REPUBLIC**
**OF NIGERIA**

  **Claimant/Respondent in the Arbitration**

**and**

**PROCESS AND INDUSTRIAL**
**DEVELOPMENTS LIMITED**

  **Defendant/Claimant in the Arbitration**

---

**FIRST WITNESS STATEMENT OF**
**FOLAKEMI ADELORE**

---

**Stephenson Harwood LLP**
**1 Finsbury Circus**
**London EC2M 7SH**
**Tel:      +44 20 7809 2384**
**Fax:      +44 20 7003 8240**
**Ref:      1543**

**Solicitors for the Claimant**

# EXHIBIT 10

IN THE HIGH COURT OF JUSTICE                            CL-2015-000917
QUEEN'S BENCH DIVISION
COMMERCIAL COURT



BEFORE THE HON MR JUSTICE PHILLIPS

In an arbitration claim

BETWEEN

THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA

Claimant

- and -

PROCESS AND INDUSTRIAL DEVELOPMENTS LTD

Defendant

In the matter of an arbitration

BETWEEN

PROCESS AND INDUSTRIAL DEVELOPMENTS LTD

Claimant in the Arbitration

- and -

THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA

Respondent in the arbitration

## ORDER AND REASONS

### ORDER

Upon the Claimant's application under Part 62.9 of the Civil Procedure Rules to extend the 28-day time period in which to apply to challenge the Part Final Aware of Lord Leonard Hoffmann, Chief Bayo Ojo and Sir Anthony Evans dated 17 July 2015 (the "**Part Final Award**")

AND UPON READING the witness statement of Folakemi Adelore dated 22 December 2015 and the witness statement of Ian David Sellars dated 31 December 2015:

IT IS ORDERED THAT the Claimant's application be dismissed

10 February 2016

**JA-131**

## REASONS

1. The application under s.68 of the Arbitration Act is made more than 4 months after the expiry of the 28 day time limit. Compelling reasons would have to be shown to justify an extension of over four times the statutory time limit. In this case the delay is said to have been caused by the fact that the new President of the Federation of Nigeria, sworn in on 29 May 2015, did not appoint an Attorney General until 11 November 2015 with the result that London solicitors were not instructed in relation to the application until 13 November 2015.

2. Even if the absence of an Attorney General was an insuperable obstacle to instructing London solicitors (which is far from clear in view of the evidence filed by the defendant), the claimant could and should have prepared all documentation in readiness so as to proceed with expedition once London solicitors were instructed, not least in view of the fact that the claimant continued to participate in the arbitration proceedings throughout the period with the benefit of external counsel. In the event documentation was not provided to London solicitors until 25 November and the application under s.68 was not issued until 40 days after London solicitors were first instructed, a period in excess of the statutory time limit. No good explanation is given for that further excessive period of delay. In those circumstances it is not appropriate to extend time.

3. In refusing to extend time I further take into account that the grounds of appeal have no merit. As to ground (A), it is incorrect to say that the Tribunal found that the clamant was not in breach of art 6(a): the finding was that the claimant had put itself in a position where it was impossible for it to comply with art 6(a) by virtue of its own breach of art 6(b). There was no internal inconsistency in the Tribunal's reasons. As to ground (B), the Tribunal clearly addressed the actual authority of claimant to enter and perform the GSPA, holding that that was the *prima facie* position and rejecting the claimant's arguments to displace that starting point. There was no ambiguity or confusion in its findings between the concepts of capacity and authority. As to ground (C), there was a clear and sufficient finding that the breach of art 6(b), rending it impossible to perform art 6(a), was a repudiatory breach. The contention that separate consideration should have been given to a breach of art 6(b) alone is misconceived.

$\int \in P$
10. 2. 16

# EXHIBIT 11

**IN THE FEDERAL HIGH COURT**
**IN THE LAGOS JUDICIAL DIVISION**
**HOLDEN AT LAGOS**

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE**
**FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER**

**IN THE MATTER OF AN ARBITRATION**

**BEFORE**

| | |
|---|---|
| **LORD LEONARD HOFFMANN** | **PRESIDING ARBITRATOR** |
| **SIR ANTHONY EVANS** | **ARBITRATOR** |
| **CHIEF BAYO OJO, SAN** | **ARBITRATOR** |

**BETWEEN**

**THE MINISTER OF PETROLEUM RESOURCES**
**(For and on behalf of the Ministry of Petroleum Resources)**          **APPLICANT**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI**          **RESPONDENT**

<u>**ORIGINATING MOTION**</u>

<u>**Brought Pursuant to Sections 29, 30 & 48 of the Arbitration and Conciliation Act Cap A18**</u>
<u>**Laws of the Federation of Nigeria 2004, and under the Inherent Jurisdiction of this**</u>
<u>**Honourable Court**</u>

**TAKE NOTICE** that this Honourable Court will be moved on ……………… the …… day of ……………… 2016 at 9 o'clock in the forenoon or so soon thereafter as Counsel may be heard on behalf of the Applicant for the following reliefs:

1. **AN ORDER** enlarging the time within which the Applicant may apply to set aside the arbitration award of the tribunal on liability dated 17 July 2015 ("the Award") in the above-mentioned arbitration proceedings.

2. **AN ORDER** setting aside and/or remitting for further consideration all or part of the arbitration Award of Lord Leonard Hoffmann, Chief Bayo Ojo, SAN and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**JA-134**

## GROUNDS OF THE APPLICATION

1. The arbitration proceedings were commenced pursuant to Clause 20 of the Gas Supply and Processing Agreement dated 11 January 2010 ("the Agreement").

2. The substantive law of the contract is Nigerian law.

3. The arbitration proceedings was initiated under the rules of the Arbitration and Conciliation Act, CAP A18 LFN 2004 ("ACA").

4. Parties agreed and the arbitration proceedings were indeed conducted in accordance with the ACA.

5. The parties have effectively agreed that the seat of arbitration is Nigeria and consequently Nigerian law is the *lex arbitri.*

6. Nigerian courts have exclusive supervisory jurisdiction in relation to matters arising from the arbitration proceedings.

7. London is not the seat of the arbitration. It is only the venue for hearings in the arbitration; a geographically convenient place hence the High Court of England cannot exercise supervisory or any jurisdiction in relation to the arbitration proceedings.

8. The period within which to apply to set aside the arbitral Award has expired hence leave of this Honourable Court is required to bring an application to set aside the Award.

9. By virtue of section 30 of the ACA, a court may on the application of a party, set aside an arbitral award where the arbitrator(s) has misconducted himself.

10. The Applicant seeks to set aside the Award on the ground that the tribunal misconducted itself to wit:

    i.      The tribunal in making the Award breached the rules of natural justice.

    ii.     The Award is inconsistent and ambiguous.

    iii.    A party to the arbitration was under some incapacity.

    iv.     The Award contains decision on a point not put forward by the parties.

**JA-135**

v.   The Award consists of  mistake of fact which is admitted to by the Tribunal and  clear beyond any reasonable doubt

Dated this 24ᵗʰ of February 2016



Olasupo Shasore, SAN
Bello Salihu
Lateefat Hakeem-Bakare ✓
Safiat Kekere-Ekun
**Applicant's Counsel**
**Twenty Marina Solicitors LLP**
Sterling Towers
20 Marina Lagos
Telephone: 01-2719368-9
E-mail: ao@ajumogobiaokeke.com

"This Originating Motion is to be served out of Lagos State and in the British Virgin Islands"

**For Service on:**

**The Respondent**
Process and Industrial Developments Limited
Trident Chambers
P.O Box 146
Road Town
Tortola
British Virgin Islands



**IN THE FEDERAL HIGH COURT
IN THE LAGOS JUDICIAL DIVISION
HOLDEN AT LAGOS**

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE
FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER**

**IN THE MATTER OF AN ARBITRATION**

**BEFORE**

| | |
|---|---|
| **LORD LEONARD HOFFMANN** | **PRESIDING ARBITRATOR** |
| **SIR ANTHONY EVANS** | **ARBITRATOR** |
| **CHIEF BAYO OJO, SAN** | **ARBITRATOR** |

**BETWEEN**

**THE MINISTER OF PETROLEUM RESOURCES
(For and on behalf of the Ministry of Petroleum Resources)**               **APPLICANT**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI**          **RESPONDENT**

**AFFIDAVIT IN SUPPORT**

I, **Safiat Kekere-Ekun,** female Nigerian citizen of 20 Marina Lagos, do hereby make oath and state as follows:

1.  I am a legal practitioner in the law firm of Twenty Marina Solicitors LLP, counsel to the Applicant herein and I have the consent of the Applicant and my employers to depose to this affidavit.

2.  Unless otherwise stated, the facts deposed to herein derive from my personal knowledge of the facts and circumstances of this case by virtue of my position as stated in Paragraph 1 above.
    <u>The Arbitration Agreement</u>

3.  The parties herein entered into a Gas Supply and Processing Agreement dated 11th January 2010 ("the GSPA"). Clause 20 of the GSPA contains parties' agreement on Applicable Law and Dispute Resolution.

4.  By the said Clause 20, parties agreed that the GSPA shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria. With

**JA-137**

respect to dispute resolution and the initiation of same, parties agreed that in the event of failure to amicably settle any dispute or difference arising from the GSPA, either party may serve on the other party a Notice of Arbitration in accordance with the Rules of the Arbitration and Conciliation Act, CAP A18 Laws of the Federation of Nigeria 2004 ("ACA").

5. It was also agreed at Clause 20 that the ***venue*** of the arbitration shall be London, England or as otherwise agreed by the parties. The Contract did not contain any express agreement as to the ***"seat"*** of arbitration.  Attached and marked **Exhibit A** is a copy of the Agreement.

### The Arbitration Proceedings

6. A dispute arose between the parties and by a Notice of Arbitration dated 22nd August 2012 ("Notice of Arbitration"), the Respondent commenced arbitration proceedings against the Applicant. The Notice of Arbitration was issued pursuant to the Rules of the ACA as agreed by the parties in Clause 20 of the Agreement. Attached and marked **Exhibit B** is a copy of the Notice of Arbitration.

7. Documents filed in the arbitration proceedings including the Procedural Orders issued by the tribunal were headed in accordance with clause 20 of the Agreement to wit: ***IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE ARBITRATION AND CONCILIATION ACT OF NIGERIA.***  Attached and marked Exhibits **C, D, E** and **F** respectively is a copy each of Procedural Orders Nos 1-4 issued by the tribunal in the arbitration proceedings.

### Lex arbitri

8. In the course of the arbitration proceedings specifically on 7th August 2013, the Presiding Arbitrator sent an e-mail to the parties. By the e-mail, the tribunal expressed concern about the Applicant's failure to serve its Statement of Defence within the time stipulated by the tribunal. The tribunal therefore proposed a telephone hearing with the parties to discuss the future progress of the arbitration proceedings. Parties subsequently agreed on the date and time for the telephone conference.

9. Few days before the agreed date for the telephone hearing (16th August 2013), Applicant's counsel sent an e-mail to the tribunal and the Respondent expressing its inability to provide proper representation at the telephone hearing. This according to Applicant's counsel was due to incomplete instructions from the Applicant. Applicant requested a postponement of the telephone hearing.  By the same e-mail, the Applicant also sought an extension of time within which to submit its Statement of Defence.

10. In reaction to Applicant's e-mail referred to in paragraph 9 above, Respondent's counsel by its e-mail of 19th August 2013 to the tribunal and the Applicant proposed that the tribunal should issue Procedural Order No. 2 in the terms of the draft produced and circulated by the Respondent.

11. The draft Procedural Order No. 2 prepared by the Respondent's counsel was adopted and issued by the tribunal on 14th September 2013 (**Exhibit D**).

12. Although parties did not expressly agree on the law that would govern the arbitration proceedings (external *lex arbitri*), in a manifestation of the parties' intention with respect to the *lex arbitri* , at paragraph 4 of its Procedural Order No. 2 (the draft of which was prepared by Respondent's counsel), the tribunal notified the parties that it shall enforce the provisions of section **21 (b) of the ACA** should the Respondent ( Applicant herein) default in filing its Statement of Defence within the time stipulated by the tribunal.

13. Specifically, at paragraph 4 of Procedural Order No. 2 (**Exhibit D**), the tribunal directed as follows:

> *"WITH THE CONSENT OF THE PARTIES...................*
> *In the event that the Respondent ( Applicant herein) fails to serve its Statement of Defence in accordance with Paragraph 2 above, the tribunal shall be entitled to continue the proceedings in accordance with <u>section 21 (b) of the Nigerian Arbitration and Conciliation Act, 1990"</u>. (Underlining is for emphasis)*

14. Apart from the Rules of the ACA, there was no reference to any other law (*lex arbitri*) in the GSPA or in the course of the arbitral proceedings. However, at the commencement of the proceedings, Applicant raised a preliminary objection to the jurisdiction of the tribunal and by its letter dated 11th October 2013, Respondent's counsel sought the consent of the Applicant to the determination of the preliminary objection in accordance with the English Arbitration Act 1996. Applicant in its response dated 14th October 2013 maintained its position on the law to govern the arbitration proceedings and stated that the preliminary objection must be determined in accordance with the ACA as agreed by the parties.

15. The Respondent in further response to Applicant's letter argued in favour of the English Arbitration Act 1996 stating that the juridical (or legal) seat of the arbitration is London as a consequence of which the English Arbitration Act 1996 is the *lex arbtri* (the law that would govern the arbitration proceedings) and that where the seat of arbitration is England, certain mandatory provisions of the English Arbitration Act would apply to the proceedings notwithstanding any agreement of the parties to the contrary. Copies of these letters were delivered to the tribunal. Attached and marked **Exhibits G, H** and I respectively is a copy each of the letters.

16. Surprisingly however, the tribunal on its own and without the consent or agreement of the parties or a ruling on whether the English Arbitration Act 1996 is the *lex arbitri* introduced the English Arbitration Act to the proceedings. Specifically, subsequent procedural orders of the tribunal (Procedural Orders Nos 5 – 11) were headed as follows:

*"IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND & WALES)
IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN
ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)"*

<u>The Award</u>

17.    The arbitration proceedings progressed and on 1st June 2015, a hearing took place at the International Dispute Resolution Center in London. The proceedings having been bifurcated, the hearing of 1st June 2015 was restricted to issues of liability. Attached and marked **Exhibits J, K, L, M** and **N** are copies of the Witness Statement of Ikechukwu Oguine, Statement of Facts challenged with regards to the Witness Statement of Michael Quinn and other facts relevant to the question of liability, Applicant's Written Submissions, Applicant's Response to the Claimant's submission in Reply and the National Domestic Gas Supply and Pricing Regulations, which forms part of the evidence relied on by the Applicant at the hearing of 1st June 2015.

18.    On 17th July 2015, the tribunal issued its award on liability ("the Award"). Attached and marked **Exhibit O** is a copy of the Award.

19.    The Applicant was desirous of challenging the Award on the ground that the tribunal misconducted itself but the process of instructing counsel for that purpose was seriously hampered by the political situation in Nigeria at the time. It was a post-election period and a new government had not been formed.  The Chief Law Officer of the Federal Government, the Attorney General and Minister of Justice had not been appointed.

20.    The Award was issued barely two months after the conclusion of general elections in Nigeria and the subsequent inauguration of a new federal government in Nigeria. The term of office of Ministers in the immediate past administration expired on or about 29th May 2015 and new Ministers were not appointed until 11th November 2015.

<u>Seat of Arbitration/Nigerian Courts have Exclusive Supervisory Jurisdiction</u>

21.    Mr. Olasupo Shasore, SAN was the Applicant's lead counsel on record throughout the proceedings leading to the Award.

22.    Upon the appointment of Nigeria's Federal Ministers, the Applicant on the advice of Mr. Shasore, SAN promptly instructed English counsel to take necessary steps to apply to set aside the Award.

23.    On the basis of the advice received from counsel, Applicant instructed its English Counsel to make necessary application to English court for extension of time to challenge the Award. The application was filed on 23rd December 2015.

24.  In its ruling of 10th February 2016, the English court refused the application. Attached and marked **Exhibits J and K** respectively is a copy each of the Application and the ruling.

Seat of arbitration is Nigeria /Nigerian Courts Have Exclusive Supervisory Jurisdiction

25.  At a telephone conference on 11th February 2016 between Applicant's Nigerian counsel and English solicitors in which I participated, the English solicitors informed us (i.e. Nigerian counsel) of the details of the ruling of the English court on the Applicant's application for extension of time to challenge the Award.

26.  Immediately after the telephone conference, we (i.e. the team of Applicant's Nigerian counsel led by Mr. Shasore, SAN) embarked on a careful and comprehensive review of the entire case file of the arbitration proceedings.  This was followed by series of brainstorming sessions particularly with respect to the seat of the arbitration.

27.  All of these exercise revealed that apart from the reference to London as the venue of the arbitration proceedings, the Agreement has no other connection with England.  None of the parties to the Agreement is English, the Agreement was to be performed in Nigeria, the Agreement is to be construed in accordance with Nigerian law and the arbitration proceedings were commenced pursuant to the ACA and the ACA rules. All of these culminated in the manifestation of the parties implied agreement to select Nigerian law as the *lex arbitri* in Procedural Order No. 2 (**Exhibit D**) which was drafted by Respondent's counsel.

28.  Mr. Shasore, SAN who was lead counsel on record throughout the proceedings leading to the Award then recalled that he had participated in all procedural matters before the arbitral tribunal wherein the dispute was by consent order affirmed to be heard pursuant to the Nigerian ACA

29.  The Respondent (Arbitration claimant) counsel had at a subsequent time suggest a change to the English Arbitration Act when Mr Shasore SAN leading for the Ministry firmly rejected the offer to change the *lex arbitri* with the Respondent.

30.  From the foregoing facts, I am of the belief that the Agreement is more closely connected to Nigeria than any other country including England.

31.  I am also of the belief that the seat of the arbitration is Nigeria, the *lex arbitri* of the arbitration proceedings subject matter of this action is the ACA and the courts that have exclusive supervisory jurisdiction in matters relating to the arbitration are Nigerian courts. As a consequence the present Applicant's reference to the English courts was as an inadvertence.

32.  I was informed by Mr. Shasore, SAN at about 1.15pm on Tuesday 23rd February 2016 at 20 Marina, Lagos and I verily believe him that the Applicant and present

Respondent never agreed nor participated in any proceedings for the change of the *lex arbitri*.

<u>Extension of Time to Set Aside an award under the ACA</u>

33.  The ACA prescribes the period within which a party aggrieved with an award must apply to court to set it aside.

34.  By the stipulation of the ACA, the time within which the Applicant may apply to set aside the award on ground of misconduct expired on or about 17th October 2016.  In view of this, leave of this Honourable Court is now required to extend the time within which to apply to set aside the Award.

35.  The default in bringing this application within the prescribed period was not out of disrespect to this Honourable Court but was occasioned by the inadvertence of counsel.

36.  The grounds for seeking to set aside the Award as stated on the motion paper are substantial and arguable.

37.  The Applicant is committed to having the Award set aside in order to properly defend the Respondent's claims particularly in view of the significant financial exposure of the Applicant to any award of damages that may be made thereafter.

38.  The Respondent will not be prejudiced by the grant of this application, as the Applicant makes this application in order that serious issues arising from the Award which touch on the financial and public interest of the Applicant are properly presented before this Honourable Court.

39.  The interest of justice will be better served by the grant of this application.

40.  I depose to this affidavit in good faith and in accordance with the Oaths Act of the Federal Republic of Nigeria.

_____

**DEPONENT**

Sworn to at the Federal High Court Registry,

Lagos, this ...,......... day of ...............,, 2016.

# EXHIBIT 12

**IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)**

**AND**

**AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT 1988**

**BETWEEN:**

### PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>**Claimant**</u>

**and**

### THE MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA

<u>**Respondent**</u>

---

## PROCEDURAL ORDER No. 12

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo, SAN

Sir Anthony Evans

## A. Introductory

1. On 24 February 2016 the Respondent ("the Government") commenced
   proceedings before the Federal High Court in Lagos for an order pursuant
   to sections 29, 30 and 48 of the Nigerian Arbitration and Conciliation Act
   1988 ("the Nigerian Arbitration Act") setting aside the Tribunal's second
   Partial Final Award dated 17 July 2016.  There is a dispute between the
   parties as to whether the Nigerian courts are entitled to exercise such
   supervisory or "curial" jurisdiction over the arbitration, this being agreed
   to depend upon whether Nigeria or England is the "seat" or "place" of
   arbitration.  This is an important question, not only for the purpose of
   determining the jurisdiction to supervise the proceedings and award, but
   also for the purposes of the enforceability of the award.  Article V of the
   New York Convention on the Recognition and Enforcement of Foreign
   Arbitral Awards provides that a Contracting State may refuse
   enforcement of an award only on a limited number of grounds, one of
   which is that the award  "(v)…has been set aside or suspended by a
   competent authority of the country in which, or under the law of which,
   that award was made."  Nigeria (and almost all other countries in the
   world) are parties to the New York Convention and Article V(v) is
   reproduced in section 52(2)(a)(viii) of the Nigerian Arbitration Act.  The
   words "country in which, or under the law of which, that award was
   made" have been generally interpreted as referring to the widely
   understood international concept of the seat or place of the arbitration or
   arbitration proceedings.  Thus an order setting aside an arbitral award by
   a court in a country which is not the seat of arbitration has no effect upon
   its enforceability under the Convention.

**JA-145**

2.  The question of the seat of arbitration was first raised by the Government in its originating motion in the High Court in Lagos on 24 February 2016.  It was contested by P&ID and the parties made their submissions to the Tribunal in letters or e-mails dated 8 March 2016 and 11 March 2016 (P&ID) and 11 and 13 March 2016 (the Government).  P&ID, before the injunction granted by the Nigerian court, requested that the Tribunal give a ruling on the matter.  The Tribunal considers that it must therefore consider the question of the seat of arbitration for the purpose of deciding the future conduct of the arbitration.  The Tribunal has the power to determine its own jurisdiction (section 12 of the Nigerian Arbitration Act) and its opinion on the disputed question may also be of assistance to the Nigerian court.

3.  The Tribunal will consider the matter under three heads.  First, the relevant law.  Secondly, the factual background to the arbitration agreement and the light it may throw upon the intentions of the parties.  Thirdly, the conduct of the parties during the course of the arbitration.

### B.    The Law

4.  The arbitration arises out of a Gas Supply and Processing Agreement ("GSPA") dated 11 January 2010 made between The Ministry of Petroleum Resources of the Federal Republic of Nigeria ("the Government") and Process and Industrial Developments Limited ("P&ID"), a company incorporated in the British Virgin Islands.  The relevant parts of article 20 provided as follows:

> "The Agreement shall be governed by, and construed in accordance with the laws of the Federal Republic of Nigeria.

**JA-146**

The Parties agree that if any difference or dispute arises between them concerning the interpretation or performance of this Agreement and if they fail to settle such difference or dispute amicably, then a Party may serve on the other a notice of arbitration under the rules of the Nigerian Arbitration and Conciliation Act 1988 which, except as otherwise provided herein, shall apply to any dispute between such Parties under this Agreement….Within thirty (30) days of the notice of arbitration being issued by the initiating Party, the Parties shall each appoint an arbitrator and the arbitrators thus appointed by the Parties shall within fifteen (15) days from the date the last arbitrator was appointed appoint a third arbitrator to complete the Tribunal…The arbitration award shall be final and binding upon the Parties. The award shall be delivered within two months after the appointment of the third arbitrator or within such extended period as may be agreed by the Parties…. The venue of the arbitration shall be London, England or otherwise as agreed by the Parties.  The arbitration proceedings and record shall be in the English language…"

5. As the GSPA (including article 20 itself)  is to be construed in accordance with the laws of the Federal Republic of Nigeria, the Tribunal considers that the meaning of words "the venue of the arbitration shall be London, England" must be construed in accordance with Nigerian law. The relevant provision is section 16 of the Nigerian Arbitration Act:

**16.** (1) Unless otherwise agreed by the parties, the place of the arbitral proceedings shall be determined by the arbitral tribunal having regard to the circumstances of the case, including the convenience of the parties.

(2) Notwithstanding the provisions of subsection (1) of this section and unless otherwise agreed by the parties, the arbitral tribunal may meet at any place it considers appropriate for consultation among its

members, for hearing witnesses, experts or the parties,
or for the inspection of documents, goods or other
property.

6.  It appears to the Tribunal that by stipulating that "the venue of the
    arbitration shall be London, England" the parties have agreed on the
    "place of the arbitral proceedings" within the meaning of section 16(1)
    and that the Tribunal's power to determine that place is excluded.  The
    question is, what is the effect of the choice of London by the parties?
    The Claimant says that the effect is to make London the seat of
    arbitration and to invoke the supervisory jurisdiction of the English
    courts, to the exclusion of the Nigerian courts.  The Government says
    that the effect is only to agree that, as a matter of convenience, the
    hearings shall take place in London but not to make it the seat of
    arbitration.  The seat of arbitration, the Government says, is Nigeria
    because, first, the GSPA is governed by Nigerian law and secondly,
    because the parties have agreed that "except as otherwise provided
    herein" the rules of the Nigerian Arbitration and Conciliation Act 1988
    shall apply to any dispute".

7.  The Nigerian Arbitration Act is based upon the UNCITRAL Model Law,
    which has been adopted in 72 countries and was intended to create
    uniformity of law in international arbitration. One would therefore expect
    that the Nigerian legislature intended its statute to be given the same
    meaning as that of the Model Law.  Article 20 of the Model Law is in
    substantially the same language as section 16 of the Nigerian Arbitration
    Act and reads as follows:

*Article 20.    Place of arbitration*

**JA-148**

5

(1) The parties are free to agree on the place of arbitration. Failing such agreement, the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case, including the convenience of the parties.

(2) Notwithstanding the provisions of paragraph (1) of this article, the arbitral tribunal may, unless otherwise agreed by the parties, meet at any place it considers appropriate for consultation among its members, for hearing witnesses, experts or the parties, or for inspection of goods, other property or documents.

8.  Likewise, article 18 of the UNCITRAL Arbitration Rules (2010 revision) provides:

*Article 18*

(1) If the parties have not previously agreed on the place of arbitration, the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case. The award shall be deemed to have been made at the place of arbitration.

(2) The arbitral tribunal may meet at any location it considers appropriate for deliberations. Unless otherwise agreed by the parties, the arbitral tribunal may also meet at any location it considers appropriate for any other purpose, including hearings.

9.  Each of these provisions is divided into two subsections. The first deals with the choice by the parties (or determination by the Tribunal) of the "place of arbitration" (UNCITRAL) or "place of the arbitral proceedings" (Nigeria). The second deals with the venue for various physical events which may take place during the arbitral proceedings, such as deliberations, witness hearings, submissions and inspections. The first is primarily a matter for the choice of the parties, with the Tribunal having a power to fix the place only if the parties have not done so. The

**JA-149**

6

second is a matter for the discretion of the Tribunal, which can be exercised unless the parties have expressly excluded it.

10. The general international understanding of the UNCITRAL and similar provisions is that the first subsection is concerned with what in English law is called the "seat" of the arbitration, a juridical concept of a link between the arbitration and a system of law, while the second is concerned with the various physical acts which may occur during the arbitration. As Redfern and Hunter *Law and Practice of International Commercial Arbitration* (6th ed) at 3.56 puts it:

> [T]he place, or 'seat', of the arbitration is not merely a matter of geography. It is the territorial link between the arbitration itself and the law of the place in which that arbitration is legally situated. When one says that London, Paris or Geneva is the place of arbitration, one does not refer solely to a geographical location. One means that the arbitration is conducted within the framework of the law of arbitration of England, France or Switzerland or, to use an English expression, under the curial law of the relevant country. The geographical place of arbitration is the factual connecting factor between that arbitration law and the arbitration proper, considered as a nexus of contractual and procedural rights and obligations between the parties and the arbitrators.

11. Likewise Dr Peter Binder, in his *Analytical commentary to the UNCITRAL Arbitration Rules 2010,* says of article 18 (cited above):

> It was clarified…by the Working Group [on the revision of the Rules] that the term "place" as used in

**JA-150**          7

art.18(1) of the Rules referred to the seat of arbitration which determined the law applicable to the arbitral procedure and court jurisdiction. Article 18(2), on the other hand, referred to the physical locations where meetings might be held.

12. It will be noted that Redfern and Hunter use the terms "seat of arbitration" and "place of arbitration" interchangeably and other commentators also use word like "venue" and "locale". The distinction is not between "seat" and "place" or some other word denoting a geographical location. That would be to introduce fine linguistic distinctions. The true distinction embodied in sections 16(1) and 16(2) is between the place (or seat or venue) *of the arbitration* (or of *the arbitration proceedings*) on the one hand and the place of *events in the arbitration on the other.* Section 16(1) of the Nigerian Arbitration Act provides that the parties may agree on the place *of the arbitral proceedings* (as a legal concept) but section 16(2) gives the Tribunal a discretion to hold *particular events* in a place other than the chosen place of the arbitration. Only one place can be chosen under section 16(1) to be the place of the arbitral proceedings as a whole, irrespective of where particular events may take place, whereas several places can be chosen under section 16(2).

13. This is the point made by the Supreme Court of Nigeria in *Nigerian National Petroleum Corporation v Lutin Investments Ltd* (2006) 2 NWLR (Pt.965) 506. The arbitration clause said that any reference should be "deemed a submission to arbitration within the [Nigerian Arbitration Act]" and the proceedings appear to have been in every respect Nigerian, but the arbitrator decided to sit in London to hear the evidence of a witness described as a "fugitive from justice". The Court

**JA-151**

decided that he was entitled under section 16(2) to do so. Justice
Onnoghen put the point most clearly when he said:

> "I hold the view that under our law, an arbitrator or an
> arbitral tribunal has the power and discretion to
> decide as regards where it holds its meetings, conduct
> hearings, take evidence etc. I further hold the view
> that such place as decided by the arbitrator or arbitral
> tribunal may be different from the seat of the
> arbitration except the parties expressly agree to the
> contrary in their arbitration agreement."

14. The Court also held that the parties had not chosen the "place of the
arbitral proceedings" under section 16(1) and that the arbitrator was
therefore entitled to do so. However, it was not suggested that by hearing
evidence in London the arbitrator had actually determined that England
should be the place of arbitration for the purposes of section 16(1). The
Court did not regard itself as deprived of its supervisory jurisdiction and
must therefore have assumed that the seat of arbitration was Nigeria. It
held that the arbitrator had a discretion to sit in London by virtue of
section 16(2) and rejected a submission that "at any place" in that
subsection should be confined to places in  Nigeria.

15. In the opinion of the Tribunal, the parties' selection of London as "the
venue *of the arbitration"* rather than of any particular steps (such as
hearings) *in the arbitration* indicates that London was selected under
section 16(1) as the place of the arbitration in the juridical sense,
invoking the supervisory jurisdiction of the English court, rather than in
relation to any particular events in the arbitration. Indeed, the parties,
having chosen the juridical place of arbitration under section 16(1) (or it
having been determined by the Tribunal) have no power under section

**JA-152**                    9

16(2) to determine where hearings shall take place.  That power, unless altogether excluded, is vested only in the Tribunal.

16. As for the choice of the procedural rules of the Nigerian Arbitration Act, this cannot in the opinion of the Tribunal displace the express choice of the place of arbitration pursuant to section 16(1).  There is no inconsistency because although the choice of England as the place of arbitration carries with it the application of certain mandatory rules of the English Arbitration Act 1996 (such as the right to challenge an award in an English court under sections 67 and 68), section 4 of the English Act provides:

> (2)    The …"non-mandatory provisions" [of the Act] allow the parties to make their own arrangements by agreement but provide rules which apply in the absence of such agreement.
>
> (5)    The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision of this Part is equivalent to an agreement making provision about that matter."

17.  Thus the effect of article 20 of the GSPA is that, the parties having chosen that England should be the place of the arbitration but  that it should be conducted according to the  Nigerian procedural rules, the latter apply except so far as inconsistent with the mandatory provisions of the English Act.

## C. The Factual Background

18.  The GSPA was made between the Government of Nigeria and a British Virgin Island company which, according to the evidence of the late Mr

**JA-153**            10

Michael Quinn, had been formed as a special purpose vehicle for the proposed project by a group of expatriates who had been working in the oil and gas industry in Nigeria for up to 30 years. It had an office in Nigeria. Both parties were thus in practice based in Nigeria. It is difficult to speculate upon the motives for the choice of London as the place of the arbitration proceedings but one possibility is that the parties agreed that a dispute between the Nigerian government and expatriate businessmen should be determined in a neutral jurisdiction and subject to the supervision of its courts.

### D. The Conduct of the Parties

19. The arbitration was commenced by notice of arbitration served by P&ID on 22 August 2012. On 19 September 2012 P&ID appointed Sir Anthony Evans as arbitrator. On 30 November 2012 the Government appointed Chief Bayo Ojo as arbitrator. On 29 January 2013 the party-appointed arbitrators appointed Lord Hoffmann third and presiding arbitrator.

20. The parties agreed that it was not practical for the dispute to be resolved within time for an award to be delivered within two months of 29 January 2013 and on 9 May 2013 agreed a procedure by which P&ID was to serve a Statement of Claim before 28 June 2013 and the Government was to serve a Statement of Defence on or before 31 July 2013.

**JA-154**

21. The Government did not serve a Statement of Defence by the agreed date but instead served on 3 October 2013 a Notice of Preliminary Objection disputing the jurisdiction of the Tribunal and the validity of the GSPA. On 11 October 2013 P&ID's lawyers wrote to the Government's lawyers:

> "Although our client considers the points raised in the Respondent's Preliminary Objection to be misconceived and devoid of merit, it considers that they should be determined as soon as possible. Therefore we invite you to agree that the issues raised be ruled upon by the Tribunal pursuant to Section 31(4) of the Arbitration Act 1996 ("the 1996 Act"), which provides that if the parties agree that the Tribunal should rule upon its own jurisdiction in an award as to jurisdiction, then the Tribunal shall proceed accordingly."

22. On 14 October 2013 the Government's lawyers replied:

> "The Respondent responds to your said latter as follows;
> - The Respondent accepts the Claimant's request that the tribunal should rule on its own jurisdiction in an award as to jurisdiction; and
> - The Respondent will be proceeding as contemplated by the parties under the Nigerian Arbitration and Conciliation Act, Cap A18 LFN 2004.

23. On 24 October 2013 P&ID's lawyers replied:

> The parties appear to be in agreement that the Arbitral Tribunal should rule on its own jurisdiction in an award as to jurisdiction. For the avoidance of doubt, we referred to Section 31 (4) of the Arbitration Act 1996 in our letter of 11 October 2013 because it is one of the Mandatory provisions

**JA-155**

of the 1996 Act, and the juridical seat of this
arbitration is London. However, and for the further
avoidance of doubt, we acknowledge that the parties
have agreed to arbitrate "under the rules of the
Nigerian Arbitration and Conciliation Act", and we
therefore accept that the rules governing the internal
procedure of the arbitration are those to be found in
the Nigerian Arbitration and Conciliation Act 2004,
principally in the rules set out in the First Schedule
thereto ("the Nigerian Arbitration Rules") , but also
in sections 14 to 23 inclusive of the 2004 act, headed
"Conduct of Arbitral Proceedings".  In  this regard
we note that Article 21 of the Nigerian Arbitration
Rules provides that the Arbitral Tribunal shall have
the power to rule on an objection that it has no
jurisdiction, including any objections with respect to
the existence of validity of the arbitration clause or
of a separate arbitration agreement.

24. There was no contradiction by the Government's lawyers of this
statement.

25. After arranging for an oral hearing which was cancelled because the
Government notified the Tribunal that it would not appear, and having
regard to the uncontradicted expert evidence of Justice S.M.A Belgore,
the Tribunal on 3 July 2014 delivered a Part Final Award by which it
dismissed the objections. In accordance with section 26(3)(c) of the
Nigerian Arbitration Act, which requires that an award state "the place
of the arbitration as agreed or determined under section 16(1) of this
Act", the award stated that the place of arbitration was London. (The
equivalent English provision in section 52(5) of the Arbitration Act 1996,
which requires an award to state the "seat of arbitration", is not one of the
mandatory provisions listed in Schedule 1 to the Act).

**JA-156**

26. On 21 July 2014 the Tribunal issued Procedural Order No 5 directing the Government to serve its Statement of Defence by 19 September 2014. On 10 November 2014, no Statement of Defence having been served, P&ID applied to the Tribunal to make a peremptory order in the form of a draft headed "In the matter of the [English] Arbitration Act 1996." The power to make such an order (which enables the court to enforce an order of the Tribunal with which a party has failed to comply) is contained in section 42 of the 1996 Act, which by section 2 applies only "where the seat of the arbitration is in England and Wales or Northern Ireland."

27. On 13 November 2014 the Government wrote to the Tribunal asking for P&ID's application to be suspended to enable settlement talks to take place and proposing a meeting in Abuja. On 14 November 2014 P&ID's solicitors replied agreeing to talks but saying "May we suggest…and given that this is a London seat arbitration, that we meet in London instead of Abuja." There was no contradiction of this statement and the parties afterwards met in London.

28. Nothing came of the settlement negotiations and on 16 February 2015 the Tribunal, upon the application of P&ID, made a peremptory order pursuant to section 42 of the Arbitration Act 1996, directing the Government to serve its Statement of Defence by 27 February 2015.

29. On 27 February 2015 the Government served a Statement of Defence.

30. On 1 July 2015 the Tribunal held an oral hearing in London and on 12 June 2015 the Government served a Final Submission in writing.

**JA-157**

31. On 17 July 2015 the Tribunal delivered a Second Partial Final Award, in which it held that the Government was liable in damages for a repudiatory breach of the GSPA. Pursuant to section 26(3)(c) of the Nigerian Arbitration Act, the second Partial Award stated that the place of arbitration was London.

32. On 17 August 2015 the Tribunal wrote to the parties proposing a case management conference on 3 September 2015 to consider procedural matters for the next and final phase of the arbitration, which would be to determine the quantum of damages payable by the Government.

33. On 20 August 2015 the Government's lawyers wrote to the Tribunal requesting that the conference be postponed to 10 September 2015 so that it could make settlement proposals. The Tribunal agreed.

34. After a further request by the Government for postponement, the conference was fixed for 10 am London time on 28 September 2015.

35. At 9:18 am on 28 September 2015 the Government's lawyers sent the Tribunal an e-mail saying that  as a Minister of Justice had not yet been appointed to the new Nigerian government, they would be "unable to make any major contribution to the Case Management Conference scheduled for today and therefore request for a postponement."

36. On 27 October 2015 the Tribunal made Procedural Order No 10 in the form of an order *nisi* giving the Government leave to apply to discharge or vary it provided such application was made before 6 November 2015. It directed P&ID to serve all the documents and evidence upon which it intended to rely for the quantum hearing by 4 December 2015 and the

**JA-158**

Government to serve its documents and evidence by six weeks thereafter. No application to discharge or vary was made.

37. On 23 December 2015 the Government applied to the Commercial Court in London for an order under section 68 of the Arbitration Act 1996, setting aside the second Partial Final Award. This jurisdiction is exercisable by the English court only if the seat of arbitration is in England. As the application was out of time, the Government applied for an extension of the time. In support of this application, it filed an affidavit by Ms Folakemi Adelore, explaining the delay. In paragraph 33, he said:

> "Since receipt of the documents on 25 November 2015, Stephenson Harwood and Leading Counsel have been considering the merits of the Applications, advising the Ministry on the same and preparing the Applications. The issue of jurisdiction of this Court and the seat of the Arbitration had first to be considered, in particular given the differing headings on the various procedural orders and the Part Final Award dated June 2014."

38. On the 10 February 2016 Phillips J dismissed the application on the grounds both of delay and lack of substantive merit.

39. On 24 February 2016 the Government commenced its proceedings in the Federal High Court in Lagos.

**JA-159**

## E. Conclusion

40. The Tribunal is of opinion that upon the true construction of article 20 of the GSPA the "place of the arbitral proceedings" was agreed to be in London and that London thereby became what in international arbitration is generally referred to as the seat of arbitration. Even if this were not the case, the Tribunal finds that in the course of the arbitration over nearly three years, the parties and the Tribunal have consistently acted upon the assumption that London was the seat of the arbitration. Arbitration is based upon the consent of the parties and the Tribunal considers that the Government must be taken to have consented to this being the correct construction of the GSPA.

Place of arbitration:  London

Signed on behalf of the Tribunal:


Lord Hoffmann
(Presiding Arbitrator)

26 April 2016

**JA-160**      17

# EXHIBIT 13

# IN THE FEDERAL HIGH COURT OF NIGERIA
# IN THE LAGOS JUIDICIAL DIVISION
# HOLDEN AT LAGOS

### SUIT NO: FHC/L/CS/264/2016

## IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A. 18 LAWS OF THE FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER

**BETWEEN:**
**THE MINISTER OF PETROLEUM RESOURCES**          **APPLICANT**
**(For and on behalf of the Ministry of Petroleum Resources)**

   **AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED BVI**          **RESPONDENT**

### ORDER

E. O. ADAKA
CERTIFIED TRUE COPY
CHIEF X OFFICER
FEDERAL HIGH COURT
IKOYI LAGOS
DATE......... 76/5/16

**UPON THIS ORIGINATING MOTION** dated and filed on the 28th day of February, 2016 coming before the Court and praying for the following :

1.   **AN ORDER** enlarging the time within which the Applicant may apply to set aside the arbitration award of the tribunal on liability dated 17th July, 2015 ("**the Award**") in the above-mentioned arbitration proceedings.

2.   **AN ORDER** setting aside and/or remitting for further

**JA-162**

2

consideration all or part of the arbitration Award of Lord Leonard Hoffmann, Chief Bayo Ojo, SAN and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**UPON READING** the Affidavit in support of Motion Ex-parte and the exhibits attached herein deposed to by **Safiat Kekere-Ekun,** Female, Nigerian Citizen of 20 Marina, Lagos State and filed at this Court Registry.

**AND AFTER HEARING** the submission of **Mr Olasupo Shasore SAN** with him **Mr Bello Salihu, Abiodun Anibaba Esq; I Aina (Mrs)** and **S. Ofulume Esq.** Counsel for the Applicant moved in terms of the motion paper.

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.  That an order is granted to the Applicant enlarging the time within which the Applicant may apply to set aside the arbitration award of the tribunal on liability dated 17th July, 2015 ("**the Award**") in the above-mentioned arbitration proceedings.



E. O. ADAKA
...RTIFIED TRUE COPY
... EXE. OFFICER
... HIGH COURT
IKOYI LAGOS

DATE........



Hon. Justice I. N. Buba

Presiding Judge

**JA-163**

3

2.   That an order is granted to the Applicant setting aside and/or remitting for further consideration all or part of the arbitration Award of Lord Leonard Hoffmann, Chief Bayo Ojo, SAN and Sir Anthony Evans and for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**ISSUED AT LAGOS, UNDER THE** seal of this Honourable Court and by the Hand of the presiding Judge this 24th day of May, 2016.

**ALOKPESI C. N.
REGISTRAR**

**JA-164**

USCA Case #18-7154      Document #1780490        Filed: 04/01/2019      Page 169 of 242

# EXHIBIT 14

**From:** Leonard Hoffmann <leonard.hoffmann@brickcourt.co.uk>
**Sent:** Friday, May 27, 2016 10:52 AM
**To:** Safiat Kekere-ekun; 'Sir Anthony Evans'; cabayoojo@aol.com; Seamus Andrew
**Cc:** 'Olasupo Shasore'; Kate Trott; 'Lateefat Hakeem-Bakare'; abiodun.anibaba@tmsllp.com
**Subject:** Re: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS
LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA


Dear colleagues


The Tribunal thanks Mr Kekere-Ekun for his notification of the order of the Federal High Court on 24 May 2016.  As the parties will be aware from Procedural Order No 12, the Tribunal has decided that the seat of the arbitration is in England. It follows that the Federal High Court had no jurisdiction to set aside its award.

The Tribunal will therefore be proceeding with the reference and would be grateful if the Respondent would indicate whether it intends to take part in the proceedings.  It wishes to issue a Procedural Order for the further conduct of the arbitration and would therefore wish to have the Respondent state its position before Friday 3 June 2016.

Yours sincerely

Leonard Hoffmann
(Presiding Arbitrator).

---

**From:** "safiat.kekere-ekun@tmsllp.com" <safiat.kekere-ekun@tmsllp.com>
**Date:** Friday, 27 May 2016 at 15:00
**To:** Leonard Hoffmann <leonard.hoffmann@brickcourt.co.uk>, "AEvans@essexcourt.net" <AEvans@essexcourt.net>,
"cabayoojo@aol.com" <cabayoojo@aol.com>, 'Seamus Andrew' <seamus.andrew@scaontier.com>
**Cc:** 'Olasupo Shasore' <os@shasore.com>, Kate Trott <kate.trott@brickcourt.co.uk>, Lateefat Hakeem-Bakare
<lateefat.hakeem-bakare@tmsllp.com>, "abiodun.anibaba@tmsllp.com" <abiodun.anibaba@tmsllp.com>
**Subject:** RE: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF
PETROLEUM RESOURCES OF NIGERIA

Dear Sirs,

This is to notify you that the award of the Tribunal on liability dated 17th July 2015 has been set aside by an order of the Federal High Court of Nigeria, Lagos Judicial Division, delivered on 24th May 2016 ("the Order").

Please find attached a certified copy of the Order.

Kind regards,
Safiat

**Safiat Kekere-Ekun**
**Associate**
**Twenty Marina Solicitors LLP**
**2nd Floor, Sterling Towers**
**20 Marina**
**Lagos, Nigeria**
**Tel:  +234 1 2912225**
**Fax:  +234 1 2719882**

**JA-166**

# EXHIBIT 15

| | |
|---|---|
| **From:** | Lateefat Hakeem-Bakare <lateefat.hakeem-bakare@tmsllp.com> |
| **Sent:** | Tuesday, June 21, 2016 1:16 PM |
| **To:** | 'Leonard Hoffmann'; cabayoojo@aol.com; 'Sir Anthony Evans'; Seamus Andrew; 'Kate Trott' |
| **Cc:** | 'Olasupo Shasore'; bello.salihu@tmsllp.com; safiat.kekere-ekun@tmsllp.com; abiodun.anibaba@tmsllp.com |
| **Subject:** | Re: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA |

Dear Tribunal,

We write further to your e-mail below in respect of the above arbitration.

We have received confirmation from the Ministry of its intention to participate in the damages phase of the arbitration while maintaining its position on the award on liability. The Ministry has also conformed to us that it is in the process of finalizing instructions to BDO LLP (Forensic Services), as experts, for this purpose.

Yours sincerely,

**Lateefat Hakeem-Bakare**
**Associate**
**Twenty Marina Solicitors LLP**
**2nd Floor, Sterling Towers**
**20 Marina**
**Lagos, Nigeria**
**Tel: +234 1 2719368-9**
**Fax: +234 1 2719882**
**+234 1 4622686**
E-mail: lateefat.hakeem-bakare@tmsllp.com

---

**From:** Leonard Hoffmann [mailto:leonard.hoffmann@brickcourt.co.uk]
**Sent:** 09 June 2016 15:45
**To:** Lateefat Hakeem-Bakare ; cabayoojo@aol.com; 'Sir Anthony Evans' ; 'Seamus Andrew' ; Kate Trott
**Cc:** 'Olasupo Shasore' ; bello.salihu@tmsllp.com; safiat.kekere-ekun@tmsllp.com; abiodun.anibaba@tmsllp.com
**Subject:** ***SPAM*** RE: ***SPAM*** Re: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA

Dear colleagues

The Tribunal extends the time for answering its question until 22 June 2016.

Leonard Hoffmann
(Presiding Arbitrator)

**JA-168**

USCA Case #18-7154      Document #1780490         Filed: 04/01/2019      Page 173 of 242

# EXHIBIT 16

___

**Subject:**          FW: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS
                    LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA

**From:** Leonard Hoffmann [mailto:leonard.hoffmann@brickcourt.co.uk]
**Sent:** Tuesday, April 19, 2016 2:57 PM
**To:** Seamus Andrew <seamus.andrew@scaontier.com>; 'Sir Anthony Evans' <AEvans@essexcourt.net>;
cabayoojo@aol.com
**Cc:** 'Olasupo Shasore' <os@shasore.com>; Kate Trott <kate.trott@brickcourt.co.uk>; safiat.kekere-ekun@tmsllp.com;
'Abiodun Anibaba' <abiodun.anibaba@tmsllp.com>; Lateefat Hakeem-Bakare <lateefat.hakeem-bakare@tmsllp.com>
**Subject:** Re: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF
PETROLEUM RESOURCES OF NIGERIA

Dear colleagues

The Tribunal acknowledges receipt of the e-mail below.  Until now, the Tribunal has not considered that there was an issue
arising in the arbitration which required it to pronounce upon where the seat is located. It has not been invited to do so by the
Nigerian court. However, if that court were to grant an injunction affecting the arbitration, the Tribunal would of course have
to rule on the question of the seat in order to decide what effect should be given to the injunction. The e-mail below invites
the Tribunal to give such a ruling in advance of any decision in Nigeria.  The members of the Tribunal will consult on whether it
would be appropriate to do so.

Yours sincerely

Leonard Hoffmann
(Presiding Arbitrator)

**From:** Seamus Andrew <seamus.andrew@scaontier.com>
**Date:** Tuesday, 19 April 2016 at 13:25
**To:** Leonard Hoffmann <leonard.hoffmann@brickcourt.co.uk>, "AEvans@essexcourt.net" <AEvans@essexcourt.net>,
"cabayoojo@aol.com" <cabayoojo@aol.com>
**Cc:** 'Olasupo Shasore' <os@shasore.com>, Kate Trott <kate.trott@brickcourt.co.uk>, "safiat.kekere-ekun@tmsllp.com"
<safiat.kekere-ekun@tmsllp.com>, 'Abiodun Anibaba' <abiodun.anibaba@tmsllp.com>, Lateefat Hakeem-Bakare
<lateefat.hakeem-bakare@tmsllp.com>
**Subject:** RE: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF
PETROLEUM RESOURCES OF NIGERIA

Dear Members of the Tribunal

As the Tribunal is aware, the Respondent has brought proceedings in the courts of Nigeria seeking to have the
Award dated 17 July 2015 ("the Liability Award") set aside for procedural misconduct (notwithstanding that it
has already made such an application, unsuccessfully, before the English courts).  It has also applied for an
anti-arbitration injunction enjoining itself and the Claimant (but not the Tribunal) from taking any further
steps in the arbitration.  Both of these applications have been brought, necessarily, on the express basis that the
seat of the arbitration is Nigeria, and that Nigeria is therefore the supervisory court for this arbitration.

As the Tribunal is also aware, the Ministry's substantive proceedings are set down for hearing in Nigeria
tomorrow, 20 April 2016.

Although we pointed out in our email of 1 April 2016 that the Claimant did not know if the Ministry intended to
seek its final relief at the hearing on 20 April 2016, we note that no clarification on this point has been

1

forthcoming from the Ministry's representatives and we therefore assume that the Ministry intends to argue
forthcoming from the Ministry's representatives and we therefore assume that the Ministry intends to argue tomorrow for an order setting aside the Liability Award.

In the circumstances it is respectfully submitted that the matter of an express ruling as to the seat by the Tribunal is now especially urgent. Although any order of the Nigerian Court would be ineffective if the seat of the arbitration is London, as the Claimant has submitted, the actions of the Ministry are designed to undermine the integrity of the arbitral process and amount to a serious breach of the Ministry's obligation to participate in the arbitration in good faith. The parties agreed to the incorporation of the Nigerian Arbitration Rules, which expressly provide for the Tribunal, rather than a national court, to determine the issue of seat where it has not been otherwise agreed by the parties. The Ministry's application for injunctive relief is in direct contravention of the agreed Arbitration Rules.

In the circumstances, we would be most grateful for a prompt ruling from the Tribunal in relation to the issue of the seat of the arbitration or, alternatively, an indication as to when the Tribunal's ruling on the issue of the seat of the arbitration is likely to be made.

We look forward to hearing from the Tribunal.

Yours faithfully

**Seamus Andrew**
*Managing Partner*

**SCA ONTIER LLP**

One New Ludgate, 60 Ludgate Hill, London, EC4M 7AW, United Kingdom

DX248 London/Chancery Lane

Tel +44 (0) 20 7183 1701 | Fax +44 (0) 20 7183 1702 | Mobile +44 (0) 771 733 0708

 | SCA ONTIER

BOLIVIA · BRAZIL · COLOMBIA · CHILE · CHINA · MEXICO · PARAGUAY · PERU · PORTUGAL · SPAIN · UNITED KINGDOM · U.S.A. · VENEZUELA

 

This e-mail (including any attachments) is intended only for the recipient(s) named above and should not be read, copied or otherwise used by any other person. It may contain confidential or privileged information. If you are not a named recipient, please contact the sender and delete the e-mail from your system. SCA ONTIER LLP is a Limited Liability Partnership registered in England Registered No. OC327289. A list of the members is open to inspection at the registered office. Authorised and Regulated by the Solicitors Regulation Authority

2

JA-171

## IN THE FEDERAL HIGH COURT OF NIGERIA
## IN THE LAGOS JUIDICIAL DIVISION
## HOLDEN AT LAGOS

### IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT CAP. A.18 LAWS OF THE FEDERATION OF NIGERIA 2004 AND THE RULES THEREUNDER

### SUIT NO: FHC/L/CS/264/2016

BETWEEN:
**THE MINISTER OF PETROLEUM RESOURCES**
**(For and on behalf of the Ministry of**     }   **APPLICANT**
**Petroleum Resources)**

**AND**

**PROCESS AND INDUSTRIAL DEVELOPMENTS** } **RESPONDENT**
**LIMITED BVI**

### ORDER

**UPON THIS MOTION ON NOTICE** dated and filed on the 5th day of April, 2016 coming before the court and praying as follows:

(1)   **AN ORDER** restraining the parties in this suit whether by themselves or through their agents, servants, privies, assigns, representatives or anybody whatsoever from

ADEBAYO - TOYEEN
CERTIFIED TRUE COPY
PRINCIPAL EXECUTIVE OFFICER
FEDERAL HIGH COURT
LAGOS

seeking and or continuing with any step, action and or participate directly or indirectly in the arbitral proceedings between the parties before: **Lord Leonard Hoffmann ("Presiding Arbitrator"), Sir Anthony Evans, And Chief Bayo Ojo, SAN** pending the hearing and determination of this suit.

(2)    **AND SUCH FURTHER AND/OR OTHER ORDER(S)** as this Honourable Court may deem fit to make in the circumstances.

**UPON READING** through the Affidavit in support deposed to by **Safiat Kekere-Ekun,** Female, Nigerian Citizen of 20 Marina, Lagos State and filed at this Court Registry.

**AND AFTER HEARING** the submission of **Mr O. Sasore SAN** with him are M/S **S. Kekere-Ekun** and **Ani-Baba** Counsel for the Applicant moved in terms of the motion paper.



ADEBAYO · TOYEEN
CERTIFIED TRUE COPY
PRINCIPAL EXECUTIVE OFFICER
FEDERAL HIGH COURT
L A G O S

**IT IS HEREBY ORDERED AS FOLLOWS:**

(1)    That an order is granted to the Applicant restraining the parties in this suit whether by themselves or through their agents, servants, privies, assigns, representatives or anybody whatsoever from seeking and or continuing with any step, action and or participate directly or indirectly in the arbitral proceedings between the parties before : **Lord Leonard Hoffmann ("Presiding Arbitrator"), Sir Anthony Evans, And Chief Bayo Ojo, SAN** pending the hearing and determination of the Motion on Notice dated 5/4/2016 .

(2)    The case is adjourned to 23/5/2016.

**ISSUED AT LAGOS, UNDER THE** seal of this Honourable Court and by the Hand of the presiding Judge this 20th day of April, 2016.

Hon. Justice I. N. Buba
Presiding Judge

ADEBAYO - TOYEEN
CERTIFIED TRUE COPY
PRINCIPAL EXECUTIVE OFFICER
FEDERAL HIGH COURT
LAGOS

**ALOKPESI C. N.**
**REGISTRAR**

JA-174

Safiat Kekere-ekun

| Subject: | FW: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA |
|---|---|
| Attachments: | P & ID Vs Min of Petroleum Resources - Proceedings at The Federal    High Co... (257 KB) |

**From:** Seamus Andrew [mailto:seamus.andrew@scaontier.com]
**Sent:** Thursday, April 21, 2016 3:29 PM
**To:** 'Leonard Hoffmann' <leonard.hoffmann@brickcourt.co.uk>; 'Sir Anthony Evans' <AEvans@essexcourt.net>; cabayoojo@aol.com
**Cc:** 'Olasupo Shasore' <os@shasore.com>; safiat.kekere-ekun@tmsllp.com; abiodun.anibaba@tmsllp.com; Lateefat Hakeem-Bakare <lateefat.hakeem-bakare@tmsllp.com>
**Subject:** RE: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA

Dear Members of the Tribunal,

We refer to the email below from Twenty Marina Solicitors LLP on behalf of the Ministry notifying the Tribunal of yesterday's Order of the Federal High Court of Nigeria, Lagos Judicial Division.

The Claimant has not been served with a copy of the Order but is aware that it was made by reason of the attached report from the Claimant's Nigerian counsel, who was present in Court in possession of a watching brief with instructions not to participate in any way in the proceedings. All of the Claimant's rights in relation to the injunction are reserved.

We note from the attached report that, contrary to the Tribunal's direction of Tuesday 19 April 2016, it appears that the Ministry's representatives did not inform the Nigerian Court that the Arbitral Tribunal was willing to rule upon the question of the seat of arbitration if the Nigerian Court were to consider it appropriate to request such a ruling. Nor did Mr. Shasore draw to the attention of the Nigerian Court the Claimant's email of 15 April 2016 in which we had set out, *inter alia*, the reasons why the Claimant regarded the Ministry's application for injunctive relief to be misleading. It would also appear that the Nigerian Court was not informed of the decision of Mr Justice Phillips of 10 February 2016.

We note also from the attached report that in addition to moving for injunctive relief, the Ministry's representatives asked the Nigerian Court to hear the Ministry's substantive application which seeks an Order setting aside and/or remitting for further consideration all or part of the Liability Award of 17 July 2015 and an extension of time in which to make that application. As stated in the attached report, the Nigerian Court declined to hear the substantive application immediately but instead adjourned it to 23 May 2016 for hearing.

In the circumstances, and given the Tribunal's indication of Tuesday, we would be grateful if the Tribunal would confirm that a ruling will now be made on the question of seat. If so, it would also assist the Claimant to know if that ruling is likely to be made prior to 23 May 2016.

Yours sincerely

**Seamus Andrew**
*Managing Partner*

**SCA ONTIER LLP**

One New Ludgate, 60 Ludgate Hill, London, EC4M 7AW, United Kingdom
DX248 London/Chancery Lane
Tel +44 (0) 20 7183 1701 | Fax+44 (0) 20 7183 1702 | Mobile +44 (0) 771 733 0708

1

**JA-175**

SCA ONTIER

BOLIVIA · BRAZIL · COLOMBIA · CHILE · CHINA · MEXICO · PARAGUAY · PERU · PORTUGAL · SPAIN · UNITED KINGDOM · U.S.A. · VENEZUELA




This e-mail (including any attachments) is intended only for the recipient(s) named above and should not be read, copied or otherwise used by any other person. It may contain confidential or privileged information. If you are not a named recipient, please contact the sender and delete the e-mail from your system. SCA ONTIER LLP is a Limited Liability Partnership registered in England Registered No. OC327289. A list of the members is open to inspection at the registered office. Authorised and Regulated by the Solicitors Regulation Authority

**From:** Lateefat Hakeem-Bakare [mailto:lateefat.hakeem-bakare@tmsllp.com]
**Sent:** 21 April 2016 12:27
**To:** 'Leonard Hoffmann'; 'Sir Anthony Evans'; cabayoojo@aol.com
**Cc:** Seamus Andrew; 'Olasupo Shasore'; safiat.kekere-ekun@tmsllp.com; abiodun.anibaba@tmsllp.com
**Subject:** RE: ARBITRATION BETWEEN PROCESS AND INDUSTRIAL PROCESS DEVELOPMENTS LIMITED AND MINISTRY OF PETROLEUM RESOURCES OF NIGERIA

Dear Tribunal,

This is to notify you of the order of the Federal High Court of Nigeria, Lagos Judicial Division, delivered on 20 April 1016, granting the following reliefs:

> "an order restraining the parties in this suit, whether by themselves or through their agents, servants, privies, assigns, representatives or anybody whatsoever from seeking and or continuing with any step, action and or to participate directly or indirectly in the arbitral proceedings between the parties before: Lord Leonard Hoffmann ("Presiding Arbitrator"), Sir Anthony Evans, and Chief Bayo Ojo, SAN pending the hearing and determination of this suit"

A certified copy of the order shall be forwarded to you in due course.

Yours faithfully,

Lateefat
**Lateefat Hakeem-Bakare**
**Associate**
**Twenty Marina Solicitors LLP**
**2nd Floor, Sterling Towers**
**20 Marina**
**Lagos, Nigeria**

2

**JA-176**

USCA Case #18-7154      Document #1780490      Filed: 04/01/2019      Page 181 of 242

# EXHIBIT 17

# SAVILLE & C⁰

—— SCRIVENER NOTARIES ——

One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

———

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

**KINGDOM OF ENGLAND**⎫
⎬ss
**CITY OF LONDON**⎭

TO ALL TO WHOM THESE PRESENTS SHALL COME, I
CHRISTOPHER GERARD HIGGINS of the City of London
NOTARY PUBLIC by royal authority duly admitted and sworn DO
HEREBY CERTIFY the genuineness of the signature of SEAMUS
RONALD ANDREW subscribed at foot of the **certification**
hereunto annexed, such signature having been subscribed today in
my presence in London, England by the said Seamus Ronald
Andrew, whose personal identity and capacity I attest, a solicitor of
the Senior Courts of England and Wales and designated member and
the managing partner of the law firm styled **SCA ONTIER LLP** of
London, England;

AND I DO FURTHER CERTIFY THAT the said SCA ONTIER
LLP is a limited liability partnership duly organised and existing in
accordance with the laws of England and Wales, registered with the
Registrar of Companies for England and Wales under number
OC327289 and with registered office at One New Ludgate, 60
Ludgate Hill, London, EC4M 7AW, England.

IN FAITH AND TESTIMONY WHEREOF I the said notary have
subscribed my name and set and affixed my seal of office at London
aforesaid this fourteenth day of March two thousand and eighteen.



My Commission expires at Death

 

**JA-178**   Regulated by the Faculty Office of the Archbishop of Canterbury

SCA Ontier LLP
One New Ludgate
5th Floor
60 Ludgate Hill
London EC4M 7AW
T: +44(0)20 7183 1701
F: +44(0)20 7183 1702
DX248 London/Chancery Lane
www.scaontier.com

# SCA ONTIER

## **<u>CERTIFICATION</u>**

I, the undersigned Seamus Ronald Andrew, English solicitor and Managing Partner of SCA Ontier LLP, hereby certify that the attached document consisting of 34 pages is a true, faithful, and complete photocopy of an original Final Award dated 31 January 2017, which was issued and signed by a majority of the arbitral tribunal, on page 34 thereof, in an arbitration captioned *In the Matter of the Arbitration Act 1996 (England & Wales) and In the Matter of an Arbitration Under the Rules of the Nigerian Arbitration and Conciliation Act (Cap A18 LFN 2004) Between Process and Industrial Developments Limited, Claimant, and the Ministry of Petroleum Resources of the Federal Republic of Nigeria, Respondent.* I served as counsel for the Claimant Process and Industrial Developments Limited in the aforesaid arbitration, and I have compared the attached document with an original of the Final Award.

_____

Seamus Ronald Andrew

14 March 2018

SCA Ontier LLP is a limited liability partnership registered in England
Registered No.OC327289. A list of the members is open to inspection at the registered office
Authorised and Regulated by the Solicitors Regulation Authority

**JA-179**

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)

AND

AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:

PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED

<u>Claimant</u>

**and**

THE MINISTRY OF PETROLEUM RESOURCES
OF THE FEDERAL REPUBLIC OF NIGERIA

<u>Respondent</u>

---

## FINAL AWARD

---

Tribunal:

Lord Hoffmann (Presiding Arbitrator)

Chief Bayo Ojo

Sir Anthony Evans

3\ January 2017

**JA-180**

## A.  INTRODUCTION

1.  This Final Award is signed and issued by the majority of the Tribunal
    (Lord Hoffmann and Sir Anthony Evans).  The dissenting opinion of Chief
    Bay Ojo SAN is attached.

2.  The reference arises out of a Gas Supply and Processing Agreement ("the
    GSPA") dated 11 January 2010 made between the Claimant Process and
    Industrial Development Limited ("P&ID") and the Ministry of Petroleum
    Resources of the Federal Government of Nigeria ("the Government")
    whereby the Government agreed that for a term of 20 years it would make
    to available to P&ID 400 MMScuFD of Wet Gas and P&ID agreed to
    process the gas and return approximately 85% by volume to the
    Government in the form of Lean Gas.

3.  This is the final award in the reference, the Tribunal having previously
    issued two partial final awards.  By its first Partial Final Award dated 3
    July 2014 the Tribunal ruled that it had jurisdiction and that the GSPA was
    valid and binding.  By its second Partial Final Award dated 17 July 2015
    the Tribunal decided that the Government had repudiated the GSPA and
    was liable in damages to P&ID.  This Final Award deals with the
    quantification of the damages for which the Government is liable.

## B.      THE PARTIES AND THEIR LAWYERS

4.  P&ID is an engineering and project management company registered at
    Trident Chambers, P.O. Box 146, Road Town, Tortola, in the British
    Virgin Islands.  It was represented by SCA ONTIER LLP of One New

    Ludgate, 60 Ludgate Hill London EC4M 7AW:

    Contact: Mr Seamus Andrew
    Telephone +44(0) 20 7183 1701
    E-mail     seamus.andrew@scaontier.com

5.  The Government is the Ministry of Petroleum Resources of the Federal
    Government of the Federal Republic of Nigeria whose office address is

2

**JA-181**

11th Floor, Block D, NNPC Towers, Herbert Macaulay Way, Central
Business District, Abuja, Nigeria.  It was represented by Chief Bolaji
Ayorinde SAN, FCIArb, OFR of B. Ayorinde & Co, Adebayo Chambers,
136 Awolowo Road, Ikoyi, Lagos, Nigeria.

Contact:  Chief Bolaji Ayorinde SAN, FCIArb, OFR

Email: chief@ayorinde-law.com

## C.  GOVERNING LAW AND ARBITRATION CLAUSE

6.  Clause 20 of the GSPA, so far as relevant, provides:

"The Agreement shall be governed by, and construed in accordance with
the laws of the Federal Republic of Nigeria.

The Parties agree that if any difference or dispute arises between them
concerning the interpretation or performance of this Agreement and if they
fail to settle such difference or dispute amicably, then a Party may serve
on the other a notice of arbitration under the rules of the Nigerian
Arbitration and Conciliation Act (Cap A18 LFN 2004) which, except as
otherwise provided herein, shall apply to any dispute between such Parties
under this Agreement.  Within thirty (30) days of the notice of arbitration
being issued by the initiating Party, the Parties shall each appoint an
arbitrator and the arbitrators thus appointed by the Parties shall within
fifteen (15) days from the date the last arbitrator was appointed, appoint a
third arbitrator to complete the tribunal…

The arbitration award shall be final and binding upon the Parties.  The
award shall be delivered within two months after the appointment of the
third arbitrator or within such extended period as may be agreed by the
Parties.  The costs of the arbitration shall be borne equally by the Parties.
Each party shall, however, bear its own lawyers' fees.

The venue of the arbitration shall be London, England or otherwise as
agreed by the Parties.  The arbitration proceedings and record shall be in
the English language…"

7.  By Procedural Order No 12 dated 26 April 2016 the Tribunal ruled that the
seat of arbitration was London, England.

3

**JA-182**

## D.  PROCEDURAL HISTORY

8.  The procedural history of the reference up to the issue of the second Partial
    Award will be found in the first and second Partial Final Awards.

9.  On 17 August 2015 the Tribunal wrote to the parties proposing a case
    management conference on 3 September 2015 to consider procedural
    matters for the next and final phase of the arbitration, which would be to
    determine the quantum of damages payable by the Government.

10. On 20 August 2015 the Government's then lawyers wrote to the Tribunal
    requesting that the conference be postponed to 10 September 2015 so that
    it could make settlement proposals.  The Tribunal agreed.

11. After a further request by the Government for postponement, the
    conference was fixed for 10 am London time on 28 September 2015.

12. At 9:18 am on 28 September 2015 the Government's lawyers sent the
    Tribunal an e-mail saying that  as a Minister of Justice had not yet been
    appointed to the new Nigerian government, they would be "unable to
    make any major contribution to the Case Management Conference
    scheduled for today and therefore request for a postponement."

13. On 27 October 2015 the Tribunal made Procedural Order No 10 in the
    form of an order nisi giving the Government leave to apply to discharge or
    vary it provided such application was made before 6 November 2015.  It
    directed P&ID to serve all the documents and evidence upon which it
    intended to rely for the quantum hearing by 4 December 2015 and the
    Government to serve its documents and evidence by six weeks thereafter.
    No application to discharge or vary was made.

14. Pursuant to Procedural Order No 10, on 4 December 2015 P&ID served
    the expert reports of Andrew Caldwell, Simon Ede, Anthony Melling and
    Bradley Wolf of the Berkeley Research Group ("BRG").

**JA-183**

15. On 21 December 2015 the Respondent applied to the Tribunal to vary Procedural Order No 10 by requiring the Claimant to serve a written statement of its case on quantum and extending the Respondent's time for serving its evidence.

16. On 23 December 2015 the Government applied to the High Court of Justice in London (the Commercial Court) for an order under the Arbitration Act 1996 setting aside the second Partial Final Award.

17. On 7 January 2016 the Respondent submitted a draft Procedural Order No 11, which provided that the Claimant should serve a written statement of its case by 12 February 2016 and that the Respondent serve a statement of its case and the evidence and documents upon which it relied by 11 March 2012.

18. On 8 January 2016 the Claimant agreed to the Respondent's proposed timetable and on 18 January 2016 the Tribunal confirmed it as Procedural Order No 11.

19. On 10 February 2016 Mr Justice Phillips, sitting in the High Court of Justice in London, dismissed the Government's application to set aside the second Partial Final Award.

20. On 7 March 2016 the Respondent applied for a further extension of its time to submit its statement of case and evidence until the first week in June 2016.

21. On 16 March 2016 the Tribunal extended the Respondent's time for service of its statement of case and evidence until 8 April 2016.

22. By Procedural Order No 13 dated 24 June 2016 the Tribunal fixed a hearing of the determination of damages in London on 22nd-24th July and gave directions for the service of evidence and submissions.

**JA-184**

23. On 19th July 2016 the Tribunal postponed the hearing until 30-31 August 2016 and the parties agreed consequential changes in the earlier procedural steps.

24. On 12 August 2016 the Government served an expert report by Upstream Commercial Advisory Limited ("Upstream").

25. On 19 August 2016 P&ID served a reply report from BRG.

26. On 22 August 2012 P&ID served written submissions.

27. On 24 August 2016 the Government served written submissions.

28. On 30 and 31 August 2016 the Tribunal held a hearing at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU. The parties were represented as above. Mr Seamus Andrew and Chief Ayorinde made oral submissions and Andrew Caldwell, Simon Ede, Anthony Melling and Bradley Wolf of BRG and Ade Dare of Upstream were cross-examined.

## E.  THE FINDINGS ON LIABILITY

29. Before considering the quantification of the Government's liability, it is necessary to be clear about the findings made by the Tribunal in its second Partial Final Award. The evidence for P&ID at that stage consisted of a statement by Mr Michael Quinn dated 10 February 2014, the then chairman of P&ID, who died before the hearing on 1 June 2015. He gave account of what had happened after the signature of the GSPA:

> "102.    The day after the signing of the GSPA, on 12 January 2010, I wrote to the Minister on behalf of P&ID to inform him that P&ID wished to commence work at once…

**JA-185**

103   I was keen to implement the GSPA as soon as possible…I wished to minimise any delay which might be caused by the operators of the 2 concessions that had been identified as likely sources of Wet Gas for the project. P&ID required from the Government certain up to date information which would be critical to the construction of the gas processing facility which P&ID would be building in Calabar to strip the Wet Gas. For instance, the precise make-up of the Wet Gas (which was also relevant to the Government's contractual obligations to supply Wet Gas with a minimum propane and butane content) and the pressure at which it would be delivered into the gas pipeline which would transport it to Calabar…

109   In the meantime, the site for the onshore plant at Calabar for the construction of the gas stripping plant and gas storage facilities had been selected by P&ID and secured from the Government of Cross River State. On 1 February 2010 Mr Hitchcock wrote to the Governor of Calabar requesting the formal allocation of the land upon which the plant would be constructed…On 16 February 2010 approval was granted, by the Government of Cross River State, to P&ID, for the allocation of Parcels 1 & 2 of the Energy City (Industrial) at Adiabo in Odukpani Local Government Area, containing an area of about 50.662 hectares of land, for the industrial use of P&ID.

110   On 14 May 2010, I wrote to NNPC to update it on the progress made by P&ID. I pointed out that all of the project finance was in place, 90% of the engineering designs had been completed, a 50 hectare site had been allocated to P&ID by the Cross Rivers State Government, and that Addax Petroleum had confirmed to the DPR its readiness to supply to P&ID the Wet Gas that it was at that time flaring in OML 123 in time for Phase 1 of the Project as set out in the GSPA. I asked the Group Managing Director of NNPC to authorise NAPIMS to oversee and conclude the necessary arrangements between P&ID and Addax, by which I meant the engineering logistics of delivery of the Wet Gas for Phase 1 from Addax, to enable work to proceed on the gas processing facility."

30.   The Government did not thereafter do anything to comply with its obligation under Article 6 b) of the GSPA to –

"ensure that all necessary pipelines and associated infrastructures are installed and all requisite arrangements with agencies and/or third party are in place to ensure that supply and delivery of Wet Gas in accordance with Article 3 so as to

**JA-186**

> facilitate the timely implementation of gas processing by the
> GPFs [gas processing facilities to be constructed by P&ID] as
> provided for in this Agreement."

31. The Government's obligation under Article 3 c. was to make available 400
MMSCuFD Wet Gas at the P&ID Calabar site boundary.  By Appendix A
it undertook to deliver a continuous supply of 150 MMSCuFD by the last
quarter of 2011 and the remaining 250 MMSCuFD by the third quarter of
2012.

32. There followed discussions about the implementation of the Government's
obligations but nothing came of them.  The Government has never
performed any of its obligations under Article 6 b).  A compromise
solution involving a possible variation of the GSPA was discussed but
these negotiations were broken off in August 2012.  P&ID served a
Request for Arbitration but did not at that stage terminate the P&ID.  On
20 March 2013 P&ID wrote to the Government saying that it treated the
Government's continued failure to perform its obligations as a repudiation
of the GSPA and accepted it as such..

33. By Procedural Order No 9 dated 6 May 2015 the Tribunal directed that the
proceedings should be bifurcated and that there should first be a hearing
on the question of liability and thereafter, if P&ID were successful, a
hearing on damages. It directed the Government to serve "a statement of
any primary facts alleged in the evidence of Mr Michael Quinn which are
challenged and any other facts alleged to be relevant to the question of
liability."

34. On 12 May 2015 the Government served a statement of the facts in Mr
Quinn's statement which it challenged.  None of them were the facts
recited in paragraph 29 above.  P&ID elected not to put in any further
evidence and not to rely upon any of the challenged matters so far as they
were denials of facts.

35. In its Part Final Award dated 17 July 2015 the Tribunal dealt with a

**JA-187**

number of defences raised on the part of the Government which are not now relevant. However, a good deal of attention was given in submissions to the fact that P&ID had not actually acquired ownership of the designated site or built any of the gas processing facilities. The written submissions of Mr Olapo Shashore, then counsel for the Government, submitted that the failure of P&ID to acquire the site and build the GPFs was a "fundamental breach" and that no gas could be delivered until this had been done.[1]

36. The Tribunal's finding on this point was that the Governments obligations under Article 6 b) were not conditional upon P&ID having constructed the GPFs:[2]

> "It would have been commercially absurd for P&ID to go to the expense of building GPFs when the Government had done nothing to make arrangements for the supply of the Wet Gas."

37. Mr Shashore also advanced a modified version of this argument, saying that P&ID should at least have acquired a site so as to enable the Government to identify the "site boundary" to which the Wet Gas should be delivered. The Tribunal said that this took the matter no further than the first version of the argument:[3]

> "Of course the Government could not actually deliver gas until there was a Site and, as we have said, until there was a plant to receive it. But that does not excuse the Government's failure to comply with 6 b). There is no suggestion that its failure to comply with these obligations was caused by uncertainty as to where the Site was going to be. It was assumed by everyone that it would be on the land allocated in Calabar."

38. After dismissing the other defences, the Tribunal found that the Government had repudiated its obligations under the GSPA and that P&ID had been entitled to accept the repudiation and claim damages for breach.

---

[1] Written submissions, 28 May 2015, paragraphs 17-36.
[2] Second Part Final Award paragraph 64.
[3] Paragraph 66.

**JA-188**

### F.    REPUDIATION AND ITS CONSEQUENCES

39.  The effect of the acceptance  by one party of the other party's repudiation
is that the primary obligations of both parties (on the one hand, to supply
gas, on the other, to process it) are discharged and come to an end.  But the
contract "remains alive for the awarding of damages either for previous
breaches or for the breach which constitutes the repudiation."[4] Thus any
obligations which P&ID had to buy the site, build the GPFs, etc. came to
an end when the repudiation was accepted. There is no claim that either
party committed any breach before the Government's repudiation. The
present question therefore is only the damage suffered by P&ID by reason
of the Government's refusal to perform the contract.

### G.  MEASURE OF DAMAGES

40. The damage suffered by P&ID is the loss of the net income it would have
received if it had been supplied with wet gas in accordance with the
contract and had been able to extract and sell the natural gas liquids. The
first question is whether this kind of loss is in principle recoverable or
whether it is too remote. The parties are agreed[5] that the general rule for
answering this question is that formulated by Alderson B in *Hadley* v
*Baxendale:*[6]

> "[T]he damages which the other party ought to receive in
> respect of such breach of contract should be such as may
> fairly and reasonably be considered either arising naturally,
> i.e., according to the usual course of things, from such
> breach of contract itself, or such as may reasonably be
> supposed to have been in the contemplation of both parties,
> at the time they made the contract, as the probable result of
> the breach of it.

41. Loss which does not fall within either of these two branches of the rule is

---

[4] Lord Wright in *Heyman v Darwins Ltd* [1942] AC 356, 379.
[5] Claimant's written submissions of 22 August 2016, paragraph 18.2; Government's written submissions of 24 August 2016, paragraph 1.2.
[6] (1854) 9 Ex. 341,

**JA-189**

usually considered too remote.

42. The Government submitted that the loss of income from sale of the natural gas liquids could not be considered to arise naturally from its repudiation of the contract because at that time P&ID had not acquired a site or constructed the GPFs.  The point is put with great clarity at the outset of its written submissions:

> "In order to put the Claimant's argument in the right perspective, it is important to consider this pertinent question which flows from the Claimant's position above.  Can the damages in the sum of $8.627 billion dollars as claimed by the Claimant be regarded as a fair, reasonable and natural consequence of the Respondent's breach? We shall answer in the negative.  This is based on the premise that it is not natural and in the usual course of things for the Claimant to make such profit without taking any steps towards the actualization of the contract such as building a gas facility or purchasing the land allotted to it."

43.  In other words, the Government submits that damages should be calculated on the assumption that even if the Government had performed its obligations, P&ID would not have done anything more.  It would not have acquired the site or built the gas facility.  The fact that P&ID had not done so before the repudiation is a constant theme of the Government's submissions.[7]

44. The Tribunal considers that this submission is wrong in law. If one party (D) repudiates a contract, the other party (C) is entitled to accept the repudiation and sue for damages. The measure of damages is the sum required to put C in the position in which he *would have been* if D had performed his obligations under the contract. For this purpose it is necessary to consider not only what D was obliged to do, but also whether C *would have* performed his obligations under the contract. If he would not have been able to do so, he may not be able to recover more than

---

[7] The point is made in the written submissions at paragraphs 1.4, 1.9, 1.10, 1.11, 1.12, 1.15, 1.16, 1.17, 1.19, 1.20, 1.21, 1.22, 1.23, 1.24, 1.26, 1.27, 1.34, 1.38, 2.4, 2.8, 2.10, 2.11, 4.9, 4.10, 4.11, 5.2 and 5.3.

11

**JA-190**

nominal damages for the repudiation. But the question is whether he *would have* performed his obligations, not whether he had already done so before the repudiation.  The Tribunal must decide this according to the evidence, the burden being upon the claimant. What would have happened is of course a hypothetical question but courts and tribunals frequently have to make such decisions.

45. These principles are clearly established in the laws of both Nigeria and England.   In *Tanko* v *Kaduna North Local Government* the Nigerian Court of Appeal said:

> "In the resolution of this issue on the assessment of damages, it is very important to note that it is a fundamental principle of our law on damages that in the event of a breach of any contract, the Plaintiff is entitled to be placed, so far as money can do it, in the same position *as he would have been in*, had the contract been performed. See: ROBINSON V. HARMAN (1848) 1 EX.850, 855 AND PIEDMOUNT PLYWOODS V. GOLDEAC (NIG) LTD (1992) 8 NWLR (PT. 260) 481 AT 491."

46. The reference to *Robinson v Harman* was to the well-known statement by Parke B:

> "The rule of the common law is, that where a party sustains a loss by reason of a breach of contract, he is, so far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed."

47.   In *Flame SA* v *Glory Wealth Shipping PTE Ltd*[8] there was a question as to whether the innocent party would have performed his obligations, Teare J summarized the law:

> "The assessment of loss necessarily requires a hypothetical exercise to be undertaken, namely, an assessment of what would have happened had there been no repudiation. That enables the true value of the rights which have been lost to be assessed.  The innocent party is claiming damages and therefore the burden lies on that party to prove its loss. That requires it to show that, had there been no repudiation, the innocent party would have been able to perform his obligations under the contract. [But]…when assessing what the innocent

---

[8] [2014] QB 1080 at paragraph 85.

**JA-191**

party would have earned had the contract been performed the
court must assume that the party in breach has performed his
obligations."

48.  It follows that if the evidence had showed that for some reason, even if
the Government was ready and willing to perform the contract, P&ID
would never have been able to acquire the site or build the plant, then it
would not be able to recover more than nominal damages. So, for example,
in *North Sea Energy Holdings NV* v *Petroleum Authority of Thailand*[9] the
buyer of a very large quantity of oil over a five year period wrongfully
repudiated the contract. The seller claimed as damages the huge profit it
would have made on the difference between the sale price and the price for
which it  expected to be able to buy the oil in Saudi Arabia. But the judge
found as a fact that it would not have been able to obtain the oil from
Saudi Arabia to perform its side of the contract and awarded nominal
damages.

49. In some cases the fact that a party had not done anything by way of
performance of the contract for three years, as in the present case, might be
evidence that it was unable or did not intend to do so. But that is not the
case here. There was an obvious reason why P&ID had not started upon
performance. As the Tribunal said in its second Part Final Award –

> "It would have been commercially absurd for P&ID to go to the
> expense of building GPFs when the Government had done
> nothing to make arrangements for the supply of the Wet Gas."

50. In fact, the evidence shows a high degree of likelihood that if the
Government had been willing to perform, P&ID would have acquired the
site and built the plant.  First, P&ID was fully prepared to acquire the land
and start constructing the plant.  Mr Quinn says in his witness statement
that, starting in 2006, P&ID –

> "…[42] set about the necessary preparatory engineering work
> required to construct a gas stripping plant capable of processing

---

[9] [1997] 2 Lloyd's Rep 418; [1999] 1 Lloyd's Rep 483

13

**JA-192**

400 MMScuFD of Wet Gas and a polymer grade propylene
plant capable of producing 250,000 metric tonnes per annum of
polymer grade propylene....[47] During the course of the next
two years, we made good progress and reached a very
advanced stage of the preparatory engineering work necessary
to implement such a project on the ground. I would estimate
that the total costs sunk into the preparatory work during that
period were in excess of $40 million...[49] By the end of the
first 2 years of our work on the Project, we had put together a
completed engineering package ready for actual permit
applications, procurement and construction...[102] The day
after the signing of the GSPA, on12 January 2010, I wrote to
the Minister on behalf of P&ID to inform him that P&ID
wished to commence work at once...[110] On 14 May 2010, I
wrote to NNPC to update it on the progress made by P&ID. I
pointed out that all of the project finance was in place, 90% of
the engineering designs had been completed [and] a 50 hectare
site had been allocated to P&ID by the Cross Rivers State
Government..."

51. As recorded in paragraph 33 above, the Government was directed by
Procedural Order No. 9 to serve notice of any primary facts in Mr Quinn's
witness statement which it disputed. It did not dispute any of the matters
mentioned above. P&ID thus showed every sign of being willing, indeed
anxious, to implement the project and there is no dispute over its ability to
have done so.

52. Upstream Commercial Advisory Limited ("Upstream"), the Government's
expert witnesses, do not appear to have been shown Mr Quinn's evidence.
Under the heading "Readiness Status of P&ID" they say that –

"P&ID made an investment decision based on a Class 5
estimate. This is flawed because a Class 5 estimate
classification is based on two percent (2%) detail definition of
the proposed project with just a notional sense of engineering
deliverables. A Class 3 estimate is indeed required for Final
Investment Decision...There's no mention of a detailed EPC
schedule in the cost estimates."[10]

---

[10] ACEE International, an international association of cost engineers, divides cost estimates in to five
classes according to their degree of detail, purpose, expected accuracy and preparation effort. Class 1 is at
the greatest level of detail, used to check a bid or tender. Class 5 is at the most general level and is intended
for a first appraisal of a project: see AACE International Recommended Practice No 18R-97.

**JA-193**

53. It is true that, as the Tribunal will in due course explain, P&ID's expert witness Mr Wolf had made his own Class 5 estimate by way of a check on the three earlier estimates with which he had been provided. But P&ID itself had gone a good deal further.  Besides the uncontested evidence extracted in paragraph 50 above, Mr Quin had said:

> "[48] By way of example, extensive work was commissioned from various specialist engineering companies such as CB&I Lummus Technology Group in New Jersey, KRAN Developments in Johannesburg and ABB Limited in the UK. The cost of the work of these three companies alone was about $29 million. In addition our own internal costs were significant...[49] By the end of the first two years of our work on the Project, we had put together a complete engineering package ready for actual permit applications, together with a 3-D software model of the plant which was in such high detail that it would have enabled training of the plant staff even before completion of construction."

54. Secondly, the prospective profits were such as to create a substantial financial incentive to go ahead.  Mr Quin estimated that the project would produce a profit of $5 to $6 billion for P&ID over a 20 year period.

55. Thirdly, there is no evidence of any legal or financial obstacles which stood in the way of the scheme. The Upstream report has a discussion of the "business environment" in Nigeria but there is nothing to suggest that with the co-operation which the Government had promised in the GSPA, it would not have been able to acquire the site and construct the plant.

56. Consequently, the Tribunal finds on a balance of probability that that P&ID would have performed its obligations under the GSPA and therefore did suffer loss.  Furthermore, such loss flowed naturally from the Government's repudiation and was not too remote.  The next step is the quantification of that loss.

## H.    THE CALCULATION

15

**JA-194**

57. If the contract had been performed, P&ID would have received for 20 years an income from the sale of natural gas liquids extracted from the wet gas supplied by the Government. As against that income, it would have had to finance the necessary capital expenditure to acquire the site and construct the gas processing facilities ("CAPEX") and incur revenue expenditure in operating the plant ("OPEX"). The loss is therefore the value of the stream of net profit which P&ID would have made if the Government had performed the contract according to its terms. As the damages have to be assessed once and for all, it is necessary to estimate the value of that stream of profit at the time of the breach, making an appropriate discount for the fact that P&ID will be awarded immediate payment in place of sums which would actually have been received over a 20 year period. The Tribunal will in due course consider whether the valuation at the date of breach may take into account what is known to have happened since that date.

A.        **Expenditure**

58.   P&ID's expert witness on expenditure was Mr Bradley Wolf. He is an engineer with 30 years of experience in engineering, procurement and construction of complex infrastructure, power generation and commercial and industrial facilities. Mr Wolf dealt first with CAPEX and then OPEX.

*(a) CAPEX*

59. Mr Wolf's principal source for estimating CAPEX was the detailed engineering work which had been done by P&ID as described by Mr Quinn.[11] This was in his opinion, at the minimum, a Class 2 estimate in the ACEE classification.[12] In addition, in April 2013 P&ID had commissioned

---

[11] See paragraphs 50 and 53 above.
[12] BRG Second Expert Report paragraph 2.2.8

**JA-195**

an independent assessment from Genesis Oil and Gas Consultants Ltd.[13]
Mr Wolf treated this as a Class 3 estimate.[14] Thirdly, in October 2015 it
had obtained another independent assessment from Wood Group Frontier
Ltd, another well-known company offering consultancy services.[15] Mr
Wolf regarded this as also being a Class 3 estimate.[16]

60. Mr Wolf then built upon these estimates to construct his own. First, he
removed the cost of plant which was additional to that required to perform
P&ID's obligations under the contract. The original plans had included a
propylene plant which had been abandoned by the time the GSPA was
signed. This had required the use of a specialised recovery process
(Randall NGL) which had the high recovery rate of the propane needed to
make propylene. Genesis had therefore both dropped the Randall NGL
process and substituted the AET Mehra process instead. Wood Group
favoured the Russell UOP process. Mr Wolf's view was that all three
processes were capable of meeting the requirements of the GPSA[17] but
that "based on removal rates, capital cost and operational considerations",
the UOP Process was the proper selection.[18]

61. Based on these materials, Mr Wolf made a calculation of the probable cost,
which he tested by reference to a Class 5 estimate of his own and "bench
marked", i.e. compared it, with information about similar plant which had
been built elsewhere. He observed in his report:

> "It is important to note that this was not by any means a
> unique project whose costs would consequently be very
> difficult to predict. The project described in the GSPA was
> typical of many others in gas rich regions of the world.
> There was nothing in the project scope, cost or timetable
> that was any different [from] many other such projects
> routinely completed around the world."

---

[13] Exhibits BRG 402 and 403.
[14] BRG Second Report paragraph 2.2.12.
[15] Exhibit BRG 404.
[16] BRG Second Report paragraph 2.2.15.
[17] BRG Report, paragraph 4.6.9
[18] BRG Report paragraph 4.6.11

17

**JA-196**

62. There is nothing to show that Mr Wolf failed to take account of local conditions in calculating CAPEX, nor was it put to him in cross-examination that he had not done so. Most of the components of the plant would have been imported and their prices were unaffected by local conditions, but labour costs were based on Nigerian rates. [19]

63. In calculating the sum which ought to be provided for contingencies, he used a programme ("@risk") which calculates the probability of deviations from estimate of each item in the budget and combines them. This has the advantage, Mr Wolf said, of taking into account "the extremely low probability that *all* of the estimated values will require the maximum contingency level."[20]

64. On this basis, Mr Wolf produced an estimated CAPEX of $579,990,000, which included a contingency allowance of $65,890,000. This represented about 15% and gave in his opinion a 90% chance that the project would not go over budget.[21]

65. The chief objection of Upsteam, the Government's expert, was that Mr Wolf had inadequate material upon which to arrive at his estimate. This, as noted above, was based upon the misapprehension that P&ID had done nothing but make a Class 5 estimate before entering into the contract and that Mr Wolf had no other material upon which to make his own estimate. The report contains no comment upon Mr Wolf's contingency calculation but the final recommendation, without explanation, is that one should "assume nominal Class % CAPEX estimates + 40%."[22] In cross-examination, the government's expert Mr Dare said that reflected the reliability of a Class 5 estimate.[23] In other words, it was made upon an altogether false assumption about the underlying figures.

---

[19] Second BRG Report, paras 2.6.5-7.
[20] BRG Second Report, paragraph 2.5.11.
[21] BRG Report, paragraph 2.1.7.
[22] Final Upstream Report, p. 26.
[23] Transcript Day 1, 30 August 2016, pp. 93-105.

**JA-197**

66. The Upstream report contains no comment upon the equipment which Mr
Wolf considered would be needed or any specifics of his estimate.  Nor
was anything of the kind put to him in cross-examination. Counsel for the
Government appeared to be satisfied with his admission that he had found
the P&ID materials "extremely helpful".[24] He was asked whether he had
subjected the third party studies to an audit.  He replied that he had –

> "compared the values that were presented with other ones that I
> have personal knowledge of or are in the public domain. So
> from a reasonableness standpoint, these values certainly, within
> my experience, I had no reason to question them."[25]

67. Finally, Mr Wolf was asked whether his estimates were "founded on
assumptions".  He replied:

> "My job is to make sure they are reasonable assumptions and
> reflective of what…it would have cost to build a plant that
> would have achieved what was outlined in the facility, but all
> estimates are based on assumptions."

68. In his closing submissions, Chief Ayorinde said that, as a matter of
Nigerian law, a "feasibility study" should not be the basis for an award of
damages[26] and that Mr Wolf, in his reliance upon the pre-contractual work
of P&ID, was presenting the Tribunal with a "feasibility study".  It was
true that he also relied upon other material and exercised his own
judgment , but his use of the P&ID papers "removes from the purity of his
report."[27]

69. The Tribunal rejects this submission.  There is no authority in Nigeria or
England for the proposition that an expert estimating what work of
construction  would have cost may not have regard to the specification of
work and estimates of cost made by the person who was to undertake that
work, simply on the ground that it was a "feasibility study".  In the case
upon which counsel relied, *Artra Industries Ltd v Nigerian Bank for*

---

[24] Transcript Day 1, 30 August 2016, pp. 8-9.
[25] Transcript Day 1, 30 August 2016, p. 11.
[26] Transcript Day 2, 31 August 2016
[27] Transcript Day 2, 31 August 2016, p. 49.

19

**JA-198**

*Commerce and Industries*[28] the court said that a particular document called a feasibility study tendered in evidence had no probative value. That was true on the facts of that case. In the present case, the Tribunal is satisfied that Mr Wolf carefully examined all the available materials and exercised his own judgment. There are no grounds upon which to reject his estimate of $579,990,000 or the adequacy of the $65,890,000 contingency which he included within it.

*(b) OPEX*

70. P&ID had made its own calculations of the OPEX for the project under six heads and arrived at a figure of $59,881,600.[29] Mr Wolf says that he has reviewed these costs and considers that they are reasonably accurate.[30] Mr Wolf was not cross-examined on this part of his evidence.

71. The Upstream Report makes no comments upon any of the six individual heads of expenditure but simply recommends that OPEX should be based on "2.5% of CAPEX with uplift of +25% to capture Niger Delta security arrangements". This produced a figure lower than Mr Wolf's estimate, but Upsteam produced an addendum in which they increased Mr Wolf's figure by 25%. Asked in cross-examination for the justification for this increase, Mr Dare said:[31]

> "It did not factor in Niger Delta adjustments, it did not factor in the fact that you have Nigeria content development requirements, all of that is a way of making operations more expensive."

72. He went on to speak of condensate evaporation strategy and the cost of transporting the condensate.

---

[28] [1997] 1 NWLR 574
[29] The estimates, broken down into 6 heads of expenditure, are at paragraph 4.9.2 of the BRG report.
[30] BRG Report, paragraph 4.9.3.
[31] Transcript Day 1, 30 August 2016, p. 106.

20

**JA-199**

73. One difficulty which the Tribunal has with these submissions is that none of it was put to Mr Wolf.  The final Upstream report had spoken only of "uplift of +25% to capture Niger Delta security arrangements (i.e. hardening of the facility site with relevant Government Security Agency personnel) as well as factor-in Nigerian Content Development (NCD) compliance"." The Tribunal received no evidence about the circumstances in which it is obligatory or prudent to employ "Government Security Agency personnel", or the incidence of insurgent activity against gas installations in the area.  These are matters which must be known to the Government and on which evidence was available. But none of it was put before the Tribunal or put to Mr Wolf in cross-examination.  Mr Dare, in oral evidence[32] after Mr Wolf had concluded his testimony, produced a number of points which had not previously mentioned in the Upstream report or otherwise: performance would be "sub-optimal" on account of having to employ Nigerian personnel, precautions would be needed to protect the condensate before export, stolen condensate could cause pollution and the government "will come after you". The claimants had no opportunity to comment on any of these matters.

74. Mr Wolf commented in his second report:

> "[2.6.3] The OPEX costs in our First Report were derived from a compilation of detailed information developed for this plant by P&ID, Genesis and the Wood Group.  These studies described that the OPEX  was based on information from similar projects and lease costs obtained after preliminary bids were tendered and woulod already have included any extra security precautions deemed prudent.

---

[32] Transcript Day 1, 30 August 2016 pp. 111-113)

**JA-200**

[2.6.4] Since the facility capital costs included security fencing around its defined perimeter and guarded entrances as part of the infrastructure and the OPEX estimates already considered the location, I believe that no specific additional uplifts to OPEX costs for "Niger Delta security arrangements" especially since the risk of disruption, to the extent that it exists, is likely more prevalent to the incoming pipeline which in this case is the responsibility of the respondent."

75. The Tribunal considers that it has no satisfactory basis for deciding that Mr Wolf did not take into account factors which would increase the OPEX by 25% or any other figure. They accordingly accept his figure.

B.  Income

76. An estimation of future income requires a calculation of (a) the yield of NGLs which the plant would have recovered from the incoming gas and (b) the prices at which they could have been sold. The resulting figure must then be discounted to allow for the award being for an immediate lump sum rather than income spread over 20 years.

*(a) Yield of NGLs*

77. The expert witness for P&ID on this point was Mr Anthony Melling of BRG. He has general experience in the gas industry and specializes in natural gas, LNG and associated liquids. The first part of his estimate was concerned with identifying the content of the gas stream which the Government was required to supply under the GSPA. As the Government could supply gas meeting the contract specification from anywhere it chose, this meant having to identify the content which such gas was most likely to have. P&ID had information about the gas quality from OML 123 in May 2008[33], but considered that this was out of date and based upon insufficient volumes.[34]

78. Instead, Mr Melling constructed from information derived from the

---

[33] Table 17 at paragraph 5.3.2 of the BRG Report.
[34] Ibid, paragraph 5.3.3

**JA-201**

Department of Petroleum Resources and NNPC a "Typical Composition of Nigerian Gas."   The minimum propane and butane contents specified in the GSPA were 3.5 and 1.8 mol per cent respectively. Accordingly, Mr Melling produced a "Minimum" yield by adjusting the typical composition so that it had no more than the contractual requirement of C3+ liquids.

79. He did not however consider that a composition producing the minimum yield was the most likely.  The GSPA provided that the Lean Gas was to be 85 mol% of the Wet Gas provided.  This suggested that the parties contemplated that P&ID would be left with 15% for NGLs, fuel gas and other losses. On this assumption, Mr Melling produced a higher figure for what  he called the "Expected" yield.

80. Mr Melling also produced a "Maximum" case in which more NGLs could be obtained from a richer feedstock which was still consistent with the contractual specifications.

81. For the purpose of calculating an annual yield in metric tonnes, Mr Melling assumed (a) that the Russell UOP plant assumed by Mr Wolf would be operational for 93% of the available time (340 days a year) with maintenance in parallel with maintenance at the end user plant (b) 4% of the energy content of the feedstock gas would be used as fuel gas (c) the production efficiency of propane and butane extraction would be 94% and (d) the process efficiency would be 90%, the rest of the propane, butane and condensate being lost to evaporation or flaring.

82. On this basis, the annual sales volumes in metric tonnes would be:

| | |
|---|---|
| Minimum yield: | 491,037 |
| Expected yield: | 811,000 |
| Maximum yield: | 1,245,739 |

83. The Upstream report said that the use of a typical rather than absolute

23

**JA-202**

composition was "unacceptable".[35]  It noted, however, that its own
analysis of the only actual field data available, namely the OML 123
figures for 2008, had produced an annual yield of 838,437 metric tonnes,
i..e. slightly more than Mr Melling's Expected yield. The Tribunal does
not accept that Mr Melling was wrong to start from a typical composition.
As the GSPA did not say from which field the Wet Gas had to come, an
estimate of what was likely to have happened if the Government had
complied with its obligations required him to say what the composition of
the gas was likely to have been.  For this purpose, it was right to start with
the typical composition of Nigerian gas.

84.  The only one of Mr Melling's assumptions which the Government
contested was the 93% operational time. Mr Dare said one should rather
assume it would operate only for 40%, or perhaps 45%, or 50% of the
time.[36]  The Upstream report said 50% and eventually Mr Dare said he
would stay with that figure. The reason given in the report was "unabated
militancy in the Niger Delta…on account of the firm nexus between AG
production and oil production performance (militancy activities are
primarily targeted at disrupting oil export.)"

85.  Even assuming that the GSPA was about exporting oil, a 50% reduction in
operating time would have been a remarkable figure.  The Upstream report
offers no actual evidence of (1) the incidence of militant attacks in the
Calabar region and its effect on oil production (2) if the attacks were
against oil pipelines, how this would affect the production of associated
gas at the wells (3) whether there had been any interference with gas
pipelines.

86.  The comment in the Second BRG Report by Mr Melling was:

3.6.2    I am aware of course of the problem of militant

---

[35] Upstream Report p. 20.
[36] See Transcript Day 1, 30 August 2016, pp. 113-115.

**JA-203**

attacks on oil and gas infrastructure in the Niger Delta, which have a variety of reasons. However it is my understanding that this problem manifests itself in the West and North West of the Niger delta region rather than the South East, where Calabar is located. This is borne out by material in the public domain.

3.6.3  The EIA state that this militant group is the most active in the region. Appended to this report is a map plotting the locations of all of the attacks by the Niger Delta Avengers reported by the online publication "Ventures Africa" in 2016.6 This map indicates that militant attacks are focused around Warri and to a lesser extent around Brass, at the mouth of the Niger Delta. Calabar is hundreds of kilometres to the East of this region.

3.6.4  Nigerian Oil Spill Monitor provide a map of spills in the Niger Delta area, indicating where they are caused by third parties.7 Almost all spills caused by third parties are found to the west of Calabar.

3.6.5  My conclusion is further supported by the 2015 Annual Report of Seven Energy, the leading integrated gas company in south east Nigeria. Seven Energy has operations in 3 locations in the Niger Delta – in the North West (around Warri), in the Anambra Basin, and in the South East, in an area encompassing Port Harcourt and Calabar.

3.6.6  The Seven Energy Annual Report specifically discloses the militancy affecting operations in the North West Delta – see page 13 – referring to "considerable interruption due to sabotage and damage caused to the Trans Forcados Pipeline". (The Trans Forcados pipeline is a crude oil pipeline in the North West Niger Delta which was bombed in February 2016). However, in the Operational Report for the South East Delta region (pp 34-37 of the Seven Energy Annual Report) no mention is made of any operational interruption due to militancy.

3.6.7  I further note that according to its 2015 Annual Report Seven Energy is actively supplying lean gas to power plants in the Calabar region. A

**JA-204**

more recent update reporting on the first quarter
of 2016 states: "During the first quarter of 2016,
Seven Energy gas deliveries in the south east
Niger Delta averaged 101 MMcfpd (Q1 2015:
44 MMcfpd). The 44% increase from the 2015
average gas deliveries of 70 MMcfpd was due to
the increase in gas taken by the Calabar NIPP
and Alaoji NIPP power stations as they increase
their electricity generation into the power grid."

3.6.8    Finally, the US Department of Energy, Energy
Information Agency provide data that can be
used to give a rough estimate of the level of
disruption to Nigerian oil production due to
militancy. Their data shows that, prior to 2016,
approximately 13% of oil production was not
achieved due to militancy. Only in 2016 did
increasing militancy cause greater disruption,
with disruption increasing to approximately
32%. This is not analogous to the outages that
one might expect in a single NGL facility in an
area relatively unaffected by militancy, but it
shows that an assumption of 50% downtime due
to militancy over the life of a project from 2015
onwards is wholly unrealistic (even for the part
of the industry most effected by attacks).

3.6.9    In summary, I am not aware of any sensible
foundation to support the assumption that the
P&ID plant would have suffered 50%
downtime, as suggested by Upstream. As stated
above, I believe that my uptime assumption of
93% is realistic.

87. There was no attempt in cross-examination to discuss or challenge any of
this information.

88. The Tribunal therefore considers it highly implausible to assume that a gas
stripping plant, situated in an area away from the main focus of militant
attacks, will be out of commission for 10 out of its 20 years of operation.

89. In any case, the Upstream calculation is based upon a misapprehension,
evident throughout the report and the submissions on behalf of the
Government, about the nature of the calculation which the Tribunal has to

**JA-205**

make. It fails to appreciate that the calculation must be made on the assumption that the Government will perform its obligations under the contract. Except so far as the Government would be entitled to plead *force majeure* (as to which no argument was presented to the Tribunal) it must be assumed to have delivered the necessary quantities of Wet Gas to P&ID's site and taken the Lean Gas for its power stations. If militancy makes it difficult to obtain the gas from one field, it must find the gas somewhere else.

90. The Tribunal finds that Mr Melling's assumption of 15 days of downtime for maintenance and other eventualities during the year is the one most likely to be correct.

*(b) Price of NGLs*

91. The price of NGLs is closely linked to the price of oil which is, like that of most commodities, cyclical – sometimes dramatically so. It is not easy to predict the future movement of prices. But such predictions have to be made, because investment decisions depend upon them. Likewise, they have to be made by the Tribunal to determine the loss which has been caused to P&ID by the repudiation of the contract.

92. There is a preliminary point of principle which needs to be decided. Is the appropriate prediction that which would have been made at the date of acceptance of the repudiation, i.e. March 2013, or should it be what would be predicted now, i.e. at the date of the hearing? P&ID's expert witness on this aspect of the case, Mr Simon Ede, has prepared calculations on both bases.

93. The Tribunal considers that the correct approach is to take into account all the information available at the hearing. This is the trend of recent decisions of the English courts on questions which involve predictions: see

27

**JA-206**

*The Golden Victory*[37] and *Bunge SA v Nidera BV*[38] . Mr Ede says of his 2015 calculation of the loss suffered by P&ID by the 2013 repudiation:

> "I take the actual 2015 prices…I assume that the price fall of 2014-15 is completely foreseen and future expectations…about long term oil prices [at the hearing date] are similarly known."

94. This appears to the Tribunal to be the right approach.

95. Mr Ede made two assumptions about how P&ID would sell its NGLs which are not challenged. First, he assumed that they would be sold f.o.b Nigeria into the north west European market. So he took into account the cost of shipping the liquids to Europe. Secondly, he assumed that NGL prices would closely follow oil prices.

96. The experts differed, however, in their forecasts of oil prices. Mr Ede based his first estimate, made in 2015, upon predictions published by the International Energy Agency ("IEA") available in 2013. Upstream did not produce an independent calculation but said that Mr Ede's estimate should be uniformly reduced by about 38% to reflect the fall in oil prices which had occurred since 2013. Mr Ede's second estimate, based on the principles stated above and an IEA forecast published in 2015, averaged about 24% lower than his first forecast.[39]

97. The 2015 IEA report, upon which Mr Ede chiefly relied, contained four different scenarios which might affect future oil prices. They were (1) the New Policies scenario, described as "the central scenario of this Outlook", which assumed that all policies affecting the energy market which had been announced would in fact be implemented (2) the Current Policies scenario, which assumed that only policies currently in force would continue (3) the 450 scenario, which assumed that policies to reduce the rise in long term average temperature, caused by greenhouse gases, to 2°C

---

[37] [2007] 2 AC 353

[38] [2015] Bus LR 987.

[39] As it happens, since Mr Ede's second report the price of Brent crude has increased from US$48 a barrel to US$55 a barrel.

**JA-207**

would be implemented (4) a Low Oil Price scenario, assuming no reduction in supply and reduced demand because of slow economic growth. The report said that the Low Oil Price scenario was unlikely in the long term because lower prices were likely to result in increased demand.

98. Mr Ede adopted the New Policies scenario for his second estimate.  He was not cross-examined on this estimate, save to secure the admission that forecasting oil prices 20 years ahead was difficult.  However, when Mr Dare gave oral evidence, he said that there were several forecasts available on web sites which were different from the New Policies scenario. He did not however identify these or produce them to the Tribunal.  The Tribunal did not have the benefit of Mr Ede's comments because none of this material (if such it was) had been put to him in cross-examination.

99. It is important to identify precisely the exercise which the Tribunal has to undertake. It is to make the best estimate which would be made today of the income stream which P&ID would have received from the sale of NGLs if the Government had performed its side of the bargain. The actual outcome will not be the same as the prediction. It is bound to be, to a greater or lesser extent, higher or lower. But this is, by definition, something which the Tribunal cannot know. One method sometimes adopted for making the necessary calculation is to ask what a third party would have paid to acquire the benefit of the GSPA on the assumption that the Government would definitely perform its obligations.  The notional third party would have decided what he should pay by making the same calculations as to what the income he would be likely to receive.  Putting the question in this way has the advantage of drawing attention to the fact that the value of future income depends upon the estimate which a notional buyer and seller would make today. That is what determines the present value of what P&ID has lost.  Someone who makes a higher or lower prediction may be able to say "I told you so" in years to come, but that does not affect the value which would now be attached to the future income stream.  The duty of the Tribunal is to decide on the evidence what that estimate would be likely to be. It is not to increase or reduce that

29

**JA-208**

estimate according to its own intuition.

100.    The only estimates of what might happen to oil prices that the Tribunal
has actually seen are those in the IEA report relied upon by Mr Ede. IEA,
says Mr Ede –

> "is an intergovernmental organization that provides reporting
> and analysis on international energy markets. Included in their
> work is analysis of future trends and developments in the oil
> and gas industries and as such they regularly publish forecasts
> of prices for these commodities. Companies operating in the oil
> and gas industries regularly make use of IEA forecasts when
> benchmarking price forecasts and analysis.  I believe that this
> is…reasonable."

101.    Mr Ede is an economist who has for 15 years specialized in energy
markets. His evidence is that IEA's New Policies scenario is the one most
appropriate to be used in forecasting. None of this was challenged in cross-
examination.

102.    By contrast, Mr Dare has said only that there are other forecasters in
the business who have arrived at different but unspecified conclusions. No
such forecasts were actually made available to the Tribunal, still less to Mr
Ede.

103.    The Tribunal considers that there is no material upon which it can
come to a conclusion different from that of Mr Ede's second estimate,
which gave effect to all the information presently available about the
movement of oil prices.  Accordingly it accepts the forecasts of prices (in
real 2013$ terms) in the second BRG Report:[40]

    *(c)   Taxation*

104.    Clause 8 h) of the GSPA provided that P&ID would enjoy "Pioneer
Status", i.e. freedom from taxation, for a period of 5 years from the

---

[40] Figure 6 in paragraph 4.5.6.

commencement of commercial operations. The BRG Report therefore assumed that the P&ID income stream would not be taxed for the first 5 years but would thereafter pay tax at the standard rate of 30%.[41] The Upstream report assumed a rate of 20% without any period of exemption,. This produced a slightly lower deduction than the BRG estimate.

105.   The Upstream Report contains no explanation of why it (a) ignored the 5 years Pioneer Status granted by the GSPA and (b) reduced the standard rate of tax to 20%. In the circumstances the Tribunal will accept the BRG calculation, which in fact results in a lower award of damages than the Upstream calculation.

*(d) Discount rate*

106.   The total net profit which P&ID would have received over 20 years must be discounted to reflect early payment, just as interest is added to damages to reflect late payment. Of course in the valuation of a business, estimated future earnings may also be discounted to reflect the risk that they will not materialise. The Government submits that such a discount should also be applied to the estimate of future profits in this case, to reflect the risk of investing in Nigeria. For this purpose, as well as the time value of money, Upstream proposes a discount rate of 7%.

107.   P&ID on the other hand say that a discount for risk is in principle wrong. If one is valuing a business where the future profits depend upon performance by the Government in the Nigerian environment, the main risk is that for one reason or another the Government will not perform its obligations, as indeed happened in this case. If P&ID was selling its rights under the GSPA to a third party, that risk would be foremost in the minds of the parties to the negotiation. But the law does not permit damages for breach of contract to be reduced to allow for the risk that the party in default will default. As for other risks, these have already been built into

---

[41] BRG Report, paragraph 7.2.2 (VI) and (VII).

31

**JA-210**

the calculation of future income: there are contingency allowances for
CAPEX and OPEX and the possible variations from the assumptions about
future oil prices may be up or down, thus cancelling each other out. P&ID
therefore submits that a deduction for risk would be a double deduction.
The BRG report says that US Treasury bonds are regarded as risk free and
their 2.65% rate of interest represents only the time value of money. It is
therefore the appropriate discount rate to use in this case.

108.    The Tribunal considers that P&ID is right for the reasons stated in the
last paragraph. A 7% rate would constitute a double contingency
allowance or allow the Government a reduction to reflect the risk of its
own default or both. 2.65% is the correct rate. On the other hand, for the
reasons given by the Government, 7% is the correct rate of interest to
apply to the Government's obligation to pay damages which crystallised at
the date of repudiation. It is not a risk free rate but reflects what P&ID
would have had to pay to borrow the money or could have earned by
investment in Nigeria.

*(e) Mitigation*

109.    The Government submits that only three years loss of income should
be taken into account because by that time P&ID should have found some
other profitable investment and thereby mitigated its loss. There is no
suggestion of what this other investment would have been. Nor is there
any explanation of why, if found,  this would have mitigated the loss
caused by repudiation of the GSPA. Even if P&ID could have found some
other unspecified investment opportunity, there is no reason why this
should be treated as mitigation of its loss. An employee who is dismissed
can mitigate his loss by finding another full time job. But there is no
reason why P&ID should not have pursued more than one investment
opportunity. The burden of proving that loss could have been mitigated is
upon the party who has broken its contract: see *Roper v Johnson* (1873)
LR 8 CP 167; *Geest plc v. Lansiquot* [2002] 1 WLR 3111 (Privy Council).
The Government has not suggested, let alone proved, what the Claimant

32

**JA-211**

might have done to earn the equivalent profit. This is not surprising because the law does not require the innocent party to take risks in an endeavour to save the party in breach from having to pay damages: *Banco de Portugal v Waterlow & Sons Ltd* [1932] AC 452 at 506 (Lord Macmillan). For all these reasons, the Tribunal considers that in this context the argument as to mitigation is misplaced.

## C. Conclusion

110.    The effect of the Tribunal's decisions on what P&ID's expenditure and income would have been if the GSPA had been duly performed is that the net present value of the profits which would have been earned is $6,597,000,000.[42] This is the measure of damages. It is a very large sum because (a) it is the present value of income which would have been earned over a long period and (b) the GSPA would have been very profitable for P&ID and (although the Tribunal has not had to make any findings on the point) probably for the Government as well.

## I.    COSTS

111.    Clause 20 of the GSPA provides that the parties are to bear the costs of the arbitration equally but that each party is to bear its own lawyer's fees. There has been no application by either side in respect of the costs of the arbitration and the Tribunal assumes that they have been borne equally.

## J.  DISPOSAL

112.    We, Leonard, Lord Hoffmann and Sir Anthony Evans, having read the parties' written evidence, pleadings and submissions and having heard their oral evidence and submissions, and having carefully considered the same and for the reasons stated above, make our Final Award as follows, namely we order the Respondent to pay to the Claimant the sum of

---

[42] See Second BRG Report, Appendix H.

33

**JA-212**

$6,597,000,000 together with interest at the rate of 7% from 20 March
2013 until the date of this award and at the same rate thereafter until
payment.

Place of arbitration:  London, United Kingdom.



Signed:


Lord Hoffmann


Sir Anthony Evans


31    January 2017.

**JA-213**

USCA Case #18-7154   Document #1780490        Filed: 04/01/2019     Page 218 of 242

# EXHIBIT 18

IN THE MATTER OF THE ARBITRATION ACT 1996 (ENGLAND AND WALES)

AND

AND IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE NIGERIAN ARBITRATION AND CONCILIATION ACT (CAP A18 LFN 2004)

BETWEEN:

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED**      **Claimant**

**And**

**THE MINISTRY OF PETROLEUM RESOURCES**      **Respondent**

**OF THE FEDERAL REPUBLIC OF NIGERIA**

**DISSENTING FINAL AWARD OF BAYO OJO, SAN**

## INTRODUCTION

This is a Minority Dissenting Final Award. I have read the Majority Award of my co-arbitrators. I am unable to agree with the conclusions reached therein. I hereby issue the following dissenting award. To avoid repetition, I adopt the following that relate to: introduction, the parties and their lawyers, the governing law and arbitration clause, procedural history and the finding on liability as contained in the majority award. I shall now proceed to the measure of damages which is where I differ.

## DAMAGES

The points of contention on damages relate to four broad issues namely:

    a.  Mitigation

    b.  Capital Expenditure (Capex)

    c.  Operating Expenditure (Opex) and

    d.  Yield.

This award will address those issues.

**JA-215**

**MITIGATION**

The majority opinion treated the issue of mitigation in a dismissive manner, by holding that Respondent did not suggest what other investment Claimant could have undertaken.[1] Claimant conceded at paragraph 28 of its 'Claimant's Written Submission in Reply' (on the issue of damages) the duty to mitigate by stating that **'it is accepted that P&ID was under a duty to mitigate its loss whether as a matter of Nigerian or English law'**, but claimed that it was a unique opportunity so there was no need to mitigate.

1. See also paragraph 59 of Claimant's Written Submission in Reply for the Hearing on Quantum on 30-31 August 2015, where it stated that **'During the 6 years from the conception of the project until the commencement of the arbitration in mid-2012 other potential projects had been put on hold'.**

2. Claimant argued that the Respondent had a duty to show that the Claimant as a reasonable person could have found alternative work. This argument in my view is misconceived. Having admitted the duty, Claimant bore the burden of proving that it has discharged the duty.

3. What is the scope of a duty to mitigate? The obligation is on the innocent party to lessen the financial loss to which it is exposed by seeking alternative means of income.

4. Claimant is an international engineering and project management company, capable of undertaking the kind of project envisaged under the agreement (GSPA) in Nigeria and other kinds of related works/projects in any other part of the world. There is no suggestion that the company was incorporated for the sole purpose of the GSPA. There is no evidence of any attempt made by Claimant to mitigate. Besides, the burden to mitigate is something that has to be taken into account throughout the period of 20 years. Indeed, by making an award without taking into account the duty to mitigate, the Respondent by implication will be subrogated to any fees or other remuneration that the Claimant might subsequently earn.

5. The purpose of damages under Nigerian law is not to give the innocent party a windfall, but to put the party in the position he would have been had the breach not occurred. Claimant is a new company that was incorporated in 2006. While not denying the fact that the Claimant is entitled to be compensated, to demand for general damages of $8.6 billion dollars is like asking for a reward for services not rendered.

6. Respondent argued that Claimant is not entitled to damages for more than three years from the date of breach. In the circumstance I think the three year period is not unreasonable, especially given the background of the project and the admitted existence of other projects which the Claimant had put on hold and to which it can easily return.

7. The majority opinion appeared to have set up a case better than, and different from that canvassed by the Claimant by suggesting that the Claimant had the capacity to do more than one work at a time. It was stated that 'An employee who is dismissed can find another full time job. But there is no reason why P&ID should not have pursued more than one investment opportunity'. See

---

[1] Paragraph 103 Final Award

paragraph 103, page 29 of the final award. The issue of the ability to do more than one work is at variance with the Claimant's case. It is on record that Claimant stated that it devoted, "substantially the whole of the time and resources" of the team on this project and that it placed on hold another project. This is clear admission that Claimant lacked the capacity to pursue more than one investment opportunity at the same time. See paragraph 59 of Claimant's written submission in reply on the hearing on quantum on 30-31 August 2016.

8. Should the Claimant get a windfall for twenty years because of a breach, or is it obligated to reduce and ameliorate the impact of the breach by finding an alternative, even if not equivalent engagement of its kind? In the case of **Kosile v. Folarin (1989) 3 NWLR (Part 107) 1 at 16 Supreme Court, KAWU, JSC** on the duty of plaintiff to mitigate damages held that:

> It is, of course, a well settled principle of law that a plaintiff is required to take all reasonable steps to mitigate the loss resulting from the defendant's wrong as no damages will be awarded in respect of any part of the loss which he could have averted by taking reasonable steps to do so.
> See also the case of **Momodu v. NULGE (1994) 8 NWLR (PT 362) 336 AT 353 Appeal Court.**

9. Mitigation aims at reduction of the impact of loss and not a provision of necessarily 'equivalent' work. Again, it is on record that Claimant put some projects on hold in order to undertake the instant contract. This was stated in paragraph 59 of Claimant's written submission on the hearing on quantum that 'During the six years from the conception of the project until the commencement of the arbitration in mid 2012, other potential projects had been put on hold'. So on the record there is evidence and/or admission of a project to which Claimant could return.

10. As I earlier stated, contrary to the suggestion of the majority, the Claimant clearly admitted its duty to mitigate by stating in paragraph 28 of the Claimant's written reply on the issue of damages that "it is accepted that P&ID was under a duty to mitigate its loss whether as a matter of Nigerian or English law." This admission cannot be disregarded. In the case of **NIMASA v. Hensmor (Nig) Ltd. (2015) 5 NWLR (Part 1452) 322 Court of Appeal,** the court held that, 'A plaintiff has the onus to mitigate damages of his cause of action rather than rush to file an action in court'. The Claimant having admitted that it was under a duty to mitigate loss, and yet failed to continue with any of the projects it had put on hold; it is my considered view that the Respondent no longer had the burden to proof same.

11. The general and fundamental rule of the law of evidence is that the court can only base its decision in any litigation on facts that are proved to exist by evidence. However section 123 of the Nigerian Evidence Act, 2011, provides that no fact needs to be proved in any civil proceeding which the parties to the proceeding or their agents agree to admit at the hearing, or which, before the hearing, they agree to admit by any writing under their hands, or which by any rule or pleading in force at the time they are deemed to have admitted by their pleadings. **_Joseph Mangtup Din v. African Newspapers of Nigeria Ltd delivered on 25th day of May, 1990 Suit No. 44/1986 Supreme Court._** The Claimant, having admitted the duty to mitigate is bound by it. See **SUNDAY ADEGBITE _TAIWO v. SARAH ADEGBORO delivered by the Supreme Court o 20th May 2011._**

3

**JA-217**

12. It is not tenable to award damages on the supposition that the Claimant will not be able to find an alternative work or project for twenty years. The crucial issue is for what part of the 20 years it is reasonable to compensate Claimant bearing in mind the admitted duty to mitigate and the fact that it had put other projects on hold and which it can return to immediately. Considering that the breach occurred in 2013, and that the project could not have started yielding proceeds earlier than 2015, it means that the Claimant had from 2013 to attempt the mitigation of its damage or loss. Therefore a period of three years from 2015 to 2018 is reasonable. See again the Supreme Court case of **Kosile v Folarin**.

13. In the related field of employment law, a plaintiff who cannot find reasonable alternative employment has a further duty to lower his or her sight, and the measure of damages would then be the difference between his previous earning and current earning. Mitigation of damages entails reduction or amelioration of the loss occasioned by the breach. The majority opinion seems to misconceive and misplace the duty to mitigate having been admitted by the Claimant. In the instant matter, there is admission by Claimant that it put other projects on hold in order to undertake the project contemplated under the GSPA. Two unassailable conclusions can be drawn from that admission.

14. The first is the inability of Claimant 'to pursue more than one investment opportunity' at the same time. The second is the availability of another work to which Claimant could return thereby undercutting the indulgence of the majority opinion to Claimant on this point. In any event, it is absurd or anomalous for Claimant to admit the existence of a duty on itself, and then, without any evidence by way of a discharge of that duty, for the majority opinion to state that the Respondent has not proved what other work claimant would have undertaken. The party that has the duty has the burden to prove the discharge of that duty under Nigerian law. The Claimant clearly bore the duty to prove its effort at mitigation.

15. It is inconceivable, untenable and indefensible for Claimant to fold its hands and ask for damages for twenty years. Again, as I earlier stated, assuming the Claimant is paid for twenty years, does the respondent become subrogated to any income that claimant might earn from subsequent work within the twenty year period?

16. In view of all the above, I find that the Claimant is not entitled to damages for loss from the breach for more than three years.

17. **CAPEX AND OPEX**

18. Claimant's experts put the CAPEX at $514, 100,000 while Respondent's state that that figure should be upped by 40%. It would appear that Claimant's estimates are rather very conservative, especially when juxtaposed with the purported expected proceeds from the project. A project that Claimant argued would yield **$8.6 billion** in profit in 20 years would cost, in the claimant's experts' opinion **$514.1million**, meaning that the cost of building the plant is recoverable in only about a year or two.

19. I am of the view that the Claimant's estimates on CAPEX and OPEX are grossly understated and that the Respondent's estimates are preferable. The points of divergence are that the Respondent added forty percent (40%) to the figure projected by the Claimant for CAPEX, and also added

4

**JA-218**

twenty five percent (25%) to the suggested figure for OPEX. Unfortunately, by their very nature, the estimates can only be projections. This is especially so because Claimant did not build the plant. Although the award on liability held that the Claimant was not liable in failing to construct the plant, that omission certainly has impacted on the calculation of CAPEX and OPEX. Thus, the experts were all over the map on the figures. The challenge therefore is to essentially know which of the two competing speculations is more tenable.

20. The Claimant's estimates are overly conservative and failed to take into account local circumstances. Calabar the proposed location for the plant is in the Niger-Delta and certainly is not immune from the challenges encountered by oil and oil related facilities in the region, and no reasonable investor will proceed with an investment in that area without paying regard to those challenges. On this score, the Respondent's estimates are, on the balance of probabilities, more tenable. This analysis is without prejudice to my earlier decision on the effect of the duty to mitigate.

21. It will be a travesty to ignore the evidence of the Respondent on CAPEX simply because it didn't follow the same methodology adopted by the Claimant. The burden is always on the Claimant to establish their case.

22. The majority award suggested that Respondent offered no evidence on this issue. The evidence of the Respondent's expert on CAPEX spans several pages of the record. The Respondent was provided with the Claimant's expert report on the issue of CAPEX. He, the Respondent's expert, testified to the fact that the Claimant's estimates, as contained in the Claimant's expert's report, were understated by about 40%. This was maintained by that witness throughout cross examination. He testified that the figures on CAPEX should be raised to 40%.

23. This was after looking at the item by item estimates made by Claimant's expert. It would be grossly unfair to characterise such evidence as irrational. Certainly, by using a broad percentage, the Respondent was saved the task of testifying item by item. But this does not affect the probative value of the evidence, since he reviewed the underlying item by item estimates and found them to be understated by that percentage. It is not absurd for an expert who has reviewed the detailed figure of another expert to point out that those estimates were understated and to testify to the extent of the understating.

24. It is also worthy to note that, in addition to Respondent's witness' expertise, he also has a working knowledge of the area where the project would have been sited. In answer to cross examination on the issue of 40% he stated clearly'

> "So there is the BRG opinion of what a class 5 estimate will provide, there is the Upstream opinion on that, and there is the opinion which is the estimate you get at finally (sic) investment decision point. They didn't have that. We don't have that. So this is a range, an uncertainty range, so you take your pick based on how familiar you are with what you expect will happen. I happen to have a working knowledge of the Niger Delta on all sides, including Calabar, and that's where that has come from. So I think the CAPEX expectation is understated, and a factor of 40 per cent definition of what project is about, yeah, is reasonable".(pages 93-94 Day1 PID 1.1 30 AUGUST 2016)

5

**JA-219**

25. It is really inaccurate for the majority opinion to suggest that on CAPEX the tribunal had no evidence at all to contradict Mr. Wolf's estimate. Mr. Dare, a competent expert witness, testified clearly and succinctly that Mr. Wolf's estimate is understated by 40 per cent plus.

26. The Respondent's witness clarified the issue of OPEX in his oral testimony. Although the initial paper submission alluded to 2.5% of CAPEX as baseline, the witness stated clearly that that is a rule of thumb applicable to projects of the value of $1 billion and above, and further that he attempted to withdraw that earlier statement when he discovered that it was not applicable to the project at hand, but that could not be done because it had already been filed. There could have been a procedural snafu on the part of counsel in not properly substituting such filing. This does not detract from the evidence and explanation of the witness. The witness addressed the issue of the Niger Delta security challenge at pages 111 to 113, providing details of the issues and items that would raise the OPEX by 25%.

27. He also specifically stated the provision of fence in CAPEX would not be sufficient to meet such challenges as the need for provision of government security agents, engagement with the community, etc. See pages 111 to 113 of the record. It is curious to suggest that there is need to show why it is prudent to employ government security personnel. Mr. Dare's evidence alluded to these challenges.

28. The majority opinion cannot aprobate and reprobate at the same time. It cannot complain that there is no evidence on these security challenges and other Niger Delta issues while at the same time observing that the Claimant had no opportunity to comment on Mr. Dare's evidence on these same matters.

29. Claimant did not object to Mr. Dare's evidence on these matters, indeed some of the matters were raised in cross examination by Claimant. A refusal on the part of the majority opinion to apply probative value to such evidence elicited in cross examination by Claimant on the ground that Claimant did not have opportunity to comment on them, will be absurd and unfair.

30. **NGL YIELDS**

31. In relation to the yields, there are two major disagreements. The first relates to the probable times that the plant could operate. Claimant's experts argued that the Claimant should allow for only 10% of downtime (meaning 90% of uptime), whereas the Respondent's experts put the probable down time at about 50%. Again the difference owes to the respective assumptions of the parties and their experts. The Claimant assumes that there would be minimal interruption, and the Respondent assumes that significant disruptions would have arisen from the Niger-Delta challenges and other intervening factors.

32. I have already stated that a reasonable investor must contemplate the Niger-Delta issue. This can be two pronged; first, as stated above, Calabar being in the Niger-Delta is not immune from the crisis that often manifest in that region and so it is not outside the realm of imagination or possibility that operations of the plant could be affected by such disturbances. The second aspect of such manifestation is the possibility of a disruption in the supply of wet gas to the plant in Calabar. This disruption can occur either at the plant in Calabar or even far away from Calabar depending on the location from where the wet gas is to be supplied to the plant.

**JA-220**

33. In this second instance, the argument was made that it is the responsibility of the Respondent to ensure the supply of gas to the Claimant at the plant. That may well be so, but where the Respondent is prevented, by factors beyond its control from delivering such gas, certainly a claim of *force majeure* would avail the Respondent and therefore it is not unreasonable in estimating the frequency and regularity with which wet gas can be supplied to the plant over a period of time to consider the possibility, and indeed the probability, of disruption owing to such events. The combination of these possibilities will certainly reduce the uptime, and this is in addition to the normal maintenance time and such other periods or time that the plant may not be in operation.

34. The flaw with the Claimant's expert's analysis is that they do not make allowance for these possibilities. They confine the probable periods that the plant will not operate to those times for maintenance and therefore discount any possibility of interruptions arising from other sources. In the circumstances, I am left with the Respondent's estimate in relation to these factors, and therefore accept the Respondent's estimates and hold that a period of uptime should be about sixty percent (60%).

35. The second major difference in the analysis of the experts for the parties is in relation to the proceeds in monetary term accruable to Claimant from the NGL. Both parties agree that the price of NGL tracks the price of crude oil; however Claimant states that the reference point of a projection of a cost of the NGL should be March 2013 being the date on which the breach occurred.
Since the price of crude oil was relatively high on that date, it would tend to have affected the estimates in an upward manner. Thus Claimant's expert puts the average price at over $100 per barrel.

36. On the other hand, Respondent's experts would rather take into account the significant fall in the price of crude oil between 2014 and 2015 with the result that their estimates are less rosy than the Claimant's. Similarly, because of the divergence in the estimate on uptime, the estimated yearly output by both sides differs in material respects. Claimant's figures are higher because they have the higher percentage of estimated uptime whereas Respondent's figures are lower because they have a lower percentage of estimated uptime.

37. It seems to me that while it may be appropriate to relate back to the date of the breach for the purposes of damages, it will be inappropriate for me to close my eyes to the evidence that the price of oil has fallen significantly and that future outlook may not be as positive as it was in 2013. To do otherwise will amount to playing the Ostrich. I am therefore persuaded that the projections of the Respondent's experts are more in consonance with reality and therefore more tenable. I therefore find that were it necessary to find the price of crude for 2015-2035 the estimates of the Respondent's experts would be a better forecast of such price.

38. However in view of my decision on the obligation of the Claimant to mitigate damage, I hold that the relevant period is three years from (2015-2018). This is because although the breach occurred in 2013, if the contract had not been broken, the Claimant wouldn't have started enjoying the fruit thereof until 2015.

39. The totality of the evidence reveals that the issue of Niger Delta crisis as affecting the facility uptime was clearly raised by the Respondent. Claimant's position on this is that Calabar is insulated

7

**JA-221**

from the phenomenon of the Niger Delta crisis and that the Respondent has not particularised incidents of disruption in Calabar as opposed to other parts of the Niger Delta region. Again the evidence of Mr. Dare proves the existence of that problem. It also indicates that the facility such as was envisaged by GSPA is not common in Nigeria let alone Calabar. In other words, it is essentially a trail blazer.

40. To nitpick on whether the Niger Delta militants would have absolved a gas plant from its disruptions would be to ascribe to them a level of rationality and consideration inconsistent with their overarching campaign. Besides, it is clearly admitted that Calabar is in the Niger Delta region and to assume that the facility, if it had been established, would somehow be insulated from the social upheaval that has characterised that region, is not realistic. Again, it is to be noted that Mr. Dare testified to his factual knowledge of that area.

41. The other issue in relation to the exact percentage of uptime or downtime is just a storm in a tea cup. Mr. Dare gave three figures of 40, 55 and 60 percent (all within the same ball-park). Certainly these are estimates by their very nature; it will be pretentious to assume that they would be exact. It is not a testimony on fact but a projection of what could have happened and so, necessarily, cannot be scientifically precise. His evidence clearly shows that the Niger Delta crisis would have had a significant impact on the operations of the plant. Certainly that evidence is preferable to that of the Claimant's experts which assumes that, and indeed wishes away, a phenomenon as pervasive and disruptive as the Niger Delta militancy and crisis in that region of which Calabar is a part.

42. I find that the uptime or downtime as the case maybe is at a percentage equivalent to any of the figures (all of which are within the same ball-park) or their average. The Respondent certainly cross examined Mr. Melling on the issue of down time and uptime.

43. **SUMMARY**

44. In summary, I am of the considered view that justice and fairness in this reference dictate that I hold as follows:

1. I hold that the Claimant ought to have mitigated its loss and cannot sit and fold its hands for twenty years expecting a windfall from the Respondent. As a result, I hold that the Claimant is entitled to damages for only three years.
2. I hold that subject to 1 above, the operating expenditure (OPEX) that the Claimant could have incurred had the breach not occurred should not be less than $75million US dollars.
3. I hold that subject to 1 above, the capital expenditure (CAPEX) should not be less than $US11, 986,000 US dollars
4. I hold that had the project proceeded, the plant would operate for not more that 60% of the time in a year.

45. **FINAL AWARD**

46. Having considered the relevant contract, correspondence and other documents put before me, and having carefully considered the written submissions of the parties, I **HEREBY FIND, AWARD AND DECLARE** as follows:

The Respondent shall pay the Claimant the sum of $250million (250,000,000) US Dollars as damages for breach within ninety days from the date of this award. Since Article 20 of the GSPA which contained

**JA-222**

the arbitration clause provides that the cost of this reference should be born equally by the parties and each party shall bear its own lawyer's fees, I make no order as to cost except for any amount paid by the Claimant which the Respondent failed to pay; in which case such sum shall be refunded to the Claimant.

**Place of Arbitration: London, United Kingdom**

**Dated the 31st Day of January 2017**

**Bayo Ojo, SAN**

**Arbitrator**

9

**JA-223**

Page 228 of 242

Filed: 04/01/2019

Document #1780490

USCA Case #18-7154

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,

Petitioner,

v.

FEDERAL REPUBLIC OF NIGERIA AND
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,

Respondents.

Case No. 18-cv-00594-CRC

ORAL ARGUMENT REQUESTED

### RESPONDENTS' MOTION TO DISMISS
### FOR LACK OF JURISDICTION UNDER THE FSIA

Respondents Federal Republic of Nigeria and the Ministry of Petroleum Resources of the

Federal Republic of Nigeria (together, "Nigeria"), by and through their undersigned counsel,

hereby move to dismiss the petition to confirm a foreign arbitral award filed by Process and

Industrial Developments Limited (ECF No. 1) for lack of jurisdiction under the Foreign

Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, pursuant to Rules

12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.

This motion is based on the accompanying Memorandum of Points and Authorities and

the Declaration of Joseph D. Pizzurro, dated August 27, 2018, filed concurrently herewith.

**JA-224**

USCA Case #18-7154    Document #1780490    Filed: 04/01/2019    Page 229 of 242

Dated: Washington, D.C.
      August 27, 2018

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:   */s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
(D.C. Bar No. 468922)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 452-7373
Fax: (202) 452-7333
Email: jpizzurro@curtis.com

-and-

Kevin A. Meehan (*pro hac vice* pending)
Juan O. Perla (*pro hac vice* pending)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax: (212) 697-1559
Email: kmeehan@curtis.com
Email: jperla@curtis.com

*Attorneys for Respondents Federal
Republic of Nigeria and Ministry of
Petroleum Resources of the Federal
Republic of Nigeria*

32749313

**JA-225**

USCA Case #18-7154      Document #1780490            Filed: 04/01/2019      Page 230 of 242

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED**,

Petitioner,

v.

**FEDERAL REPUBLIC OF NIGERIA and
MINISTRY OF PETROLEUM
RESOURCES OF THE FEDERAL
REPUBLIC OF NIGERIA**,

Respondents.

Case No. 18-cv-594 (CRC)

## OPINION AND ORDER

Petitioner Process and Industrial Developments Limited ("P&ID") brought an action in this Court to confirm an arbitral award against Respondents the Federal Republic of Nigeria and its Ministry of Petroleum Resources (together, "Nigeria"), pursuant to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). Nigeria filed a Motion to Dismiss the Petition, claiming immunity under the Foreign Sovereign Immunities Act ("FSIA"). In response, P&ID has filed what it styles a Motion for a Briefing Schedule, which Nigeria opposes. In short, the parties disagree about how to proceed: P&ID's Motion asks the Court to continue under summary motions practice, which would require Nigeria to present now all defenses—jurisdictional or otherwise—in response to the Petition. Nigeria seeks instead an initial ruling on the Court's jurisdiction before briefing the merits of the Petition. In light of analysis by the D.C. Circuit and another court in this district, the Court will grant P&ID's Motion.

The FSIA immunizes a foreign state from suit except in limited circumstances. 28 U.S.C. § 1604. The so-called arbitration exception allows actions against foreign states "to confirm an

**JA-226**

award made pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards[.]" Id. § 1605(a)(6). The New York Convention is one such international agreement and is codified in Chapter 2 of the Federal Arbitration Act ("FAA"). See 9 U.S.C. § 201, *et seq.* The FAA directs courts to hear petitions to confirm awards under the procedures governing motions practice. Id. § 6.

Nigeria maintains that because the FAA does not distinguish between sovereign and private respondents, the FSIA takes precedence and entitles it to an initial jurisdictional determination. See Respondents' Opp'n to Mot. for Briefing Schedule ("Opp'n") at 5-7. Nigeria's reliance on the FSIA as a jurisdictional bar to confirming the award is familiar, but its insistence on bifurcated proceedings is less common. Even when sovereign nations have filed motions to dismiss such petitions, they have also filed responses on the merits, and courts typically have addressed all defenses together. See, e.g., Balkan Energy Ltd. v. Republic of Ghana, 302 F. Supp. 3d 144, 149 (D.D.C. 2018), appeal docketed, Case No. 18-7064 (D.C. Cir. Apr. 30, 2018); BCB Holdings Ltd. v. Gov't of Belize, 110 F. Supp. 3d 233, 238 (D.D.C. 2015).

The D.C. Circuit's decision in TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928 (D.C. Cir. 2007), charts the appropriate course here. It explained that the FAA's instruction in its Chapter 1 that "[a]ny application to the court . . . shall be made and heard in the manner . . . for the making and hearing of motions," applies to its Chapter 2, which codifies the New York Convention. Id. at 940 (first alteration in original) (quoting 9 U.S.C. § 6). The court concluded that, as a consequence, "it appears that motions to enforce arbitral awards [pursuant to the New York Convention] should proceed under motions practice, not notice pleading." Id. Importantly,

2

USCA Case #18-7154    Document #1780490    Filed: 04/01/2019    Page 231 of 242

USCA Case #18-7154    Document #1780490    Filed: 04/01/2019    Page 232 of 242

the TermoRio respondents included Colombia, a sovereign under the FSIA, and the court gave no indication that this fact altered its analysis.

Nigeria attempts to cabin TermoRio, contending that because the court "held that a petition is properly dismissed, as opposed to granted, in a summary procedure where the foreign state voluntarily presented its jurisdictional and merits defenses at the same time," it "did not address whether a motion to dismiss under the FSIA was sufficient as an initial response to a petition to confirm an award." Opp'n at 7 n.3 (emphasis deleted). True, the procedural posture of that case differs from this one and the circuit did not answer the precise question before this Court. But as P&ID notes, the TermoRio district court had found it had subject-matter jurisdiction over the arbitration claim notwithstanding Colombia's invocation of the FSIA. See TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P., 421 F. Supp. 2d 87, 93-94 (D.D.C. 2006). Assessing that decision, the D.C. Circuit found it "clear that the District Court [had] properly addressed [the] application for enforcement of the arbitration award" because it had "reviewed [the] application and [the] response, reviewed the affidavits submitted by the parties in support of their respective positions, and, on the basis of that review, arrived at its judgment." TermoRio, 487 F. 3d at 940. More generally, TermoRio explained in detail how cases brought pursuant to the New York Convention should proceed and gave no indication that the FSIA alters those procedures; its instruction is sufficiently broad to apply here. This Court declines to ignore the circuit court's directive based on differences in procedural posture.

Another court in this district recently reached a similar conclusion. In Balkan Energy Ltd. v. Republic of Ghana, a sovereign-nation respondent moved to dismiss for lack of jurisdiction under the FSIA and submitted additional filings in which it raised merits defenses. 302 F. Supp. 3d at 149. The court depicted Ghana's procedural maneuvers as dubious, id., and

3

**JA-228**

USCA Case #18-7154    Document #1780490    Filed: 04/01/2019    Page 233 of 242

cited TermoRio for the proposition that, pursuant to the FAA, "Ghana should have included all arguments and supporting affidavits for denial of the Petition in its response to the Petition, rather than submitting them in piecemeal fashion." Id. at 149 n.2.

Despite these decisions, Nigeria insists that it has an "absolute right to a definitive sovereign immunity determination before being required to defend this lawsuit on the merits." Opp'n at 2. But the cases it cites contemplate potentially arduous discovery and trial on the merits. See, e.g., Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 137 S. Ct. 1312 (2017) (lawsuit regarding liability for expropriation of property); Price v. Socialist People's Libyan Arab Jamahiriya, 389 F.3d 192, 197 (D.C. Cir. 2004) (claim of torture and terrorism); Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000) (noting, in breach of contract action, that FSIA creates "an immunity from *trial and the attendant burdens of litigation* . . . . [and] to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit." (emphasis added) (internal quotation marks and citation omitted)). By contrast, the FAA's procedural provisions ensure swift resolution of P&ID's Petition: Nigeria need only submit a single opposition to the Petition, to which P&ID must then reply. This limited process does not rise to the level of discovery, trial, or other procedures from which immunity is designed to shield foreign sovereigns. Cf. Balkan Energy, 302 F. Supp. 3d at 157 (rejecting request for discovery to ensure that "proceeding remain summary in nature" (internal quotation marks and citation omitted)).

Nigeria maintains that this case is distinct because it plans to present intricate defenses including that "enforcement of the award would violate United States public policy against contractual penalties and against imposing punitive damages on foreign states." Opp'n at 9. But these types of merits defenses are "frequently raised" and "rarely . . . successful." Balkan

4

**JA-229**

USCA Case #18-7154     Document #1780490     Filed: 04/01/2019     Page 234 of 242

Energy, 302 F. Supp. 3d at 158 (quoting BCB Holdings Ltd., 110 F. Supp. 3d at 249)).  Nigeria's ostensibly complex merits defenses may succeed, but their mere invocation is insufficient to upend the FAA procedures that the D.C. Circuit has directed this Court to follow.  And, in any event, Nigeria has not explained how separate jurisdictional and merits stages, with attendant appeals, would alleviate its burdens relative to the ordinary process of a single round of briefing under motions practice.

For the foregoing reasons, it is hereby

**ORDERED** that [31] Petitioner's Motion to Set a Briefing Schedule is GRANTED.  It is further

**ORDERED** that parties shall adhere to a briefing schedule as follows:  Respondents shall file their opposition to [1] Petition to Confirm Arbitration Award on or before October 31, 2018; Petitioner shall file its reply on or before November 21, 2018.  It is further

**ORDERED** that Respondents' opposition to [1] Petition to Confirm Arbitration Award shall include all jurisdictional and merits arguments that it asks the Court to consider.

**SO ORDERED**.

Christopher R. Cooper

CHRISTOPHER R. COOPER
United States District Judge

Date: October 1, 2018

5

**JA-230**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROCESS AND INDUSTRIAL
DEVELOPMENTS LIMITED,

                              Petitioner,

              v.                                            Case No. 18-cv-00594-CRC

FEDERAL REPUBLIC OF NIGERIA AND
MINISTRY OF PETROLEUM RESOURCES OF
THE FEDERAL REPUBLIC OF NIGERIA,

                              Respondents.

## NOTICE OF APPEAL

Notice is hereby given that Respondents Federal Republic of Nigeria and the Ministry of

Petroleum Resources of the Federal Republic of Nigeria (together, "Nigeria"), hereby appeal to

the United States Court of Appeals for the District of Columbia Circuit from this Court's

Opinion and Order dated October 1, 2018 [ECF No. 34] ("Order") requiring Nigeria to defend

the merits of the petition to confirm an arbitral award ("Petition"), filed by Process and Industrial

Developments Limited ("P&ID"), before Nigeria's assertion of sovereign immunity has been

conclusively resolved under the Foreign Sovereign Immunities Act ("FSIA").

By requiring Nigeria to defend this lawsuit on the merits before a conclusive and

authoritative decision on its sovereign immunity has been reached, the Order has the effect of

abrogating Nigeria's immunity from suit, i.e., "immunity not only from liability, but also from

the costs, in time and expense, and other disruptions attendant to litigation." *Kelly v. Syria Shell

Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000). *See Butler v. Sukhoi Co.*, 579 F.3d

1307, 1311 (11th Cir. 2009) ("Inasmuch as the order on appeal required appellants to answer the

complaint and called for discovery, it denied them immunity from suit under the FSIA."); *In re

Republic of the Philippines*, 309 F.3d 1143, 1149 (9th Cir. 2002) ("We agree with the Republic

**JA-231**

that the district court should have addressed the merits of the immunity question first in order to preserve the immunity that may be determined to exist."); *United States v. Moats,* 961 F.2d 1198, 1201, 1203 (5th Cir. 1992) (finding that a denial of immunity had occurred, even though "the district court did not specify lack of immunity," because "the effect of the order [was] to require Pemex to defend the lawsuit," and observing that "sovereign immunity is an immunity from the burdens of becoming involved in any part of the litigation process"); *see also Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 80 (2d Cir. 2013) (explaining that a denial of immunity from suit is no less injurious simply because the underlying action is based on a petition to confirm an arbitral award, rather than an action implicating a trial).  Thus, as a denial of jurisdictional immunity under the FSIA, the Order is immediately appealable pursuant to the collateral order doctrine.  *See Princz v. Fed. Republic of Germany*, 998 F.2d 1, 1 (D.C. Cir. 1993) (*per curiam*) (Ginsburg, R.B., & Wald, J.J.); *Butler*, 579 F.3d at 1311; *Republic of the Philippines*, 309 F3d at 1149; *Moats,* 961 F.2d at 1201; *Blue Ridge*, 735 F.3d at 72.

Accordingly, this Court has been divested of jurisdiction to resolve the merits of P&ID's petition, and these proceedings are effectively stayed, pending the D.C. Circuit's resolution of Nigeria's appeal from the denial of its jurisdictional immunity under the FSIA.  *See Princz*, 998 F.2d at 1; *Tatneft v. Ukraine*, No. 17-cv-582-CKK, 2018 U.S. Dist. LEXIS 152356, at *2 (D.D.C. May 2, 2018); *see also In re Socialist People's Libyan Arab Jamahiriya*, No. 04-7038, 2004 U.S. App. LEXIS 7244, at *1 (D.C. Cir. Apr. 13, 2004) (*per curiam*) (Edwards, Randolph, & Garland, J.J.) (granting writ of mandamus requiring the district court to halt "any and all proceedings" pending resolution of an appeal from a denial of foreign sovereign immunity).

**JA-232**

Dated:  Washington, D.C.
          October 5, 2018

                                    Respectfully submitted,

                                    CURTIS, MALLET-PREVOST,
                                    COLT & MOSLE LLP

                                    By:   _/s/ Joseph D. Pizzurro_____
                                    Joseph D. Pizzurro
                                    (D.C. Bar No. 468922)
                                    1717 Pennsylvania Avenue, N.W.
                                    Washington, D.C. 20006
                                    Tel.:  (202) 452-7373
                                    Fax:  (202) 452-7333
                                    Email:  jpizzurro@curtis.com

                                    -and-

                                    Kevin A. Meehan (*pro hac vice*)
                                    Juan O. Perla (*pro hac vice*)
                                    101 Park Avenue
                                    New York, NY 10178
                                    Tel.: (212) 696-6000
                                    Fax:  (212) 697-1559
                                    Email: kmeehan@curtis.com
                                    Email: jperla@curtis.com

                                    *Attorneys for Respondents Federal*
                                    *Republic of Nigeria and Ministry of*
                                    *Petroleum Resources of the Federal*
                                    *Republic of Nigeria*

3

**JA-233**

Page 238 of 242

Filed: 04/01/2019

Document #1780490

USCA Case #18-7154

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

**PROCESS AND INDUSTRIAL DEVELOPMENTS LIMITED,**

Petitioner,

v.

**FEDERAL REPUBLIC OF NIGERIA and MINISTRY OF PETROLEUM RESOURCES OF THE FEDERAL REPUBLIC OF NIGERIA,**

Respondents.

Case No. 18-cv-594 (CRC)

---

### OPINION AND ORDER

Petitioner Process and Industrial Developments Limited ("P&ID") seeks to confirm an arbitral award against Respondents the Federal Republic of Nigeria and its Ministry of Petroleum Resources (together, "Nigeria"), pursuant to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified in Chapter 2 of the Federal Arbitration Act ("FAA"). See 9 U.S.C. § 201, *et seq*. In its initial response to P&ID's Petition, Nigeria moved to dismiss for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), which allows courts to hear cases against foreign states only in limited circumstances. 28 U.S.C. § 1604.

P&ID objected that, because the FAA calls for single responses to petitions to enforce arbitral awards, Nigeria improperly sought to bifurcate this proceeding into a jurisdictional phase and a merits phase. See Petitioner's Motion for Briefing Schedule, ECF No. 31. The Court

**JA-234**

agreed and ordered Nigeria to file a response to the Petition that included all jurisdictional and substantive defenses. See Order Granting Motion for Briefing Schedule, ECF No. 34 ("Scheduling Order").

Rather than comply with the Order, Nigeria appealed, contending that the Court's Order abrogated its sovereign immunity and that it is entitled to a definitive jurisdictional decision before briefing the merits of its defense. Notice of Appeal, ECF No. 35. The Court stayed proceedings because an appeal typically divests it of jurisdiction. October 9, 2018 Minute Order. P&ID now moves to lift that stay and asks the Court to re-assert jurisdiction by certifying the appeal as invalid or frivolous. Petitioner's Motion to Certify Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay, ECF No. 37 ("Petitioner's Motion"). While P&ID may well be correct that Nigeria's appeal is dilatory, the Court cannot conclude that it is wholly invalid or frivolous. Because the question of whether this interlocutory appeal is appropriate goes to the D.C. Circuit's own jurisdiction and is best answered there, this Court will deny P&ID's motion.

**I.    Analysis**

Generally, appeal is appropriate only when a district court has issued a "final decision[]," 28 U.S.C. § 1291, that "leaves nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233 (1945). Nigeria's appeal here invokes one of several exceptions: A denial of sovereign immunity is immediately reviewable on interlocutory appeal. See, e.g., Princz v. Fed. Republic of Germany, 998 F.2d 1, 1 (D.C. Cir. 1993) (per curiam).

Yet interlocutory review is available only if an order "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." Will v. Hallock,

USCA Case #18-7154     Document #1780490     Filed: 04/01/2019     Page 239 of 242

2

**JA-235**

USCA Case #18-7154     Document #1780490       Filed: 04/01/2019      Page 240 of 242

546 U.S. 345, 349 (2006) (quoting P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993)).

"A non-frivolous appeal from the district court's order divests the district court of jurisdiction . . . and the district court may not proceed until the appeal is resolved." Bombardier Corp. v. National R.R. Passenger Corp., No. 02-7125, 2002 WL 31818924, at *1 (D.C. Cir. Dec. 12, 2002) (per curiam). But "[i]t is settled that a notice of appeal from an unappealable order does not divest the district court of jurisdiction." McKesson HBOC, Inc. v. Islamic Republic of Iran, 315 F. Supp. 2d 63, 66 (D.D.C. 2004). In such instances, "a notice of appeal [is] so baseless that it does not invoke appellate jurisdiction," and the district court can retain jurisdiction. Apostol v. Gallion, 870 F.2d 1335, 1339 (7th Cir. 1989).

P&ID's contention that Nigeria's appeal is invalid or frivolous rests largely on the notion that the Court has not yet ruled on Nigeria's immunity and so the Scheduling Order did not conclusively determine the matter. Its point is sound: The Court's Order did not reject the immunity defense, but merely required Nigeria to follow FAA procedures and submit a single response that raised all defenses for simultaneous adjudication.

Nevertheless, Nigeria presents a non-frivolous theory that the Order is immediately reviewable because it had the *effect* of abrogating sovereign immunity. See Respondents' Opposition to Motion to Certify Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay, ECF No. 38, at 9; see generally, Notice of Appeal. If the Court had rejected its immunity defense, Nigeria would have been forced to submit a merits defense. Here, in rejecting its procedural gambit, the Court's Order had the same consequence.

It bears repeating that the consequence of the Court's Order is not particularly burdensome on Nigeria. See Scheduling Order at 4 (FAA procedures "ensure swift resolution"

**JA-236**

USCA Case #18-7154   Document #1780490   Filed: 04/01/2019   Page 241 of 242

and require Nigeria to submit only a single response to the petition, a "limited process [that] does not rise to the level of discovery, trial, or other procedures from which immunity is designed to shield foreign sovereigns."). In fact, the bifurcated process Nigeria seeks would likely aggravate its litigation burdens relative to the FAA's summary procedures.

Nonetheless, the Circuit has never had occasion to determine the question presented here: Whether a sovereign state may seek interlocutory appeal of a procedural order requiring it to act before determination of its claimed sovereign immunity.   A "crucial question" in this determination "is whether deferring review until final judgment so imperils the interest [at stake] as to justify the cost of allowing immediate appeal[.]" Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 108 (2009).  The Court recognizes the sensitive nature of the interests protected by sovereign immunity—denial of such immunity is immediately appealable precisely because of its sensitivity.  The political branches have carved out narrow exceptions to the principle that foreign sovereigns should not be dragged into U.S. courts, and there may be important policy reasons for bifurcating the process here despite the FAA's call for summary procedures.  That is a question the Circuit has not yet answered squarely. See Scheduling Order at 3.

Given the effects of its Scheduling Order, the Court cannot conclude that Nigeria's contentions are so baseless as to assert jurisdiction despite the Notice of Appeal.  P&ID remains free, of course, to press its jurisdictional arguments at the Circuit.

4

**JA-237**

**II.  Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [37] Petitioner's Motion to Certify Respondents' Appeal as Invalid or Frivolous, Retain Jurisdiction, and Lift Stay is DENIED.

**SO ORDERED**.

Christopher R. Cooper

CHRISTOPHER R. COOPER
United States District Judge

Date:  November 1, 2018

**JA-238**